# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

FAURECIA SISTEMAS
AUTOMOTRICES DE MEXICO
SA DE CV,

       *Plaintiff*,

                                             Case No. 2:23−CV−10763

v.

                                             Hon. Gershwin A. Drain

CAMACO, LLC,

       *Defendant*.

| | |
|---|---|
| BUTZEL LONG, P.C. | Scott T. Seabolt (P55890) |
| Cynthia J. Haffey (P57352) | Adam G. Winnie (P82820) |
| David J. DeVine (P70012) | HICKEY HAUCK BISHOFF |
| 150 W. Jefferson Ave., Suite 100 | JEFFERS & SEABOLT, PLLC |
| Detroit, MI 48226 | 706 S. Main |
| (313) 225-7000 | Plymouth, MI 48170 |
| haffey@butzel.com | (313) 964-8600 |
| DeVine@butzel.com | sseabolt@hhbjs.com |
| *Attorneys for Plaintiff* | awinnie@hhbjs.com |
| | *Attorneys for Defendant* |

## DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION TO STAY AND ENJOIN ARBITRATION

Defendant Camaco, LLC, ("Camaco") by and through its undersigned counsel, hereby responds to the Motion to Stay and Enjoin Arbitration filed by Plaintiff Faurecia Sistemas Automotrices de Mexico SA de CV ("Plaintiff" or "Forvia").

## TABLE OF CONTENTS

QUESTION PRESENTED ........................................................................ iii

CONTROLLING AND MOST APPROPRIATE AUTHORITY ........................... iv

BRIEF IN SUPPORT ............................................................................. 1

I.   Introduction and Background .............................................................. 1

II.  Standard of Review ............................................................................. 3

III. Legal Analysis ................................................................................... 4

   a.   Plaintiff Is Not Likely To Succeed On The Merits, And In Any Case Does
Not Have A "Strong Likelihood" Of Success ......................................... 5

   b.   Plaintiff Will Suffer No Injury If This Motion Is Denied .......................... 12

   c.   There Will Be No Harm To Third Parties In Either Event .......................... 14

   d.   The Public Interest Is Served By Enforcing The Arbitration Agreement ...... 15

IV. Conclusion ....................................................................................... 16

## QUESTION PRESENTED

1.      Is there an enforceable agreement between Camaco and Forvia where the parties have been, and continue to be, performing under the relevant Purchase Orders, even though the Purchase Orders lists the plant location and address for each party, as opposed to the parties' full legal names?

**Defendant CAMACO answers: Yes**
**Forvia answers: No**
**The Court should answer: Yes**

2.      Does the ongoing supply agreement between Camaco and Forvia contain an enforceable arbitration provision?

**Defendant CAMACO answers: Yes**
**Forvia answers: No**
**The Court should answer: Yes**

3.      Should the Court permit the arbitration filed by Camaco with the American Arbitration Association to proceed?

**Defendant CAMACO answers: Yes**
**Forvia answers: No**
**The Court should answer: Yes**

iii

## CONTROLLING AND MOST APPROPRIATE AUTHORITY

*Blanton v. Domino's Pizza Franchising LLC*, 962 F.3d 842, 845 (6th Cir. 2020)

*Ciccio v. Smile Direct Club, LLC*, 2 F.4th 577, 583 (6th Cir. 2021)

*Henry Schein, Inc. v. Archer & White Sales, Inc*., 202 L. Ed. 2d 480, 139 S. Ct. 524, 528 (2019)

## BRIEF IN SUPPORT

### I.      Introduction and Background

This is a dispute between two sophisticated commercial entities engaged in the automotive supply chain. The parties are currently engaged in a supply agreement that was quoted and awarded in 2016 and has been in effect since 2018.

Camaco is a Delaware limited liability company, with a principal place of business in Farmington Hills, Michigan. Camaco manufactures, among other things, automotive seat frames which are ultimately sold to vehicle manufacturers to be incorporated into finished vehicles. The seat frames relevant to this dispute are manufactured at Camaco's plant in Portage, Indiana, and were ultimately incorporated into the Ford Explorer.

Upon information and belief, Forvia is a business organized under the laws of Mexico. Relevant to this dispute, Forvia manufactures and sells the tracks on which automotive seats mount, which allow the seats to slide forward or backward, adjusting to the desired position of the vehicle's occupant. The tracks relevant to this dispute are manufactured at Forvia's plant in San Luis Potosi, Mexico.

The supply and relationship between Forvia and Camaco is governed by a purchase order between those two entities. That purchase order is labelled CPM000126, and is effective October 31, 2018 through December 30, 2025 (the

"Purchase Order"). The Purchase Order is subject to periodic revisions. One revision of the Purchase Order is attached here as ***Exhibit A***.

The Purchase Order lists the name "Camaco Portage Manufacturing, LLC," which is not a separate legal entity but is a name used to denote Camaco's plant in Portage, Indiana. The Purchase Order lists the supplier as "Faurecia Automotive SLP," which is similarly a moniker used to denote Forvia's plant in San Luis Potosi, Mexico.

Shortly after supply began in 2018, Ford employees discovered that the seats in the Ford Explorer were exhibiting a noticeable "BSR" (buzz, rattle, or shake) condition. In other words, something in the seat was rattling when it should not have been. It was determined that the problem was Forvia's tracks. Camaco has incurred more than $4.5 million in damages as a result of Forvia's defective tracks, including chargebacks from Camaco's customer. Since that time, Camaco has attempted to negotiate an agreeable resolution of the damages with Forvia, but to no avail.

As a result, Camaco was forced to file a demand for arbitration with the American Arbitration Association, pursuant to Camaco's terms and conditions. The Demand for Arbitration was filed on February 13, 2023. In its Demand, Camaco alleges that Camaco and Forvia entered into purchase orders for the supply of these tracks, those purchase orders are governed by Camaco's terms and conditions, and those terms and conditions provide an express warranty that the tracks will comply

with the necessary requirements of Camaco and, ultimately, Ford. (See ECF No. 6-2, PageID.90, Ex. A to Mtn. to Stay and Enjoin Arbitration, ¶¶3-6). In response, Forvia filed the instant action, seeking a declaration that it is not a party to the Purchase Order, and is not required to arbitrate this dispute.

Shortly after filing this case, Forvia filed the instant motion to stay, and permanently enjoin, the arbitration filed by Camaco. Forvia's motion should be denied. Forvia's arguments make very little logical sense and defy its own conduct over the past five (5) years. Forvia's insistence on evading responsibility for its defect is transparent. Forvia is not likely to succeed on the merits of its claim. Forvia is a party to the Purchase Order, it agreed to be bound by Camaco's Terms and Conditions, and those Terms and Conditions require arbitration.

## II.   <u>Standard of Review</u>

Forvia's Motion requests two forms of relief. It asks the Court to "preliminarily and permanently enjoin the arbitration proceedings." (ECF No. 6, PageID.71, 72, 86  Mtn. to Stay and Enjoin, pp. 3, 4, 10). Though Forvia only provides the standard applicable to the former.

"A preliminary injunction is an extraordinary and drastic remedy" that should "only be awarded upon a clear showing that the plaintiff is entitled to such relief." *S. Glazer's Distributors of Ohio, LLC v. Great Lakes Brewing Co*., 860 F.3d 844, 849 (6th Cir. 2017). As the movant, Plaintiff has the burden of establishing the

existence of the following factors to justify the issuance of an injunction: (1) Plaintiff has a strong likelihood of success on the merits; (2) Plaintiff would suffer irreparable injury absent the injunction; (3) the injunction would not cause substantial harm to others; and (4) the public interest would be served by issuance of an injunction. *Id*. Each of these factors weighs against granting the injunctive relief sought by Forvia.

To obtain a *permanent* injunction, the relevant factors are "essentially the same" as for a preliminary injunction, "with the exception that for a preliminary injunction the plaintiff must show a likelihood of success on the merits," but for a permanent injunction, the plaintiff must show "actual success." *InterVarsity Christian Fellowship/USA v. Bd. of Governors of Wayne State Univ*., 534 F. Supp. 3d 785, 838 (E.D. Mich.), reconsideration denied, 542 F. Supp. 3d 621 (E.D. Mich. 2021). This is a critical distinction. Forvia cannot make a showing of "actual success" in the case.

### III.   <u>Legal Analysis</u>

While Forvia requests both preliminary and permanent injunctive relief, it provides no analysis or basis for a permanent injunction at this stage in the proceedings. As such, the remainder of this brief will focus on Forvia's request for a preliminary injunctions staying the pending arbitration.

### a.  Plaintiff Is Not Likely To Succeed On The Merits

1.  <u>The Legal Standard For The Arbitrability Question</u>

Forvia is not likely to succeed on the merits of its challenge to arbitration in this Court, as binding precedent from both the U.S. Supreme Court and the 6th Circuit mandate that the question of arbitrability in this context be determined by the arbitrator, not a Court.

The U.S. Supreme Court recently held that "[w]hen the parties' contract delegates the arbitrability question to an arbitrator, the courts must respect the parties' decision as embodied in the contract." *Henry Schein, Inc. v. Archer & White Sales, Inc*., 202 L. Ed. 2d 480, 139 S. Ct. 524, 528 (2019). Relying on *Henry Shein*, the 6th Circuit has issued several recent opinions holding that there is "clear and unmistakable evidence that the parties intended to delegate" the question of arbitrability to the arbitrator where the parties' agreement incorporates the rules of the American Arbitration Association. *Ciccio v. SmileDirectClub, LLC*, 2 F.4th 577, 583 (6th Cir. 2021) [internal quotation marks omitted].

In *Ciccio*, the 6th Circuit ruled that an arbitration agreement providing that any arbitration "shall be resolved using the rules of the American Arbitration Association" constituted an agreement to submit arbitrability questions to the arbitrator. The reason being that the AAA Rules provide the arbitrator with the authority to determine his or her own jurisdiction.  Thus, incorporation of those rules

is a clear and unmistakable agreement to arbitrate the question of arbitrability. See

also *Blanton v. Domino's Pizza Franchising LLC*, 962 F.3d 842, 845 (6th Cir. 2020)

("What's more, district courts in our circuit have long found that the incorporation

of the AAA Rules provides 'clear and unmistakable' evidence that the parties agreed

to arbitrate 'arbitrability.'")

In the present case, Camaco's 2020 Terms and Conditions control.[1] A copy of

those Terms and Conditions are attached here as ***Exhibit B.*** Those provide, in

pertinent part:

> **57. Arbitration.**
> A. All disputes arising under or in connection with any Order or any other document pertaining to any Order shall be finally settled by arbitration before a single arbitrator. [. . .]
>
> B. If the applicable Order is issued from a Purchaser location in the United States, the arbitrator shall be appointed by the American Arbitration Association ("AAA"), which arbitration shall be conducted under the AAA's commercial arbitration rules in effect at the time of the Order, provided however, that discovery shall be permitted in accordance with the United States Federal Rules of Civil Procedure. The location of the arbitration will be in Michigan.

Forvia argues that Camaco's 2020 Terms and Conditions should not apply, because

the Purchase Order was originally issued in 2018. This argument is not availing. The

---

[1] See Camaco's Demand for Arbitration, attached here as ***Exhibit C***. The exhibit to the Demand for Arbitration was Camaco's 2020 Terms and Conditions. The 2020 Terms and Conditions are already attached to this Response as ***Exhibit B***, so to avoid unnecessary duplication, the Demand for Arbitration is being attached as ***Exhibit C*** without that exhibit.

terms in effect when the Purchase Order was issued were Camaco's 2013 Terms and Conditions. The 2013 Terms and Conditions provide that "[t]hese terms and conditions [ ] may be amended from time to time[.]" ***Ex. D***, §2A. They were amended in 2020, and the 2020 Terms and Conditions now govern. But even if that were not the case, the 2013 Terms and Conditions also contain an arbitration provision. [2]

For purposes of the instant motion, and Forvia's likelihood of success on the merits, the arbitration provision(s) in this case clearly incorporate the AAA Rules. Thus, there is no dispute, as a legal matter, that the question of arbitrability was clearly and unmistakably delegated to the American Arbitration Association. However, in the event the Court finds, for any reason, that the parties did not delegate the question of arbitrability to the arbitrator, Camaco will address Forvia's likelihood of success on the merits of its substantive arguments below.

---

[2] The 2013 Terms and Conditions provide, in pertinent part:

> **49. Arbitration**. All disputes arising under or in connection with any Order or any other document pertaining to any Order shall be finally settled by arbitration in Southfield, Michigan, before a single arbitrator appointed by the American Arbitration Association ("AAA") which arbitration shall be conducted under AAA's commercial arbitration rules then in effect at the time of the Order provided, however, that discovery shall be permitted in accordance with the United States Federal Rules of Civil Procedure.

2.  <u>The Parties Named In The Arbitration Are The Appropriate Parties</u>

Forvia asserts that the entity named on the Purchase Order is not actually Forvia, and therefore Forvia is not a party to the Purchase Order or to the Terms and Conditions requiring arbitration. Forvia is wrong.

The names listed on the Purchase Order denote the locations where the parts are manufactured and where the parts are shipped. The Camaco name listed on the Purchase Order—" Camaco Portage Manufacturing"—is not a formal legal entity. It is a name used to denote the relevant Camaco, LLC plant in Portage, Indiana. The Camaco logo on the Purchase Order is that of CAM Camaco ACO, LLC. The phone number on the Purchase Order is that of Camaco, LLC.

Similarly, the Forvia entity named in both the demand for arbitration and in this case is the appropriate entity. The entity listed as "supplier" on the Purchase Order is "Faurecia Automotive SLP," but that name is used to denote the relevant Forvia plant in San Luis Potosi, Mexico, where the tracks in question are manufactured. "SLP" stands for "San Luis Potosi," because that is where the Forvia plant is located. The *legal* name of the entity at that location is "Faurecia Sistemas Automotrices de Mexico SA de CV," which is why Camaco's Demand for Arbitration listed that entity as the Respondent.

This is also supported by the very payments Camaco makes to Forvia for the supply of parts under the Purchase Order. Attached as ***Exhibit E***[3] is a payment confirmation from Camaco to Forvia. The beneficiary of the payment is reflected as:

<div align="center">Faurecia Sistemas Automotrices de M[ ]</div>

The remainder of the name is omitted from the relevant field, presumably due to its length. But the beneficiary is clearly *not* "Faurecia Automotive SLP." It is Faurecia Sistemas Automotrices de Mexico SA de CV, which is why that entity is the proper Respondent in the arbitration.

Further supporting this fact, the full address for Forvia in the Purchase Order is:

> Av Central No 200 Parque Logisitico,
> San Luis Potosi S.L.P.
> San Luis Potosi, C.P. 78395 Mexico,

This is also the publicly listed address of Faurecia Sistemas Automotrices de Mexico SA de CV. See ***Exhibit F.***

Moreover, there is no indication that "Faurecia Automotive SLP" is a formal legal entity. In contrast, Faurecia Sistemas Automotrices de Mexico SA de CV not only exists, but is registered to do business in the United States. (See ***Exhibit G***, registration with New York Secretary Of State), and was successfully served by the

---

[3] The payment confirmation attached as ***Exhibit E*** has been redacted to remove account, routing, and pricing information.

New York Secretary of State itself in connection with Camaco's Demand for Arbitration. See ***Exhibit H***, affidavit of NY Secretary of State.

As a legal matter, the precise names printed on a purchase order are not dispositive of whether a contract exists between two parties. For example, this Court recently engaged in a similar analysis regarding a party with a location in Mexico. See *Johnson Elec. N. Am., Inc. v. Daimay N. Am. Auto., Inc.*, No. 19-CV-13190, 2020 WL 1531727, at \*2 (E.D. Mich. Mar. 31, 2020). There, this Court noted that the party in question was not named on the relevant purchase orders, but in considering the actual relationship between the parties in question, the Court considered the street address listed on the purchase orders, the plant where the relevant shipments originated, the employer and work location of the individuals who communicated about the relevant orders, and whether it was alleged that the party in question actually "has a connection" to the business and location in Mexico. *Id*. See also *Long v. Hartley Amusements, Inc.*, No. 11-12790, 2011 WL 3799658, at \*2 (E.D. Mich. Aug. 26, 2011) ("[I]t is not dispositive [ ] that Defendants are not individually named in the Services Contract," as it is "possible Plaintiff will produce [ ] evidence indicating adoption of the contract" later in the case. "What is salient to the court's analysis is [Plaintiff has] asserted enough facts to make these allegations plausible on their face.")

In order to succeed on the merits, Forvia would ultimately need to prove that even though it is the entity manufacturing and shipping the tracks in question from the location listed on the Purchase Order, that it is somehow legally immune from liability for any contractual dispute because the Purchase Order lists, for logistical purposes, Forvia's plant location and not its legal name. This argument has no merit. Camaco, LLC and Faurecia Sistemas Automotrices de Mexico SA de CV are parties to the Purchase Orders. These entities have been doing business together under the Purchase Orders for five (5) years. Arguments to the contrary are not tenable.

3. <u>Camaco's Terms And Conditions Apply And Required Arbitration</u>

Separately, Forvia argues that certain of the recurring order forms did not explicitly reference Camaco's Terms and Conditions and, therefore, the arbitration provision does not apply. Again, Forvia misses the mark. By way of example, attached as ***Exhibit I*** are 3 iterations of the Purchase Order, ranging from April 2022 through March 2023. All of these were accepted by Forvia. The Purchase Orders include the following pertinent language:

> CAMACO-Amvian's Supplier Requirements Manual Terms and Conditions shall apply to this order.
>
> CAMACO-Amvian's PO Terms & Conditions shall apply to this order.
>
> These documents are available on our website at: www.camacollc.com > Suppliers

Forvia never contested the application of Camaco's Terms and Conditions, even for the March 2023 revision.

These are sophisticated automotive suppliers who understand the use of plant locations on purchase orders, and the applicability of terms and conditions. Even if Forvia can somehow sidestep the binding precedent requiring that the arbitrability question be decided by the arbitrator, it has no chance of success on the merits where it will be forced to prove that it is *not* the entity that has been supplying these tracks for the past five (5) years.

### b.  Plaintiff Will Suffer No Injury If This Motion Is Denied

"A showing of probable irreparable harm is the single most important prerequisite to granting injunctive relief." *Cooper-Standard Auto. Inc. v. Daikin Am., Inc.*, 568 F. Supp. 3d 846, 848 (E.D. Mich. 2021) [internal quotation marks omitted]. And demonstrating irreparable harm is "a heavy burden[.]" *Smith v. State Farm Fire & Cas. Co.*, 737 F. Supp. 2d 702, 713 (E.D. Mich. 2010).

Forvia does not perform any actual analysis on this most critical point. Instead, Forvia's argument, in full, is the following conclusory sentence:

> Faurecia Mexico will suffer irreparable harm if the injunction is not issued because it will be forced either to participate in an arbitration to which it did not consent or abstain and risk a default.

(Mtn. p.8.) In support, Forvia cites two cases. The first is *Vestax Sec. Corp. v. Desmond*, 919 F. Supp. 1061, 1074 (E.D. Mich. 1995), in which this Court actually ruled contrary to Forvia's position: "Balancing these factors, it appears that Vestax should **_not_** be granted a preliminary injunction preventing Desmond from arbitrating claims[.]" *Id*. [emphasis added]. In addition, the excerpt quoted by Forvia was one in which the Court was (a) interpreting 3rd Circuit law, and (b) analyzing the narrower question of whether the Court or the Arbitrator should determine the threshold question of arbitrability. But even on that narrow question, *Vestax*—a 28 year old case—is not particularly helpful. The applicable, current, and binding precedents are *Henry Schein, Inc. v. Archer & White Sales, Inc*., 202 L. Ed. 2d 480, 139 S. Ct. 524, 528 (2019) and *Ciccio v. SmileDirectClub, LLC*, 2 F.4th 577, 583 (6th Cir. 2021), which both require the arbitrability question be reserved for the arbitrator where the parties have incorporated the AAA Rules.

The second case cited by Forvia is *JHS Cap. Holdings v. Deel*, No. 10-11418, 2010 WL 5296928, at *5 (E.D. Mich. Dec. 20, 2010). Once again, this case holds the exact opposite of what Forvia is seeking to achieve:

> Although Plaintiffs assert they will suffer irreparable harm if they are forced to arbitrate, "[t]here is nothing inherently unfair ... about being required to participate in arbitration, especially where one has contractually agreed to resolve disputes via arbitration."

*JHS Cap. Holdings v. Deel*, No. 10-11418, 2010 WL 5296928, at *5 (E.D. Mich. Dec. 20, 2010) citing *Pritchard v. Dent Wizard Int'l Corp*., 275 F.Supp.2d 903, 919

13

(S.D.Ohio 2008). Beyond that, the applicability of this case is marginal at best. The case concerned whether, and which, parties were required to arbitrate under the FINRA Code, which turned on the question of whether certain parties were "members or persons associated with a member" for purposes of that Code. The instant case does not present that question. Instead, it presents the question of whether Forvia, which is currently performing under the Purchase Orders, is in fact a party to those Purchase Orders. It is.

Forvia has not shown irreparable harm and has not carried its "heavy burden" in that regard.

### c.  There Will Be No Harm To Third Parties

A preliminary injunction will unquestionably harm Camaco. Forvia's conclusory and circular argument that an injunction "would only preclude Camaco from exercising a right it does not have," is unavailing. (Mtn. p.9). To the contrary, and of relevance to this factor as well as the irreparable harm factor, Courts have in fact found that irreparable harm would result from a party seeking to *avoid* arbitration, as opposed to a party seeking to enforce it. See *Midmark Corp. v. Janak Healthcare Priv. Ltd*., No. 3:14-CV-088, 2014 WL 1513009, at *10 (S.D. Ohio Apr. 16, 2014) ("The irreparable injury question is met as a matter of law. If a party must undergo the expense of trial, the anticipated advantages of arbitration—speed and economy—are lost.").

The advantages of arbitration benefit both parties, and there is no harm to either party by enforcing the arbitration agreement.

### d. The Public Interest Is Served By Enforcing The Arbitration Agreement

"[T]here is a strong public policy in favor of carrying out commercial arbitration when a contract contains an arbitration clause." *Midmark Corp. v. Janak Healthcare Priv. Ltd*., No. 3:14-CV-088, 2014 WL 1513009, at *10 (S.D. Ohio Apr. 16, 2014) quoting *Safelite Group, Inc. v. Zurich American Ins. Co., Inc*., 2012 WL 3224104, *8 (S.D.Ohio 2012) and *Unlimited v. Questar Publishers*, 52 F.3d 1373, 1384 (6th Cir.1995).

Forvia's cite to *Vestax Sec. Corp* is, once again, inapplicable and unhelpful. Forvia should not be entitled to hide from an express arbitration agreement in a contract that Forvia has been, and continues to be, an active participant in. Forvia has not made a single argument or assertion that it is ***not*** supplying the tracks in question. Its entire argument is premised on the notion that if the Purchase Order provides a plant location rather than the full, legal name of a Mexican entity, then the legal entity itself is immune from liability under the agreement.

It is undeniable that public policy stands opposed to such an approach to contract law or commercial dealings between any parties, but certainly between sophisticated commercial entities transacting business across international borders.

## IV.    Conclusion

For the reasons explained above, Camaco, LLC respectfully requests that the

Court deny Forvia's motion to Stay and Enjoin the Arbitration of this dispute.

<div style="margin-left: 50%;">

HICKEY HAUCK BISHOFF
JEFFERS & SEABOLT, PLLC

By: /s/ Scott T. Seabolt
      Scott T. Seabolt (P55890)
      Adam G. Winnie (P82820)
706 S. Main
Plymouth, MI 48170
(313) 964-8600
sseabolt@hhbjs.com
awinnie@hhbjs.com

</div>

Date: April 26, 2023

**Exhibits for CAMACO's Response to Forvia's**
**Motion to Stay and Enjoin Arbitration**

| Exhibit | Description |
|---|---|
| A | Camaco PO, Revision Date 3/23/2022 |
| B | 2020 CAMACO Terms and Conditions |
| C | CAMACO's February 13, 2023 Demand for Arbitration (without exhibit) |
| D | 2013 CAMACO 2013 Terms and Conditions |
| E | Camaco to Forvia, Payment Confirmation, reflecting beneficiary as "Faurecia Sistemas Automotrices de M" |
| F | Screenshot of contact information for of Faurecia Sistemas Automotrices de Mexico SA de CV, as reflected on Google |
| G | Faurecia Sistemas Automotrices de Mexico SA de CV Registration with New York Secretary Of State |
| H | Affidavit of N.Y. Secretary of State |
| I | Camaco PO, Revision Date 4/1/2022<br>Camaco PO, Revision Date 1/16/2023<br>Camaco PO, Revision Date 3/31/23 |

# EXHIBIT A



| CAMACO Portage Manufacturing, LLC |
|---|
| 6515 Ameriplex Dr. Suite B |
| Portage, IN 46368 |
| Tel (248) 442-6800 |

# BLANKET PURCHASE ORDER CPM000126

| **Supplier:** | Faurecia Automotive SLP | **PO No:** | CPM000126 |
|---|---|---|---|
| | Av Central No 200 Parque Logisitico | **PO Date:** | 10/14/18 |
| | San Luis Potosi S.L.P. | **Due Date:** | |
| | San Luis Potosi | **Purchase Order Revision:** | 7 |
| | C.P. 78395 Mexico | | |
| | Phone: +1-248-606-9256 | **Revision Date:** | 3/23/22 |
| | | **Issued By:** | Benavidez, Jimmie |
| **Attention:** | Boday, Rick | | |
| | (248) 724-5174 | **Blanket Order:** | 10/31/18 - 12/30/25 |
| | | **Pymt Terms:** | Net 47 |
| **Ship To:** | 6515 Ameriplex Drive | **INCO Terms:** | FCA |
| | Suite B | **Freight Terms:** | |
| | | **Note:** | PO for production parts purchased from Faurecia. U625. |
| | Portage, IN 46368 | | |

Revision 1 6/19/19:

Added cost of $0.5810 for expendable packaging to the piece price of the tracks.

*Quote:030819A.

Revision 2 6/27/19:

Changed payment terms to Net 47 days.

Changed 1/1/19 for rev 3 to retro quarterly steel pricing.

7/8/2020 -
Rev.4 Added Q3 2020 pricing per Larry K. worksheet

Rev.5 Q4 Price change added.
Rev.6 Q1 2022 price added.
Rev.7 Q2 2022 price added.

## Items

| Line Item | Part | Supplier Part No | Description | Account | Effective Date | Unit Price |
|---|---|---|---|---|---|---|
| 1 | CAM-0000-1926 | | PLASTIC CLIP- RECLINER TUBE RETAINER RH CAM-0000-1926-DWG-2 EAU 420,885 | 4231-000-000 | - | $0.115/pcs |
| 2 | CAM-0000-1927 | | PLASTIC CLIP- RECLINER TUBE RETAINER LH DWG: CAM-0000-1926-DWG-2 EAU 420,886 | 4231-000-000 | - | $0.115/pcs |
| 3 | CAM-0000-0567 | | ASM TRACK FAURECIA L315 U625 RH OB CAM-0000-0567-DWG-04 EAU 381,850 | 4231-000-000 | 12/31/16 12/31/18 3/31/19 6/30/19 9/30/19 12/31/19 3/31/20 6/30/20 9/30/20 12/31/20 3/31/21 6/30/21 9/30/21 | $8.68/pcs $9.74/pcs $9.59/pcs $9.49/pcs $9.37/pcs $9.3051/pcs $9.3974/pcs $9.2749/pcs $9.2437/pcs $9.6351/pcs $10.2839/pcs $10.8213/pcs $11.3912/pcs |



CAMACO Portage Manufacturing, LLC
6515 Ameriplex Dr. Suite B
Portage, IN 46368
Tel (248) 442-6800

# BLANKET PURCHASE
# ORDER CPM000126

| | | | Items | | | |
|---|---|---|---|---|---|---|
| Line Item | Part | Supplier Part No | Description | Account | Effective Date | Unit Price |
| | | | | | 12/31/21 | $11.292/pcs |
| | | | | | 3/31/22 | $10.3494/pcs |
| 4 | CAM-0000-0464 | | ASM TRACK FAURECIA_L315_U625 OB LH<br>CAM-0000-0567-DWG-04<br>EAU 381,850 | 4231-000-000 | 12/31/16 | $8.68/pcs |
| | | | | | 12/31/18 | $9.74/pcs |
| | | | | | 3/31/19 | $9.59/pcs |
| | | | | | 6/30/19 | $9.49/pcs |
| | | | | | 9/30/19 | $9.37/pcs |
| | | | | | 12/31/19 | $9.3051/pcs |
| | | | | | 3/31/20 | $9.3974/pcs |
| | | | | | 6/30/20 | $9.2749/pcs |
| | | | | | 9/30/20 | $9.2437/pcs |
| | | | | | 12/31/20 | $9.6351/pcs |
| | | | | | 3/31/21 | $10.2839/pcs |
| | | | | | 6/30/21 | $10.8213/pcs |
| | | | | | 9/30/21 | $11.3912/pcs |
| | | | | | 12/31/21 | $11.292/pcs |
| | | | | | 3/31/22 | $10.3494/pcs |
| 5 | CAM-0000-1128 | | ASM TRACK FAURECIA L315 U625 RH IB<br>CAM-0000-0567-DWG-04<br>EAU 381,850 | 4231-000-000 | 12/31/16 | $8.68/pcs |
| | | | | | 12/31/18 | $9.74/pcs |
| | | | | | 3/31/19 | $9.59/pcs |
| | | | | | 6/30/19 | $9.49/pcs |
| | | | | | 9/30/19 | $9.37/pcs |
| | | | | | 12/31/19 | $9.3051/pcs |
| | | | | | 3/31/20 | $9.3974/pcs |
| | | | | | 6/30/20 | $9.2749/pcs |
| | | | | | 9/30/20 | $9.2437/pcs |
| | | | | | 12/31/20 | $9.6351/pcs |
| | | | | | 3/31/21 | $10.2839/pcs |
| | | | | | 6/30/21 | $10.8213/pcs |
| | | | | | 9/30/21 | $11.3912/pcs |
| | | | | | 12/31/21 | $11.292/pcs |
| | | | | | 3/31/22 | $10.3494/pcs |
| 6 | CAM-0000-1129 | | ASM TRACK FAURECIA_L315_U625 IB LH<br>CAM-0000-0567-DWG-04<br>EAU 381,850 | 4231-000-000 | 12/31/16 | $8.68/pcs |
| | | | | | 12/31/18 | $9.74/pcs |
| | | | | | 3/31/19 | $9.59/pcs |
| | | | | | 6/30/19 | $9.49/pcs |
| | | | | | 9/30/19 | $9.37/pcs |
| | | | | | 12/31/19 | $9.3051/pcs |
| | | | | | 3/31/20 | $9.3974/pcs |
| | | | | | 6/30/20 | $9.2749/pcs |
| | | | | | 9/30/20 | $9.2437/pcs |
| | | | | | 12/31/20 | $9.6351/pcs |
| | | | | | 3/31/21 | $10.2839/pcs |
| | | | | | 6/30/21 | $10.8213/pcs |
| | | | | | 9/30/21 | $11.3912/pcs |
| | | | | | 12/31/21 | $11.292/pcs |
| | | | | | 3/31/22 | $10.3494/pcs |
| | | | Notes | | | |



CAMACO Portage Manufacturing, LLC
6515 Ameriplex Dr. Suite B
Portage, IN 46368
Tel (248) 442-6800

# BLANKET PURCHASE ORDER CPM000126

| Notes |
|---|

Please invoice to:

Camaco Portage Manufacturing
6515 Ameriplex Dr. Suite B
Portage, IN 46368

A/P Contact:  Kizzie Wade

AP-Portage@camacollc.com

*Please ship parts based only on releases by the Camaco Portage plant.*

*Plex 6/30/22 1:04 PM lklemczak*

# EXHIBIT B

**CAMACO/AMVIAN PURCHASE ORDER TERMS AND CONDITIONS**
**March 11, 2020 Version 1**

**1. Formation; Offer; Acceptance; Exclusive Terms.**

A. Each purchase order, together with these Terms and Conditions ("Order") is an offer by Camaco/Amvian or its applicable affiliate or subsidiary ("Purchaser") to the party to whom such Order is addressed and such party's applicable affiliates and subsidiaries ("Seller") to enter into the agreement it describes and it shall be the complete and exclusive statement of such offer and agreement. An Order does not constitute an acceptance by Purchaser of any offer or proposal by Seller, whether in Seller's quotation, acknowledgement, invoice or otherwise. In the event that any Seller quotation or proposal is held to be an offer, that offer is expressly rejected and is replaced in its entirety by the offer made up of the Order.

B. A contract is formed when Seller accepts the offer of Purchaser. Each Order shall be deemed accepted upon the terms and conditions of such Order by Seller by shipment of goods, commencement of performance of services, commencement of work on goods, written acknowledgement, or any other conduct of Seller that recognizes the existence of a contract pertaining to the subject matter hereof. Additionally, each Order shall be deemed accepted five (5) business days after Purchaser delivers the Order to Seller, if Seller fails to object to the Order.

C. Acceptance is expressly limited to these Terms and Conditions and such terms and conditions as are otherwise expressly referenced on the face of the Order. No purported acceptance of any Order on terms and conditions which modify, supersede, supplement or otherwise alter these Terms and Conditions shall be binding upon Purchaser and such terms and conditions shall be deemed rejected and replaced by these Terms and Conditions unless Seller's proffered terms or conditions are accepted in a physically signed writing (a "Signed Writing") by Purchaser's Vice President – Procurement, notwithstanding Purchaser's acceptance of or payment for any shipment of goods or similar act of Purchaser.

D. In the event of a conflict between the Order and any prior or contemporaneous agreement or document exchanged between Purchaser and Seller, the Order governs.

E. Camaco/Amvian may from time to time administer purchasing for its affiliates and subsidiaries and issue Orders containing the Camaco/Amvian logo, but identifying a different Purchaser. Seller acknowledges and agrees that no such Order shall constitute or be interpreted to represent an Order of Camaco/Amvian or a guaranty by Camaco/Amvian of any obligations or liabilities of the Purchaser identified on the Order.

**2. Applicability of Terms and Conditions.**

A. These terms and conditions, as may be amended from time to time (the "Terms and Conditions") apply to the purchase by Purchaser of all goods and/or services, as applicable, from Seller as described on the face of each Order (collectively, "Goods") or on any document expressly referenced on the face of such Order describing such Goods. The term "Goods" throughout these Terms and Conditions includes, without limitation, raw materials, components, intermediate assemblies, tooling, molds, equipment and end products and all services, whether or not performed in connection with any of the foregoing items. Certain of the Terms and Conditions apply only to particular types of Goods, but only where expressly limited to those types of Goods.

1

B. These Terms and Conditions apply to all Sellers under an Order, including, without limitation, any Seller that is a Directed Supplier. A "Directed Supplier" is any Seller from which Purchaser has been requested or recommended to procure Goods at the direction or suggestion of Purchaser's customer and/or the ultimate Original Equipment Manufacturer ("OEM") customer, if different (collectively, the "Customer") (including through co-sourcing arrangements), or when, due to a Customer's product description, specification or other limitation, Purchaser is limited to such Seller for the Goods required. Each Seller that is a Directed Supplier acknowledges the applicability of these Terms and Conditions and agrees to be bound by these Terms and Conditions, including, without limitation, the World Class Supplier requirements under Section 6 and the payment terms under Section 38.

C. Each Order and Order amendment issued by Purchaser to Seller after the date of these Terms and Conditions incorporates these Terms and Conditions which shall apply to each such Order, as amended, in its entirety. In addition, Camaco/Amvian's Supplier Requirements Manual, Quality Assurance Agreement, Warranty Agreement, Tooling Equipment and Die Design Build Standards and Tooling Audit Guidelines (referenced in Supplier Requirements Manual), Packaging and Shipping Requirements (referenced in Supplier Requirements Manual), and other manuals, guidelines and requirements available from time to time under the heading "Documents" through links provided on the Camaco/Amvian web site at http://camacollc.com under Supplier Information (together, the "Documents") are incorporated by reference. In the event of a conflict between any Documents and these Terms and Conditions, these Terms and Conditions shall govern. Purchaser may modify any Documents or add additional Documents, at any time, by posting notice of such modified or new Documents through links provided on the Camaco/Amvian web site at http://camacollc.com under Supplier Information at least ten (10) days prior to any modified or new Documents becoming effective. Seller shall review the Camaco/Amvian website and the Documents periodically. Seller's continued performance under the Order without providing written notice to Purchaser in accordance with Section 49 detailing Seller's objection to any modified or new Documents prior to the effective date of such modified or new Documents will be subject to and will constitute Seller's acceptance of such modified or new Documents.

D. The Terms and Conditions and Documents that are applicable to each Order are the Terms and Conditions that are in effect on the Issue Date shown on the later of the Order or any Order amendment applicable to such Order.

E. No exception to, deviation from, or waiver of these Terms and Conditions shall be valid or binding on Purchaser unless specified on the face of an Order or Order amendment or made in a Signed Writing by Purchaser's Vice President – Procurement.

**3. Documents used in Purchasing.** The following documents may be used by Purchaser as a part of Purchaser's sourcing and purchasing process. Except as otherwise (i) expressly provided in one of the following documents enumerated in subsections A through I that has been signed by Purchaser's Vice President – Procurement or (ii) expressly provided on the face of the Order, the Order supersedes all such documents in their entirety.

A. Long Term Agreement ("LTA"). This is an agreement relating to price reductions that also is used, in some cases, as an indicator for eligibility to quote on certain business.

B. Supply Agreement ("SA"). This is an agreement that provides relationship terms between Seller and Purchaser including agreed upon price changes and that also is used, in some cases, as an indicator for eligibility to quote on certain business.

C. Joint Development Agreement ("JDA"). This is an agreement between Purchaser and another party to develop jointly a specific product or technology.

D. Letter of Intent ("LOI"). This is an agreement by which Purchaser agrees to be liable for certain expenses associated with the acquisition by a third party of long lead time items, normally tooling or equipment. Such an agreement is binding on Purchaser only if it (i) expressly states that it is binding and (ii) contains a stated maximum liability and a limited duration.

E. Supplier Owned Tooling Agreement ("SOTA"). This is an agreement between Purchaser and Seller relating to tooling owned by Seller that is used, in certain cases, to supplement the relevant terms of the Order.

F. Request for Quotation ("RFQ"). This is an introductory step in potentially generating an offer from Purchaser to Seller contained in an Order. It may include Volume and Duration Projections (See Section 5) and specifications for the Goods being quoted.

G. Engineering Change Notice ("ECN"). This is an alternative introductory step in potentially generating an offer from Purchaser to Seller contained in an Order. It may include Volume and Duration Projections (See Section 5) and specifications for the Goods being quoted.

H. Quotation. Following the RFQ or ECN, this is generally the next step in generating the offer from Purchaser to Seller contained in the Order. It also may include Volume and Duration Projections (See Section 5) and may reference projected prices.

I. Order. The Order describes the Goods being purchased, specifies the name and address of the Purchaser and Seller and incorporates these Terms and Conditions. In accordance with Section 1, each Order constitutes Purchaser's offer to Seller to enter into the agreement it describes and is the complete and exclusive statement of such offer and agreement. Each Order is either a Spot-buy Order or a requirements contract Order depending on the quantity and duration specified on the face of the Order. A Spot-buy Order is a one-time Order for a specific quantity of Goods. A requirements contract Order is an Order for all or a designated portion of Purchaser's requirements for Goods for a specified period of time in accordance with the firm quantities and delivery schedules specified in Releases issued by Purchaser pursuant to the Order. All references to an "Order" shall mean the initial Order, as amended by any Order amendments issued by Purchaser.

J. Release. This is a schedule by which Purchaser (i) specifies the firm quantity of Goods that Seller is to deliver to Purchaser on at least a weekly basis, (ii) authorizes material fabrication, and/or (iii) authorizes the purchase of raw materials/components, each for the period specified therein. The Release indicates the firm quantity of Goods and/or the firm quantity of raw materials/components, as applicable, for which Purchaser is liable to Seller and that Seller is obligated to provide to Purchaser for the period specified therein. The Release may also provide a forecast of the quantity of Goods that will be ordered beyond the firm quantity amount. The forecast is not binding on Purchaser or Seller.

K. Order amendment. This is an amendment to the Order issued by Purchaser on Purchaser's purchase order form through Purchaser's standard purchasing protocol to reflect an amendment or modification to the Order.

3

4. **Quantity and Duration.**

A.  The quantity applicable to each Order is specified on the face of the Order. If no quantity is stated, or if the quantity is identified as "blanket," "blanket order," "as released," or similar language, then the quantity shall be one hundred percent (100%) of Purchaser's requirements for the Goods (a "Requirements Contract"). For all Requirements Contract Orders, Purchaser shall issue a Release (see Section 3) to specify the quantities needed, delivery locations, and dates. Seller acknowledges and agrees that, notwithstanding anything in any Order to the contrary, Seller is obligated to provide Goods to Purchaser in at least the quantity and for at least the period specified in any Release. A Release will specify a firm quantity of Goods and/or a firm quantity of raw materials/components that Purchaser will be responsible for in the event of termination (see Section 22). Releases may include Volume and Duration Projections (see Section 5), but Releases are only binding upon Purchaser for, and Purchaser will have no obligation or liability beyond, the quantity specified as firm in the Release. Seller acknowledges and agrees to accept the risk associated with the lead times of the various components if they are beyond the firm Release amounts provided by Purchaser.

B.  Unless the Order specifically provides that Seller shall produce one hundred percent (100%) of Purchaser's requirements for the Goods, Purchaser shall have the right to obtain a portion of such Goods from another third party source or from Purchaser's internal sources.

C.  Unless stated otherwise on the face of the Order, the duration of each Order shall be the life of the program(s) into which the Goods ultimately are incorporated, including any extensions or renewals thereof, plus applicable service and replacement parts requirements.  In addition, Purchaser may, in its sole discretion and upon written notice to Seller, extend the duration of this Order for the life of any successor and/or derivative program(s) for which Purchaser wishes to use the Goods.  Purchaser and Seller acknowledge, however, that this Paragraph does not affect or otherwise change Purchaser's rights of termination set forth herein.

5. **Volume and Duration Projections.** From time to time and in connection with quotations, requisitions and Orders, Purchaser may provide Seller with estimates, forecasts or projections of its future volume or quantity requirements for the Goods and/or the term of a program ("Volume and Duration Projections"). Volume and Duration Projections, unlike a Release for a firm quantity, are not binding on Purchaser. They also are not evidence of a Requirements Contract. Seller acknowledges that the Volume and Duration Projections, like any other forward looking projections, are based on a number of economic and business factors, variables and assumptions, some or all of which may change over time, and may or may not be accurate at the time they were made or later. Purchaser makes no representation, warranty, guaranty or commitment of any kind or nature, express or implied, regarding any Volume and Duration Projections or other estimate, forecast or projection provided to Seller, including as to its accuracy or completeness. Seller accepts that Volume and Duration Projections may not be accurate and that actual volume or duration could be less than or greater than the projections. Seller acknowledges that this risk, and possible reward, is an aspect of the automotive industry.

6. **World Class Supplier Requirements.** Seller must provide world-class competitive Goods in terms of *cost* (see Section 7), *quality* (see Section 9), *delivery* (see Section 11), *technology* (see Section 12) and *customer support* (see Section 13). Each reference to World Class Supplier in these Terms and Conditions and in any other document or agreement between Purchaser and Seller incorporates by reference each of the foregoing elements (cost, quality, delivery, technology and customer support) and all of the conditions, provisions and requirements pertaining to such elements

4

in these Terms and Conditions. Seller's failure to meet the requirements of a World Class Supplier is a basis for Purchaser's immediate termination of the Order under Section 22.

**7.  Cost.**

A.  Prices charged for Goods listed on the Order are not subject to increase, including specifically any increase based upon changes in raw material or component pricing, labor, overhead, currency fluctuations, taxes, tariffs and duties, transportation costs, or component costs, unless specifically agreed to by Purchaser on the face of an Order amendment or in a Signed Writing by Purchaser's Vice President – Procurement

B.  Seller represents that the price charged to Purchaser for Goods is at least as low as the price charged by Seller to buyers of a class similar to Purchaser under conditions similar to those specified in the Order and that all prices comply with all applicable governmental laws and regulations in effect at the time of quotation, sale and delivery. Seller agrees that any price reduction implemented by Seller for any Goods or related charges will apply to all shipments of such Goods under the Order or any Order amendment from and after Seller's implementation of the price reduction.

C.  Seller shall ensure that the price charged to Purchaser for Goods remains competitive with the price for similar goods available to Purchaser from other Sellers.

D.  Seller agrees to participate in Purchaser's cost savings and productivity programs and initiatives and to implement Seller's own cost savings and productivity programs and initiatives to reduce Seller's costs.

E.  Purchaser shall also receive the full benefit of all discounts, premiums and other favorable terms of payment customarily offered by Seller to its other customers.  In the event Seller reduces its price for similar goods and services during the term of this Order, Seller agrees to reduce the prices of the Goods to Purchaser correspondingly.  Seller warrants that the prices in this Order shall be complete, and no additional charges of any type shall be added without Purchaser's express written consent.

**8.  Taxes.** Unless prohibited by law, the Seller shall pay all federal, state or local tax, transportation tax, or other tax, including but not limited to customs duties and tariffs, which is required to be imposed upon the Goods ordered, or by reason of their sale or delivery.  All prices shall be deemed to have included all such taxes.

**9.  Quality.**

A.  Seller shall meet all quality requirements of Purchaser and all quality requirements of Purchaser's Customer, including, but not limited to, the applicable plans relating to IATF 16949, ISO 14001 and the various OEM End of Life Vehicle ("ELV") reporting and other requirements for tooling, raw material and production parts or components including, but not limited to, any requirements related to disposition of Purchaser or Purchaser's Customer owned tooling.

B.  Seller agrees to participate in Purchaser's quality and development program(s) and to comply with all quality requirements and procedures specified by Purchaser, as revised from time to time. Based on Purchaser's assessment of responsibility, the Seller may be held responsible for any and all costs associated with quality issue investigation, containment and Remedial Actions (as hereafter defined) on account of Goods provided by Seller to Purchaser (including third party activities identified and initiated by Purchaser or as directed by Purchaser's

customer). Seller is obligated to provide any and all reasonable support requested by Purchaser to address immediately and correct concerns regarding the quality of Goods provided. Seller shall provide additional resources, as necessary and as identified by Purchaser, to support product development, process development, validation, production launch, or any issue that may jeopardize the success of the manufacture or assembly of any Goods or of the program.

C. Seller warrants that its overall equipment (shared and specific) and plant capacity are adequate to meet Purchaser's needs. Ongoing capacity analysis must account for at least: scrap variation, downtime, maintenance, and other Customer requirements. At Purchaser's discretion, each production process must successfully complete a Run-at-Rate. The Run-at-Rate must demonstrate that Seller's production process can produce in less than 24 hours at least one day's quantity of acceptable quality Goods to satisfy Seller's Capacity Planning Volume ("CPV"). Purchaser is not obligated to pay Seller any incremental costs as long as the Release quantities do not exceed Seller's CPV. The requirement for capacity and the CPV is not a volume, program or other commitment by Purchaser.

D. Seller is responsible for all sub-tier providers of goods or services. Seller must maintain adequate development, validation, launch, and ongoing supervision to assure all Goods provided to Purchaser conform to all specifications, standards, drawings, samples and descriptions, including, without limitation, as to quality, performance, fit, form, function and appearance, under the Order.

E. For all Goods, in addition to any other applicable warranties, Seller shall provide the warranties specified in Section 14.

**10. Inspection, Work in Progress, And Rejections.** Purchaser shall have the right (but not the obligation) to inspect, to review work progress, and to test all Goods, special tooling, materials and workmanship to the extent practicable at all times and places during the period of manufacture. If any Goods are defective in material or workmanship or otherwise not in conformity with the requirements of any Order, Purchaser shall have the right, notwithstanding payment, any prior inspection or test, custom or usage of trade, either to reject them or to require their correction by and/or at the expense of Seller promptly after notice.

**11. Delivery.**

A. Deliveries shall be made both in quantities and at times specified on the Order or on Releases furnished by Purchaser. Time and quantity of delivery are of the essence of each Order. Seller shall adhere to shipping directions specified on the Order or Releases. Purchaser shall not be required to make payment for Goods delivered to Purchaser that are in excess of firm quantities and delivery schedules specified in Purchaser's Releases. Purchaser may change the rate of scheduled shipments or direct temporary suspension of scheduled shipments, neither of which shall entitle Seller to a modification of the price of Goods covered by any Order. With each delivery, Seller shall be deemed to have made the representations, warranties and covenants with respect to its financial and operating condition provided in Section 16.

B. Premium shipping expenses and/or other related expenses necessary to meet delivery schedules set forth in Releases shall be Seller's sole responsibility, unless the delay or expense was solely the result of Purchaser's negligence and Seller provides Purchaser with notice of any claim against Purchaser within ten (10) days after the occurrence of the alleged negligent action of Purchaser giving rise to such claim.

C. Notwithstanding any shipping terms contained in the Order or any other agreement concerning payment of freight expenses, delivery shall not have occurred and the risk of loss shall not have shifted to Purchaser until the Goods have been delivered to Purchaser's applicable facility and have been accepted at that facility.

## 12. Technology

A. If Purchaser furnished or supplied Seller with any designs, drawings, specifications, blueprints or other materials that contain proprietary information, Seller shall not disclose or use for the benefit of Seller or others such designs, drawings, specifications, blueprints or other material including any copies thereof, except as approved by Purchaser on the face of an Order or Order amendment or in a Signed Writing by Purchaser's Vice President - Procurement.

B. Seller expressly warrants that all Goods covered by each Order will not and do not infringe on any patent, trademark, copyright or other intellectual property of any third party. Seller (i) agrees to defend, hold harmless and indemnify Purchaser and its Customers against all claims, demands, losses, suits, damages, liability and expenses (including actual fees for attorneys, experts and consultants, settlement costs and judgments) arising out of any suit, claim or action for actual or alleged direct or contributory infringement of, or inducement to infringe, any United States or foreign patent, trademark, copyright or other proprietary right by reason of the manufacture, use or sale of the Goods ordered, not including infringement arising out of compliance with specifications furnished by Purchaser or for actual or alleged misuse or misappropriation of a trade secret resulting directly or indirectly from Seller's actions; and (ii) waives any claim against Purchaser and its Customers, including any hold-harmless or similar claim, whether known or unknown, contingent or latent, in any way related to a claim asserted against Seller or Purchaser for infringement of any patent, trademark, copyright or other proprietary right, not including claims arising out of compliance with specifications furnished by Purchaser. Seller hereby assigns to Purchaser all right, title and interest in and to all inventions, trademarks, copyrights and other proprietary rights in any material created for and paid for by Purchaser under each Order. Technical information and data furnished to Purchaser in connection with each Order are disclosed on a non-confidential basis. The warranties in this subsection B are not applicable for Goods designed or developed by Purchaser.

C. Seller expressly warrants that all copyrightable works of original authorship (including but not limited to computer programs, technical specifications, documentation and manuals), ideas, inventions (whether patentable, patented or not), know-how, processes, compilations of information, trademarks and other intellectual property (collectively, "Deliverables") shall be original to Seller and shall not incorporate any intellectual property (including copyright, patent, trade secret, mask work, or trademark rights) of any third party. Seller further agrees that it shall not disclose to Purchaser any confidential information, including any trade secrets, of any third party.

D. All Deliverables, including, but not limited to, any idea, invention, concept, design, prototype, product configuration, process, technique, procedure, system, plan, model, program, software or code, data, specification, drawings, diagram, flow chart, documentation, or the like that are created in the course of performing any Order (separately or as part of any Goods), and all intellectual property rights in Deliverables, are exclusively owned by Purchaser and not by Seller. Seller agrees that all works of original authorship created by Seller in connection with each Order are "works made for hire" as that term is used in connection with the U.S. Copyright Act. To the extent that, by operation of law, Seller owns any intellectual property rights in the Deliverables, Seller hereby assigns to Purchaser all rights, title and interest, including

7

copyrights and patent rights, in such Deliverables. The term "intellectual property" as used herein means all patents, patent applications, patentable subject matter, copyrights, copyrightable subject matter, work of authorship, derivative works, trademark, trade name, trade dress, trade secrets, know-how, and any other subject matter, material, or information that is considered by Purchaser to be proprietary or confidential and/or that otherwise qualifies for protection under any law providing or creating intellectual property rights, including the Uniform Trade Secrets Act.

E.  Seller grants to Purchaser an irrevocable, non-exclusive, worldwide license with the right to grant sublicenses to affiliates to use any technical information, know how, copyrights and patents owned or controlled by Seller or its affiliates to make, have made, use and sell any Goods provided by Seller under each Order. The license shall be effective from the first delivery of Goods under the Order. Purchaser's license shall be royalty free, fully paid-up, permanent and irrevocable for the subject program(s) only.

F.  Seller shall ensure that any subcontractors to Seller shall have contracts with Seller in writing consistent with the terms of this Section 12 to ensure that the protections required by Purchaser from Seller are also received from subcontractors for the benefit of Purchaser and Seller. Purchaser will work with Seller to come to agreement with these subcontractors of Seller.

**13.  Customer Support.**

A.  Seller shall support all supplier initiatives of Purchaser and support Purchaser in meeting the initiatives of its Customers. Upon Seller's written request, Purchaser shall cooperate with Seller to explain to Seller the terms, conditions and requirements of Purchaser's Customers.

B.  As all elements of the automotive tiered supply network must work together to ensure that Purchaser's Customer's terms, conditions and requirements are met, it is the intent of both Seller and Purchaser that the applicable terms, conditions and requirements of Purchaser's Customer shall flow through Purchaser to Seller to the extent that they do not conflict with the terms of the Order. To the extent that Seller does not meet the applicable terms, conditions or requirements of Purchaser's Customer or to the extent that the terms of Purchaser's Customer do conflict with the terms of the Order, notwithstanding any such conflict, to indemnify and hold harmless Purchaser from any and all claims and demands from Purchaser's Customer relating to any actual or alleged problem or issue with the Goods sold by Seller under any Order or the manner in which Seller has supplied such Goods under the Order.

C.  The industries in which the Purchaser participates are customer focused and Seller agrees to work with Purchaser to meet the requirements of Purchaser's Customers. Therefore, in the event that any requirement imposed by any Order on Seller is found to be unenforceable or a gap is otherwise created in the terms applicable to any Order through operation of law, conflict in terms or otherwise, the parties agree that the corresponding requirement of Purchaser's Customer shall be applicable to and binding on Seller for the benefit of Purchaser. Seller acknowledges that it is familiar with the automotive industry and the applicable terms of Purchaser's Customer that would apply in such an event.

**14.  Warranty.**

A.  "Warranty Period" shall mean, for each of the Goods provided, the time period beginning on the day of first use of the Goods by Purchaser or acceptance by Purchaser, and continuing until the later of: (i) 18 months; (ii) the period provided under applicable law; (iii) the warranty period

provided by Purchaser to its Customer; or (iv) if the Goods are utilized for new vehicles, the same period as the new vehicle warranty period offered to retail purchasers in the country in which the vehicle incorporating the Goods is sold. Seller may contact Purchaser's representative for information regarding those countries in which vehicles incorporating the Goods will be sold. Any reduction in the Warranty Period provided for in this Section shall not be valid unless contained in a writing signed by Purchaser's Vice President – Procurement.

B.  In addition to Seller's customer warranties, any express warranties set forth in this Order, any statutory warranties or any warranties implied by law, Seller expressly warrants that: (i) all Goods covered by each Order will strictly conform to all specifications, standards, drawings, samples or descriptions furnished to or by Purchaser, and all industry standards, laws and regulations in force in countries where Goods or vehicles equipped with such Goods are to be sold; (ii) all Goods will be merchantable, of good material and workmanship and free from defects and shall be new and of the highest quality; (iii) safe, fit and sufficient for the particular purposes intended by Purchaser, which purposes Seller acknowledges are known to it; (iv) shall be adequately contained, packaged, marked and labeled; (v) in the case of services, all services performed on behalf of Purchaser shall be performed in a competent, workmanlike manner; (vi) the Goods shall be manufactured in accordance with all applicable federal, state, and local laws, regulations, industry standards or other standards, labeling, transporting, licensing approval or certification requirements in the United States or any other country where the Goods will be sold or used; and (vii) for all Goods under the Order, Seller shall convey good title to Purchaser, free of all liens, claims or other encumbrances.

C.  All warranties shall survive inspection, test, delivery, acceptance, use and payment by Purchaser and shall inure to the benefit of Purchaser, its successors, assigns, customers, and the users of Purchaser's goods and services. These warranties may not be limited or disclaimed.

D.  In the event that Purchaser or its Customer voluntarily or pursuant to a government mandate, makes an offer to owners of vehicles (or other finished products) on which the Goods, or any parts, components or systems incorporating the Goods, are installed to provide remedial action to address a defect or condition that relates to motor vehicle (or other finished products) safety or the failure of the finished product to comply with any applicable law, safety standard or guideline, whether in connection with a recall campaign or other customer satisfaction or corrective service action (a "Remedial Action"), the Warranty Period shall continue for such time period as may be dictated by Purchaser's Customer or the federal, state, local or foreign government where the Goods are used or provided and Seller shall fully comply with the requirements of this Order.

E.  All warranties are intended to provide Purchaser with protection from any and all warranty claims brought against Purchaser by its Customer. This includes, but is not limited to, meeting any Customer-required warranties relating to the Goods in question or products into which the Goods are incorporated. All such Customer-required warranties are incorporated by reference.

F.  Without limiting other means of giving notice, the following communications shall each constitute notice of breach of warranty under the Order: (i) any communication specifying a defect, default, claim of defect or other problem or quality issue with Goods sold under the Order; (ii) any communication to Seller claiming that Seller's Goods are in breach of any warranty or that Seller is in default under the Order; and (iii) a termination notice from Purchaser under Section 22. Any such claim of breach by Purchaser may only be rescinded in writing by an authorized member of Purchaser's Legal Department.

G. To mitigate its damages, Purchaser may fully defend any claim from any Customer that any Goods supplied by Seller are defective, in breach of warranty, or otherwise did not meet applicable legal or contractual requirements because such Customer may attempt to hold Purchaser responsible for problems caused in whole or in part by Seller. Seller and Purchaser agree that this defense is in the interest of both Seller and Purchaser. Seller hereby waives the right to argue that the fact that Purchaser took any such position in any way limits Purchaser's right to assert a claim against Seller by Purchaser for breach of warranty, contribution, indemnification or other claim that may arise from or be related to the subject matter of any of the foregoing.

H. In the event that Seller wishes to participate in any of the negotiations with Purchaser's Customer regarding any of the foregoing or any related litigation or defense of any such claim, then in each case that Seller receives notice of default or claim of breach, Seller shall give Purchaser prompt notice of its request to participate in accordance with Section 49, which notice shall describe with particularity the details of the alleged default or breach.

I. Notwithstanding the expiration of the Warranty Period, Seller shall nonetheless be liable for costs and damages associated with the conduct of any Remedial Action to the extent that such Remedial Action is based upon a reasonable determination (including by use of statistical analysis or other sampling methodology) that the Goods fail to conform to the warranties set forth in the Order. Where applicable, Seller shall pay all reasonable expenses associated with determining whether a Remedial Action is necessary. Purchaser and Seller agree that any Remedial Action involving Goods for Purchaser shall be treated separately and distinctly from similar Remedial Actions of other goods of Seller; provided that such separate and distinct treatment is lawful and Seller shall in no event fail to provide at least the same protection to Purchaser on such Goods as Seller provides to its other customers in connection with such similar Remedial Actions.

J. Notwithstanding anything to the contrary in this Order, Seller agrees to waive the expiration of the Warranty Period in the event there are failures or defects discovered after the Warranty Period of a significant nature or in a significant portion of the Goods, or a defect is discovered which, in Purchaser's reasonable opinion, constitutes a threat of damage to property or to the health and safety of any person.

**15. Changes.**

A. Purchaser reserves the right at any time to direct changes, or cause Seller to make changes, to the Goods under any Order or Order amendment, including, but not limited to, changes in the design (including drawings and specifications), processing, methods of packing and shipping and the date or place of delivery of the Goods covered by the Order or to otherwise change the scope of the work covered by the Order including work with respect to such matters as inspection, testing or quality control, and Seller agrees to promptly make such changes. Any such changes shall be deemed not to affect the time for performance or cost under the Order unless (i) Seller provides Purchaser with written notice in accordance with Section 49 of a claim for adjustment to time for performance or cost within ten (10) days after Purchaser's notice to Seller of the change and (ii) after auditing such claim, Purchaser determines that an adjustment (up or down) is appropriate. Any such claim by Seller for adjustment to time for performance or cost under an Order must be solely and directly the result of the change directed by Purchaser and any notice of such claim shall be effective only if accompanied by all relevant information sufficient for Purchaser to verify such claim. In addition, Purchaser shall have the right to audit all relevant records, facilities, work or materials of Seller to verify any claim. Seller shall consider and advise Purchaser of the impact of a design change on the

10

system in which the Goods covered by the Order are used. ***Nothing in this Section shall excuse Seller from proceeding with the Order as changed pending resolution of any claim by Seller for adjustment to time or cost.***

B. Without the prior approval of Purchaser on the face of an Order amendment or in a Signed Writing by Purchaser's Vice President – Procurement, Seller shall not make any changes to any Order or the Goods covered by the Order, including, without limitation, changing (i) any third party supplier to Seller of services, raw materials or goods used by Seller in connection with its performance under the Order, (ii) the facility from which Seller or such supplier operates, (iii) the price of any of the Goods covered by the Order, (iv) the nature, type or quality of any services, raw materials or goods used by Seller or its suppliers in connection with the Order; (v) the fit, form, function, appearance, performance of any Goods covered by the Order; or (vi) the production method, or any process or software used in the production or provision of any Goods under the Order. Any changes by Seller to any Order or the Goods covered by the Order shall constitute a breach of the Order.

**16. Financial and Operational Condition of Seller.**

A. Seller represents and warrants to Purchaser as of the date of each Order (which representations and warranties shall be deemed repeated as of the date of Seller's acceptance of each Release under the Order and at the time of each delivery under the Order) that it is not insolvent and is paying all debts as they become due; that it is in compliance with all loan covenants and other obligations; that all financial information provided by Seller to Purchaser concerning Seller is true and accurate; that such financial information fairly represents Seller's financial condition; and that all financial statements of Seller have been prepared in accordance with generally accepted accounting principles, uniformly and consistently applied.

B. Seller shall permit Purchaser's third party representatives to review Seller's books and records concerning compliance with each Order and Seller's overall financial condition and agrees to provide Purchaser with full and complete access to all such books and records for such purpose upon Purchaser's request. Seller agrees that, if Seller experiences any delivery or operational problems, Purchaser may, but is not required to, designate a representative to be present in Seller's applicable facility to observe Seller's operations. Seller agrees that, if Purchaser provides to Seller any accommodations (financial or other) that are necessary for Seller to fulfill its obligations under any Order, Seller shall reimburse Purchaser for all costs, including attorneys' and other professionals' fees, incurred by Purchaser in connection with such accommodation and shall grant a right of access to Purchaser to use Seller's premises, machinery, equipment and other property necessary for the production of Goods covered by such Order (and a lien to secure the access right) under an access and security agreement.

**17. Seller Insolvency.** Purchaser may immediately terminate each Order without any liability of Purchaser to Seller upon the occurrence of any of the following or any other similar or comparable event (each, a "Seller Insolvency"): (i) insolvency of Seller; (ii) Seller's inability to promptly provide Purchaser with adequate and reasonable assurance of Seller's financial capability to perform timely any of Seller's obligations under any Order; (iii) filing of a voluntary petition in bankruptcy by Seller; (iv) filing of an involuntary petition in bankruptcy against Seller; (v) appointment of a receiver or trustee for Seller; or (vi) execution of an assignment for the benefit of creditors of Seller.

**18. Audit Rights.** Purchaser and its Customers shall have the right at any reasonable time to examine all relevant documents, records, materials, equipment, tooling and Goods in the possession

or under the control of Seller relating to any of Seller's obligations under this Order or any other Order or Release.  Seller agrees to reasonably cooperate in any such audit request by the Purchaser.

**19.   Rights of Entry, Reclamation, And Inspection.** Purchaser shall have the right to enter Seller's facility during normal business hours or, in the event of a Seller shutdown, at reasonable times, to inspect the facility, Goods, materials and any property of Purchaser covered by each Order and, without the necessity of a court order, may enter upon Seller's premises and remove property belonging to Purchaser or any Customer of Purchaser, including, without limitation, Bailed Property (hereinafter defined) and other Goods, inventory or Seller's Property (hereinafter defined) that has been or is agreed to be sold to Purchaser under the Order.  Purchaser's inspection of the Goods, whether during manufacture, prior to delivery or within a reasonable time after delivery, shall not constitute acceptance of any work in process or finished Goods.

**20.   Remedies for Breach by Seller.**

A.   The rights and remedies reserved to Purchaser in each Order, including, without limitation, the rights of entry, reclamation and inspection under Section 27, shall be cumulative with, and additional to, all other or further remedies provided in law or equity. Without limiting the generality of the foregoing, should any Goods fail to conform to the warranties set forth herein or should Seller or any Goods provided by Seller fail to meet any of the conditions of a World Class Supplier under Section 6, Purchaser shall notify Seller and Seller shall, if requested by Purchaser, reimburse Purchaser for nonconforming Goods, including, but not limited to, costs, expenses and losses incurred by Purchaser (a) in inspecting, sorting, testing, repairing or replacing such nonconforming Goods; (b) resulting from production interruptions, (c) in conducting Remedial Actions, and (d) in connection with claims for personal injury (including death) or property damage caused by such nonconforming Goods. If requested by Purchaser, Seller shall, without charge to Purchaser, administer and process warranty charge-backs for nonconforming Goods in accordance with Purchaser's directions.

B.   Seller acknowledges and agrees that money damages would not be a sufficient remedy for any actual, anticipatory or threatened breach of any Order by Seller with respect to its delivery of Goods to Purchaser and that, in addition to all other rights and remedies which Purchaser may have, Purchaser shall be entitled to specific performance and temporary, preliminary and permanent injunctive or other equitable relief as a remedy for any such breach, without proof of actual damages and without bond or other security being required.

C.   In addition, notwithstanding the foregoing, Seller acknowledges that shutting down Customer's plant creates issues for which money damages are not a sufficient remedy. While the cost of a plant shutdown may easily generate substantial costs, the damages to Purchaser's relationship with Purchaser's Customer through potential loss of business, and other damages which are equally difficult to calculate, are far worse. Because of these risks, in the event of a breach or threatened breach by Seller of any of the representations, warranties or covenants of Seller (including without limitation, any commitment related to being a World Class Supplier), Purchaser may, without notice to Seller, resource the production of Goods from Seller to another supplier or dual source any of the Goods covered hereby (i.e., have another supplier produce or be prepared to produce Goods being produced by Seller), to protect Purchaser and its Customers. This process of moving business may take a considerable amount of time and Seller understands that, given the risks posed by the possible shutdown of Purchaser's Customer, Purchaser is justified in initiating and transferring business without prior notice to Seller.

12

D.  Seller understands that the resourcing of business during a program, while not desirable, is a part of the automotive business and is an acknowledged risk to Seller in the industry. Even the risk of Seller's financial or operational uncertainty, in light of the huge risks to Purchaser and Purchaser's Customer, is an example of a justified reason to move production, without notice, and that any incidental or related activity by Purchaser is understandable and reasonable.

E.  Notwithstanding anything to the contrary contained in any Order, Purchaser does not release any claim against Seller that is based in whole or in part on any fraud or duress in connection with the Order or any breach or anticipatory breach of the Order or any other Order between Purchaser and Seller (even if that Order relates to other products).

**21.**  A waiver by Purchaser of any right or remedy shall not affect any rights or remedies subsequently arising under the same or similar clauses.  The failure of the Purchaser to insist upon the performance of any term or condition of this Order, or to exercise any right hereunder shall not be construed as a waiver of the future performance of any such term or condition or the exercise in the future of any such right.

**22.  Termination.**

A.  Purchaser's Right to Terminate for Breach. Purchaser reserves the right to terminate immediately all or any part of each Order of Purchaser to Seller if Seller: (i) repudiates, breaches or threatens to breach any of the terms of the Order including, without limitation, Seller's warranties and World Class Supplier provisions; (ii) fails to perform or deliver Goods as specified by Purchaser; or (iii) fails to provide Purchaser with adequate and reasonable assurance of Seller's ability to perform timely any of Seller's obligations under any Order, including, without limitation, delivery of Goods; or if Purchaser terminates for breach, any other Order issued by Purchaser to Seller in accordance with the terms of such other Order (whether or not such other Order is related to the Order).

B.  Purchaser's Right to Terminate for Convenience.

(1)  In addition to any other rights of Purchaser to terminate each Order, Purchaser may at its option, immediately terminate all or any part of the Order at any time and for any reason by giving written notice to Seller.

(2)  Upon receipt of notice of termination pursuant to this Section 22.B, Seller, unless otherwise directed in writing by Purchaser, shall (i) terminate immediately all work under the Order; (ii) transfer title and deliver to Purchaser the usable and merchantable finished Goods, work in process, and raw materials/components that Seller produced or acquired in accordance with firm Release amounts under the Order and which Seller cannot use in producing goods for itself or for others; (iii) settle all claims by subcontractors approved by Purchaser on the face of an Order or Order amendment or in a Signed Writing by Purchaser's Vice President – Procurement, if any, for reasonable actual costs that are rendered unrecoverable by such termination; (iv) take actions reasonably necessary to protect property in Seller's possession in which Purchaser has an interest and (v) upon Purchaser's request, cooperate with Purchaser in effecting the resourcing of the Goods covered by the Order to an alternative supplier designated by Purchaser.

(3)  Upon termination of any Order by Purchaser under this Section 22.A or 22.B, Purchaser shall pay to Seller the following amounts without duplication: (i) the Order price for all finished and completed Goods that conform to the requirements of the Order and not

previously paid for; (ii) Seller's reasonable actual cost of the usable and merchantable work in process and raw materials/components transferred to Purchaser in accordance with subsection B(2)(ii) hereof; (iii) Seller's reasonable actual cost of settling claims for the obligations Seller would have had to the subcontractors approved by Purchaser on the face of an Order or Order amendment or in a Signed Writing by Purchaser's Vice President – Procurement in the absence of termination, and (iv) Seller's reasonable actual cost of carrying out its obligations under subsections B(2)(iv) and B(2)(v). Purchaser shall not be liable for and shall not be required to make payments to Seller, directly or on account of claims by Seller's subcontractors, for any other alleged losses or costs, whether denominated as loss of anticipated profit, unabsorbed overhead, interest on claims, product development and engineering costs, facilities and equipment rearrangement costs or rental, unamortized depreciation costs, general and administrative burden charges resulting from termination of the Order or otherwise. Purchaser's obligation to Seller upon termination under this Section 22.B shall not exceed the obligation Purchaser would have had to Seller in the absence of termination.

(4) Upon notification within twenty (20) days after the effective date of termination under this Section, Seller shall furnish to Purchaser its termination claim, together with all supporting data which shall consist exclusively of the items of Purchaser's obligation to Seller that are listed in subsection B(3). Purchaser may audit Seller's records before or after payment to verify amounts requested in Seller's termination claim.

(5) Under no circumstances will Purchaser be required to pay for any unauthorized improvements, corrections, modifications, or upgrades to tooling or other equipment. Nor shall Purchaser be required to pay for Seller's maintenance or repair for tooling or other equipment.

C. No Termination Right by Seller. Because Purchaser's commitments to its Customers are made in reliance on Seller's commitments under each Order, Seller has no right to terminate any Order.

D. Transition of Supply. Upon the expiration or earlier termination of any Order for whatever reason, Seller agrees to take such action as may be reasonably required by Purchaser to accomplish the transition from Seller to an alternative seller, including, without limitation the actions set forth below. The term "alternative seller" expressly includes, but is not limited to, a Purchaser-owned facility.

(1) Seller shall provide all notices necessary or desirable for Purchaser to resource the Order to an alternative seller.

(2) Seller shall provide a bank of Goods covered by the Order to ensure that the transition to any alternative seller chosen by Purchaser will proceed smoothly. The amount of the bank required shall be determined by Purchaser in its sole discretion.

(3) Seller shall return to Purchaser all Bailed Property (hereinafter defined) and any other property furnished by or belonging to Purchaser or any of Purchaser's Customers in as good as condition as when received by Seller, reasonable wear and tear excepted.

(4) Seller shall, at Purchaser's option, (i) assign to Purchaser any or all supply contracts or orders for raw material or components relating to the Order, (ii) sell to Purchaser, at Seller's cost, any or all inventory and work in process relating to the Order and (iii) sell to Purchaser,

14

at the unamortized portion of the cost of such items, less any amounts Purchaser previously has paid to Seller for the cost of such items, any or all Seller's Property (hereinafter defined) relating to the Order (see Section 26).

(5) Seller shall cooperate with Purchaser and perform a reasonable tooling and property exit process as a standard course of conducting business.  Seller also agrees to provide all information requested or required by the Purchaser for the transition.

**23.  Limitation of Damages.** In no event shall Purchaser be liable to Seller for anticipated profits or for special, incidental or consequential damages. This limitation of liability provision applies notwithstanding the type of the Order (including, without limitation, Spot-buy Orders, or Requirements Orders). Purchaser's liability for a claim of any kind or for any loss or damage arising out of or in connection with or resulting from each Order, the Goods or any other agreement between Purchaser and Seller is the Reasonable Obsolescence, if any, created by the breach giving rise to the claim. Purchaser and Seller agree that "Reasonable Obsolescence" means the following amounts without duplication: (i) the Order price for all finished and completed Goods that conform to the requirements of the Order and not previously paid for; (ii) Seller's reasonable actual cost of the usable and merchantable work in process and raw materials/components transferred to Purchaser in accordance with the termination and that are covered by outstanding firm Releases from Purchaser; and (iii) Seller's reasonable actual cost of settling claims for the obligations Seller would have had to the subcontractors approved in a Signed Writing by Purchaser's Vice President – Procurement. In the absence of termination limited to the amount of the firm quantities of Goods and raw materials/components specified in Releases issued by Purchaser that are currently outstanding. Purchaser shall not be liable for and shall not be required to make payments to Seller, directly or on account of claims by Seller's subcontractors, for any other alleged losses or costs, whether denominated as loss of anticipated profit, recoupment of investment, unabsorbed overhead, interest on claims, product development and engineering costs, facilities and equipment rearrangement costs or rental, unamortized depreciation costs, general and administrative burden charges resulting from termination of the Order or otherwise. Notwithstanding anything to the contrary, Purchaser's obligation to Seller upon termination of any Order shall not exceed the obligation Purchaser would have had to Seller in the absence of termination of such Order. All outstanding tooling amounts that have been approved and agreed upon shall be paid by the Purchaser to the Seller prior to any tool moves.

**24.  Assignment.** Seller shall not assign or delegate any of its duties or obligations under any Order without the prior consent of Purchaser on the face of an Order or Order amendment or in a Signed Writing by Purchaser's Vice President – Procurement, which consent may be withheld in Purchaser's sole discretion. Any sale or other transfer of stock or other securities of Seller that would result in a change in control of Seller shall be deemed an assignment under the Order. Seller may assign its claims for money under any Order as collateral security for indebtedness of Seller, but Purchaser shall not be required to pay the assignee until Purchaser receives written notice of the assignment, a true copy of the assignment and a release from Seller reasonably acceptable to Purchaser. Any such assignment shall not prohibit Purchaser from enforcing its rights against Seller or the assignee, including, without limitation, Purchaser's rights to setoff and recoupment under Section 39, all of which rights of Purchaser against Seller or assignee are senior to any rights of such assignee. Purchaser may freely assign to any third party its rights and obligations under any Order without the consent of Seller.

**25. Bailed Property.**

A.  All supplies, materials, molds, machinery, equipment, patterns, tools, dies, jigs, fixtures, blueprints, designs, specifications, drawings, photographic negatives and positives, art work, copy layout, consigned material for production or repair and other items furnished by Purchaser, either directly or indirectly, to Seller or to any sub-supplier of Seller in connection with or related to any Order, or for which Seller has been reimbursed by Purchaser (collectively, "Bailed Property"), is and shall remain the property of Purchaser and be held by Seller on a bailment at-will basis. Seller shall bear the risk of loss of and damage to the Bailed Property and Seller, at its own expense, shall keep such Bailed Property insured for the benefit of Purchaser, naming Purchaser as the loss payee and additional insured. The Bailed Property: (i) shall at all times be properly housed and maintained by Seller; (ii) shall not be used by Seller for any purpose other than the performance of the Order; (iii) shall be deemed to be personal property of Purchaser; (iv) shall be conspicuously marked by Seller to identify it as the property of Purchaser and indicate Purchaser's name and address; (v) shall not be commingled with the property of Seller or with that of a third person; and (vi) shall not be moved from Seller's premises without the prior approval by Purchaser on the face of an Order or Order amendment or in a Signed Writing of Purchaser's Vice President – Procurement.

B.  Seller, at its expense, shall maintain, repair and refurbish Bailed Property in first class condition including repair necessitated by wear and tear and other usage by Seller. All replacement parts, additions, improvements and accessories for such Bailed Property shall automatically become Purchaser's property upon their incorporation into or attachment to the Bailed Property. In the event that it becomes necessary, as determined by either Purchaser or Seller, to replace the Bailed Property due to normal use by the Seller, or otherwise, said replacement of Bailed Property shall be at the sole expense of the Seller and said replacement Bailed Property shall remain the property of the Purchaser.

C.  Seller agrees that Purchaser has the right, at any time, with or without reason of any kind to retake possession of or request return of any or all Bailed Property, without the necessity of obtaining a court order. Upon the request of Purchaser, the Bailed Property shall be immediately released to Purchaser or delivered to Purchaser by Seller, either (i) F.O.B. transport equipment at Seller's plant, properly packaged and marked in accordance with the requirements of the carrier selected by Purchaser to transport such property, or (ii) to any location designated by Purchaser, in which event Purchaser shall pay to Seller the reasonable cost of delivering such Bailed Property to such location. Purchaser shall have the right to enter onto Seller's premises at all reasonable times to inspect the Bailed Property and Seller's records with respect thereto. Seller waives any lien or other rights that Seller might otherwise have on any of the Bailed Property, including, but not limited to, any statutory or equitable liens for work performed on such property, for the purchase price of any Goods manufactured using the property, or otherwise. Seller agrees that any missing components of or inserts to any Bailed Property shall be replaced by Seller at current costs. Seller shall ensure that the Bailed Property does not become subject to any liens or other claims by any third party.

D.  Seller acknowledges and agrees that (i) Purchaser is not the manufacturer of the Bailed Property nor the manufacturer's agent nor a dealer therein; (ii) Purchaser is bailing the Bailed Property to Seller for Seller's benefit; and (iii) Seller has inspected the Bailed Property and is satisfied that the Bailed Property is suitable and fit for its purposes, and (iv) PURCHASER HAS NOT MADE AND DOES NOT MAKE ANY WARRANTY OR REPRESENTATION WHATSOEVER, EITHER EXPRESS OR IMPLIED, AS TO THE FITNESS, CONDITION, MERCHANTABILITY, DESIGN OR OPERATION OF THE BAILED PROPERTY OR ITS

FITNESS FOR ANY PARTICULAR PURPOSE. Purchaser will not be liable to Seller for any loss, damage, injury or expense of any kind or nature caused, directly or indirectly, by the Bailed Property, including, without limitation, its use or maintenance, or its repair, service or adjustment, or by any interruption of service or for any loss of business whatsoever or howsoever caused, including, without limitation any anticipatory damages, loss of profits or any other indirect, special or consequential damages.

E.   Seller authorizes Purchaser to file a UCC-1 financing statement or similar document with the appropriate filing authority to give notice of Purchaser's ownership interest in the Bailed Property. Failure to file a financing statement will not alter or amend Purchaser's ownership rights to the Bailed Property. Seller shall provide Purchaser, upon Purchaser's request, with a written inventory of all Bailed Property.

F.   Seller assumes all risk of death or injury to persons or damage to property arising from use of the Bailed Property. Seller shall be responsible for training all Seller personnel or other individuals authorized to access Seller's facility where Bailed Property is located regarding proper use and safety procedures for the Bailed Property.

**26. Seller's Property.** Unless otherwise agreed to by Purchaser and Seller in a written agreement signed by both Seller and Purchaser's Vice President – Procurement, Seller, at its expense: shall (i) furnish, (ii) keep in good condition, and (iii) replace when necessary all Seller's Property (hereinafter defined). Seller hereby grants Purchaser an irrevocable option to purchase, free and clear of all liens, claims and other encumbrances, any or all of Seller's supplies, materials, molds, machinery, equipment, patterns, tools, dies, jigs, fixtures, blueprints, designs, specifications, drawings, photographic negatives and positives, art work, copy layout and other items necessary for the production of the Goods under any Order (collectively, "Seller's Property") that are specially designed or configured for manufacture or assembly of Goods under the Order upon Purchaser's payment of the unamortized portion of the cost of such items of Seller's Property, less any amounts Purchaser previously has paid to Seller for the cost of such Seller's Property. Seller shall permit Purchaser to audit Seller's records to verify the amount due for any of Seller's Property. This option will not apply to any of Seller's Property that is used by Seller to produce a substantial quantity of like products for other customers of Seller which cannot readily be obtained by Seller's customer(s) from third parties unless, Purchaser does not have the ability to acquire the property comparable to Seller's property to run the tools, and in such cases, Seller assigns to Purchaser and Purchaser or its designee assumes Seller's obligation to produce such products for Seller's other customers using those items of Seller's Property during the period subsequent to the sale of Seller's Property to Purchaser. Seller shall cooperate with Purchaser's reasonable requests for information regarding any such obligation to Seller's other customer(s) and to effect such assignment and assumption. Purchaser's right to exercise the option under this Section is not conditioned on a breach by Seller or Purchaser's termination of the Order.

**27. Rights of Entry, Reclamation and Inspection.** Purchaser shall have the right to enter Seller's facility during normal business hours or, in the event of a Seller shutdown, at reasonable times, to inspect the facility, Goods, materials and any property of Purchaser covered by each Order and, without the necessity of a court order, may enter upon Seller's property and remove property belonging to Purchaser or any Customer of Purchaser, including, without limitation, Bailed Property and other Goods, inventory or Seller's Property that has been or is agreed to be sold to Purchaser under the Order. Purchaser's inspection of the Goods, whether during manufacture, prior to delivery or within a reasonable time after delivery, shall not constitute acceptance of any work in process or finished Goods.

17

28. **Subcontracting.**

A. Seller shall not subcontract any of its duties or obligations under any Order without prior approval by Purchaser on the face of an Order or Order amendment or in a Signed Writing by Purchaser's Vice President – Procurement. Seller shall ensure that any subcontractor so approved complies with all production part approval process requirements of Purchaser's Customer and any other requirements of Purchaser. Purchaser or Purchaser's representative shall be afforded the right to verify at any subcontractor's premises and Seller's premises that subcontracted Goods conform to specified requirements. Verification by Purchaser or Purchaser's representative shall not (i) shift responsibility for quality by the subcontractor from Seller to Purchaser, (ii) absolve Seller of the responsibility to provide acceptable Goods nor (iii) preclude subsequent rejection of Goods by Purchaser. Notwithstanding any verification by Purchaser or Purchaser's representative, Seller remains fully liable for any work subcontracted.

B. In the event Seller's subcontracting of any of the work under any Order is approved by Purchaser on the face of an Order or Order amendment or in a Signed Writing by Purchaser's Vice President – Procurement, and as a condition to such approval, Seller shall provide Purchaser with written evidence that the subcontractor agrees to be bound by these Terms and Conditions and the Order.

C. In the event Seller cannot fulfill any of its obligations under any Order, Seller shall, at Purchaser's option and in addition to any other rights or remedies available to Purchaser under the Order or otherwise, assign to Purchaser all of Seller's rights with respect to any subcontractors under such Order.

29. **Nonconforming Goods.** Purchaser, at its option, may reject and return at Seller's risk and expense, or retain and correct, Goods received pursuant to any Order that fail to conform to the requirements of the Order even if the nonconformity does not become apparent to Purchaser until the manufacturing, processing or assembly stage or later. To the extent Purchaser rejects Goods as nonconforming, the quantities under the Order will not be reduced by the quantity of nonconforming Goods unless Purchaser otherwise notifies Seller in writing. Seller shall replace nonconforming Goods with conforming Goods unless otherwise notified in writing by Purchaser, including, without limitation by way of a termination notice from Purchaser under Section 22.A. Nonconforming Goods will be held by Purchaser for disposition in accordance with Seller's written instructions at Seller's risk. Seller's failure to provide written instructions within ten (10) days (or such shorter period as may be commercially reasonable under the circumstances) after notice of nonconformity, shall entitle Purchaser, at Purchaser's option, to charge Seller for storage and handling, or to dispose of the Goods without any liability of Purchaser to Seller. Seller shall reimburse Purchaser for (a) any amounts paid by Purchaser on account of the purchase price of any rejected nonconforming Goods, and (b) any costs incurred by Purchaser in connection with the nonconforming Goods, including, but not limited to inspection, sorting, testing, evaluations, storage or rework, within ten (10) days after a debit memo for the costs has been issued by Purchaser. Payment by Purchaser for nonconforming Goods shall not constitute an acceptance, limit or impair Purchaser's right to assert any legal or equitable remedy, or relieve Seller's responsibility for latent defects.

30. **Indemnification.**

A. Seller shall indemnify and hold harmless Purchaser, its affiliates and subsidiaries, and their respective directors, officers, employees and agents from any claims, liabilities, damages (including special, consequential, punitive and exemplary damages), costs and expenses (including actual fees for attorneys, experts and consultants, settlement costs and judgments)

("Liabilities") incurred in connection with any claims (including lawsuits, administrative claims, regulatory actions and other proceedings to recover for personal injury or death, property damage or economic losses) that are related in any way to or arise in any way from the Goods, Seller's representations, Seller's performance of or failure to perform obligations under any Order, including claims based on Seller's breach or alleged breach of warranty (whether or not the Goods have been incorporated into Purchaser's products and/or resold by Purchaser), and claims for any violation of any applicable law, ordinance or regulation or government authorization or order. Seller's obligation to indemnify will apply regardless of whether the claim arises in tort, negligence, contract, warranty, strict liability or otherwise, except to the extent of any such liability arising solely out of the gross negligence of Purchaser. This indemnity obligation is in addition to Seller's warranty obligations.

B.  If Seller performs any work on Purchaser's premises or utilizes the property of Purchaser, whether on or off Purchaser's premises, Seller shall indemnify and hold harmless Purchaser, its affiliates and subsidiaries, and their respective directors, officers, employees and agents from and against any Liabilities arising from or in connection with Seller's performance of work or use of Purchaser's property except to the extent of any such liability, claim or demand arising solely out of the gross negligence of Purchaser.

C.  Within a reasonable time of becoming aware of any actual or potential Liabilities for which Seller may be obligated to indemnify Purchaser, Purchaser shall notify Seller. Seller, at Purchaser's option and at Seller's expense, will undertake defense of such actual or potential Liabilities through counsel approved by Purchaser. Provided, however, that Seller shall first obtain authorization from Purchaser before settlement is made of the actual or potential Liabilities if the terms of such settlement could materially adversely affect Purchaser, including any terms which admits the existence of a defect in Goods or a failure of Purchaser to fully and faithfully perform its obligations. In the alternative, Purchaser may elect to undertake defense of such Liabilities to the extent it is asserted against Purchaser, and Seller shall reimburse Purchaser on a monthly basis for all expenses, attorney fees, and other costs incurred by Purchaser.

**31. Insurance.** Seller shall obtain and maintain at its sole expense property and casualty insurance coverages and liability limits, which at the time are usual and customarily obtained in connection with Seller's products or services, but in no event less than any minimum amount requested by Purchaser or as otherwise required by law. This includes, without limitation, providing full fire and extended coverage insurance for the replacement value of (i) all Seller's Property and (ii) any Bailed Property, both for their full replacement value. Seller shall furnish to Purchaser certificates of insurance setting forth the amount of coverage, policy number and date(s) of expiration for insurance maintained by Seller and such certificates must provide that Purchaser shall receive thirty (30) days prior written notification from the insurer of any termination or reduction in the amount or scope of coverages. Seller's furnishing of certificates of insurance or purchase of insurance shall not release Seller of its obligations or liabilities under any Order. If Seller shall fail to maintain any insurance under any Order, Purchaser shall have the right to procure such insurance and Seller shall reimburse Purchaser on demand, for all actual costs and expenses of procuring such insurance.

**32. Compliance.**

A.  Seller agrees to comply with all federal, state, local and foreign laws, Executive Orders, rules, regulations and ordinances that may be applicable to Seller's performance of its obligations under each Order, and each Order shall be deemed to incorporate by reference all the clauses required by the provisions of said laws, orders, rules, regulations and ordinances. All purchased

materials used in manufacture of the Goods shall satisfy current governmental and safety constraints on restricted, toxic and hazardous materials as well as environmental, electrical and electromagnetic considerations applicable to the country of manufacture and sale.

B.  Seller must be in compliance with, ISO14001, IATF 16949 and ELV or their successors, as amended from time to time.

C.  Seller shall not (i) utilize forced or involuntary labor, regardless of its form, (ii) employ any child, except as part of a government approved job training, apprenticeship or similar program, or (iii) engage in abusive employment or corrupt business practices, in the supply or provision of Goods under any Order.

D.  Seller shall adopt and enforce a code of conduct for business practices with principles, policies and procedures consistent with the principles, policies and procedures set forth in Purchaser's Code of Business Conduct and Ethics available through links provided on the Camaco/Amvian web site at http://Camacollc.com. Seller shall promptly report all violations of Seller's code of conduct to Purchaser's Vice President – Procurement.

E.  Seller shall provide Purchaser written notice immediately upon becoming aware that any director, officer or employee of Seller, or any of its subsidiaries or affiliates, is also a director, officer or immediate family member of any director or officer of Purchaser, or any of its subsidiaries or affiliates. As to employees of Seller only, Seller only needs to report this information to Purchaser if the employee (excluding an officer or director of Seller) is substantively involved in Seller's business relationship with Purchaser or receives any direct or indirect compensation or benefit based on Seller's business relationship with Purchaser.

F.  In the event Seller subcontracts any of its duties or obligations under any Order in accordance with Section 28, Seller shall ensure that all subcontractors comply with the requirements under this Section 32. At Purchaser's request, Seller shall certify in writing Seller's and its subcontractor's compliance with all such requirements. Purchaser shall have the right to audit and monitor Seller's and its subcontractor's compliance with Seller's and its subcontractor's obligations under any Order. Seller shall indemnify and hold harmless Purchaser, its affiliates and subsidiaries, and their respective directors, officers, employees and agents from and against any liability claims, demands or expenses (including actual fees for attorneys, experts and consultants, settlement costs and judgments) arising from or relating to Seller's or it's subcontractor's noncompliance.

**33. Production Part Approval Requirements.** With respect to Orders for production parts, Seller agrees to meet the full requirements identified in the industry production part approval process manual and agrees to present this information and data relating thereto to Purchaser upon request, regardless of the authorized submission level, at Level No. 3 or its current equivalent unless otherwise authorized by Purchaser on the face of an Order or Order amendment or in a Signed Writing by Purchaser's Vice President – Procurement.

**34. Identification of Goods.** All Goods supplied pursuant to each Order that are construed as a completed part shall permanently bear Purchaser's part number and name or code name, Seller's name or code name, and date of manufacture by Seller.

**35. Shipping.**

A.  Seller agrees (i) to properly pack, mark and ship Goods in accordance with the requirements of Purchaser and the involved carrier in a manner to secure the lowest transportation cost; (ii)

to route shipment in accordance with Purchaser's instructions; (iii) to make no charge for handling, packaging, storage, transportation (including duties, taxes, fees, etc.), cost of vehicle or other transport expenses or drayage of Goods unless otherwise approved by Purchaser on the face of an Order or Order amendment or in a Signed Writing by Purchaser's Vice President – Procurement; (iv) to provide with each shipment, papers showing the Order number, Order amendment or Release number, Purchaser's part number, Seller's part number where applicable, quantity of pieces in shipment, number of cartons or containers in shipment, Seller's name and vendor number, the bill of lading number and the country of origin; and (v) to promptly forward the original bill of lading or other shipment receipt for each shipment in accordance with Purchaser's instructions and carrier requirements. The marks on each package and identification of the Goods on packing slips, bills of lading and invoices shall be sufficient to enable Purchaser to easily identify the Goods purchased.

B. For Goods that may contain potentially hazardous and/or restricted materials, if requested by Purchaser, Seller shall promptly furnish to Purchaser in whatever form and detail Purchaser requests (i) a list of all potentially hazardous ingredients in the Goods, (ii) the quantity of one or more such ingredients, and (iii) information concerning any changes in or additions to such ingredients. Before shipping the Goods, Seller agrees to furnish to Purchaser sufficient warning and notice in writing (including appropriate labels on the Goods, containers and packing) of any hazardous material that is an ingredient or a part of any of the Goods, together with such special handling instructions necessary to advise the involved carriers, Purchaser, and their respective employees how to exercise that measure of care and precaution that will best prevent bodily injury or property damage in the handling, transportation, processing, use or disposal of the Goods, containers and packing shipped to Purchaser. Seller shall comply with all applicable federal, state, local and foreign laws and regulations pertaining to product and warning labels. If Goods are shipped by Seller to European destinations, before shipments are made, Seller shall notify Purchaser of the "Classification of Dangerous Goods" as required by the European Agreement concerning the "International Carriage of Dangerous Goods".

C. Any packaging made of wood (including pallets) must conform to the international softwood standards, including USDA Regulations on Wood Packaging Material Imports. In the event Seller fails to comply with such standards, Seller shall be liable for all related replacement and transportation costs.

**36. Customs Drawback Documents, Other Government Requirements, and Export Controls.**

A. Upon Purchaser's request, Seller shall furnish promptly all documents required for customs drawback purposes, properly completed in accordance with government regulations applicable thereto. Seller shall furthermore, at its expense, provide all information necessary (including written documentation and electronic transaction records relating to the Goods, tooling and equipment necessary for Purchaser to fulfill any customs-related or other Governmental agency-related obligations, origin marking or labeling requirements and certification or local content reporting requirements, to enable Purchaser to claim preferential duty treatment at the time of entry for Goods, tooling and equipment eligible under applicable trade preference regimes, and to make all arrangements that are necessary for the Goods to be covered by any applicable duty deferral or free trade zone program(s) of the country of import. Seller shall, at its expense, provide Purchaser or Purchaser's nominated service provider with all documentation to enable the Goods to be exported, and obtain all export licenses or authorizations necessary for the export of the Goods, tooling and equipment unless otherwise indicated in the Order, in which event Seller shall provide all information as may be necessary to enable Purchaser to obtain such licenses or authorization(s). Credits or benefits resulting or

21

arising from any Order, including trade credits, export credits or the refund of duties, taxes or fees, shall belong to Purchaser.

B.  Seller is responsible for any incorrect information provided by Seller or any noncompliance with applicable customs regulations by Seller that results in penalties and/or additional duties for Purchaser. Seller also acknowledges and agrees at Purchaser's option to adhere to all security procedures required by the Customs-Trade Partnership Against Terrorism (C-TPAT). Seller shall share with Purchaser any audit or inspection information related to C-TPAT inspection and/or validation at Seller's location.

**37. Invoices.** All invoices and/or advanced shipping notices ("ASN") for Goods shipped pursuant to each Order must reference the Order number, Order amendment or Release number, Purchaser's part number, Seller's part number where applicable, quantity of pieces in shipment, number of cartons or containers, Seller's name and number, and bill of lading number, before any payment will be made for Goods by Purchaser. In addition, no invoice may reference any term separate from or different than these Terms and Conditions or the terms that appear on the face of the Order. Purchaser reserves the right to return all invoices or related documents submitted incorrectly. Payment terms will begin to run at the latter of receipt of the latest correct invoice, receipt of ASN, or at receipt of goods in the Purchaser's facility and input into Purchaser's system by the applicable Purchaser facility. Any payment by Purchaser of a nonconforming invoice is not an acceptance of any nonconforming element or terms on such invoice.

**38. Payment Terms.**

A.  Unless otherwise specified in the Order, Payment terms are Net 60.

B.  If a payment date falls on a non-business day, payment will occur on the following business day.

C.  Seller will comply with Purchaser's shipping and invoicing requirements.  Failure to do so by the Seller may delay payment to the Seller. Purchaser shall not be liable to Seller for any delay in payment, or any other damages, resulting from Seller's failure to comply with Purchaser's shipping and invoicing requirements.

D.  In cases in which Purchaser's Customer is funding or reimbursing Purchaser for the cost of tooling, notwithstanding the particular payment terms applicable to an Order, in no event will Seller have a right to payment for tooling before: (i) Purchaser is paid by its Customer for such tooling; and (ii) the tooling meets the applicable approved PPAP process.

E.  In no event will a Seller who is a directed supplier have a right to receive payment from Purchaser until Purchaser is fully paid by Purchaser's Customer for the Goods or, as applicable, the assemblies into which such Goods are incorporated.

F.  Purchaser may, at its option, upon notice to Seller, revise its payment terms for production Goods to take into account any change in the payment terms of Purchaser's Customer applicable to the Goods under any Purchase Order.

**39. Setoff and Contractual Recoupment.**

A.  In addition to any right of setoff or recoupment provided or allowed by law, all amounts due Seller, or any of its subsidiaries or affiliates shall be considered net of indebtedness or obligations of Seller, or any of its subsidiaries or affiliates to Purchaser or any of its subsidiaries

or affiliates, and Purchaser or any of its subsidiaries or affiliates may setoff against or recoup from any amounts due or to become due from Seller, or any of its subsidiaries or affiliates to Purchaser or any of its subsidiaries or affiliates however and whenever arising. In the event that Purchaser or any of its subsidiaries or affiliates reasonably feels itself at risk, Purchaser or any of its subsidiaries or affiliates may withhold and recoup a corresponding amount due Seller or any of its subsidiaries or affiliates to protect against such risk.

B.   An "affiliate" of a party means any other company that controls, is controlled by, or is under common control with such party. For purposes of this definition, the term "control" means the ownership, directly or indirectly, of twenty percent (20%) or more of the capital or equity of a company or the ability, by voting securities, contract or otherwise, to elect a majority of the board of directors or other governing body of such company.

C.   If an obligation of Seller or any of its subsidiaries or affiliates to Purchaser or any of its subsidiaries or affiliates is disputed, contingent or unliquidated, Purchaser or any of its subsidiaries or affiliates may defer payment of all or any portion of the amount due until such obligation is resolved. Without limiting the generality of the foregoing and by way of example only, in the event of a bankruptcy of Seller, if all of the Orders between Purchaser and Seller have not been assumed, then Purchaser may defer payment to Seller, via an administrative hold or otherwise, for Goods against potential rejection and other damages.

D.   In the event of a "Seller Insolvency" (as defined in the Seller Insolvency Section), Purchaser also may setoff, recoup, and/or withhold from amounts due Seller or any of its subsidiaries or affiliates any amounts that Seller is obligated to indemnify Purchaser pursuant to this Order, regardless of whether such amounts become due before or after the filing of a petition for bankruptcy protection by Seller.

**40. Sales Tax Exemption.** Purchaser hereby certifies that Goods and services identified as industrial processing purchased under each Order are eligible for state and federal sales tax exemption under the Federal tax payer identification number indicated on the face of the Order.

**41. Advertising.** Seller shall not refer to Purchaser in advertising or public releases without the prior approval in a Signed Writing of Purchaser's Vice President – Procurement and shall not use Purchaser's trademarks or trade names in advertising or promotional materials.

**42. Force Majeure.** Any delay or failure of Purchaser or Seller to perform its obligations under the Order will be excused if, and to the extent that, the party is unable to perform specifically due to an event or occurrence beyond its reasonable control and without its fault or negligence, such as: acts of God; restrictions, prohibitions, priorities or allocations imposed or actions taken by a governmental authority; embargoes; fires; explosions; natural disasters; riots; wars; sabotage; or inability to obtain power. As soon as possible (but no more than one full business day) after the occurrence, Seller shall provide written notice describing such delay and assuring Purchaser of the anticipated duration of the delay and the time that the delay will be cured. During the delay or failure to perform by Seller, Purchaser may at its option: (a) purchase Goods from other sources and reduce its Releases to Seller by such quantities, without liability of Purchaser to Seller and require Seller to reimburse Purchaser for any additional costs to Purchaser of obtaining the substitute Goods compared to the prices set forth in the Order; (b) require Seller to deliver to Purchaser at Purchaser's expense all finished Goods, work in process and parts and materials produced or acquired for work under the Order; or (c) require Seller to provide Goods from other sources in quantities and at a time requested by Purchaser and at the price set forth in the Order. If upon request of Purchaser, Seller fails to provide within ten (10) days (or such shorter period as Purchaser requires) adequate

assurances that any delay will not exceed thirty (30) days or if any delay lasts longer than thirty (30) days, Purchaser may terminate the Order without liability and Seller shall reimburse Purchaser for costs associated with the cancellation. Seller acknowledges and agrees that the change in cost, supplier actions or contract disputes will not excuse performance by Seller under theories of force majeure, commercial impracticability or otherwise and Seller expressly assumes these risks.

**43. Labor Disputes.** Seller shall notify Purchaser in writing of any actual or potential labor dispute delaying or threatening to delay timely performance of this Order. Seller shall notify Purchaser in writing six (6) months in advance of the expiration of any current labor contracts. In addition, Seller at its expense shall take all actions deemed reasonably necessary by Purchaser to ensure that in the event of any anticipated labor disruption, strike or worker slowdown or resulting from the expiration of Seller's labor contracts, an uninterrupted supply of Goods will be available to Purchaser in an area that will not be affected by any such disruption for a period of at least thirty (30) days.

**44. Service and Replacement Parts.**

A. Upon receipt of a Release, Seller shall sell to Purchaser all Goods necessary for Purchaser to fulfill Purchaser's and its Customer's service and replacement parts requirements for its current model year at the then current production prices plus any actual net cost differential for required unique packaging. If the Goods are systems, modules or assemblies, Seller shall sell the components or parts of such systems, modules or assemblies at prices that will not in the aggregate exceed the then current production price of the system, module or assembly less the costs of labor involved in connection with the system, module or assembly plus any actual net cost differential for required unique packaging.

B. For fifteen (15) years after termination or expiration of the current model production of the vehicle involved, Seller shall sell to Purchaser Goods necessary for Purchaser to fulfill Purchaser's and its Customers' service and replacement parts requirements for past model years. For the first five (5) years of past model service, the prices shall be the prices specified in the last Order for current model production. For the following ten (10) years of past model service or such longer period as Purchaser's Customer requires service parts, the prices shall be as specified in the last Order for current model production plus any actual net cost differential for required unique packaging, plus any actual net cost differential and manufacturing costs as mutually agreed between Purchaser and Seller.

**45. Packaging.** All packaging must conform to Purchaser's standard packaging requirements, which are available through links provided on the Camaco/Amvian web site at http://Camacollc.com under Supplier Information, or as required by Purchaser's customer.

**46. Claims from Seller.** Any action by Seller under any Order must be commenced within one (1) year after the breach or other event giving rise to Seller's claim occurs, regardless of Seller's lack of knowledge of the breach or other event giving rise to such claim.

**47. Severability.** If any term(s) of the Order is invalid or unenforceable under any statute, regulation, ordinance, executive order or other rule of law, such term(s) shall be deemed reformed or deleted, as the case may be, but only to the extent necessary to comply with such statute, regulation, ordinance, order or rule, and the remaining provisions of the Order shall remain in full force and effect.

**48. Electronic Communications and Electronic Signatures.** Seller shall comply with any method of electronic communication specified by Purchaser, including requirements for electronic

funds transfer, purchase order transmission, production Releases, electronic signature, and communication. E-mails, even those containing a signature block of one of Purchaser's representatives shall not constitute a Signed Writing.

**49. Notices.** All notices, claims and other communications to Purchaser required or permitted under the Order shall be made in writing and sent by certified or registered mail, return receipt requested and proper postage prepaid to the following address and shall be effective only upon receipt by Purchaser. Seller's failure to provide any notice, claim or other communication to Purchaser in the manner and within the time periods specified in the Order shall constitute a waiver by Seller of any and all rights and remedies that otherwise would have been available to Seller upon making such notice, claim or other communication.

**50. Confidentiality.**

A. Seller acknowledges and agrees that it will be obligated to maintain the secrecy and confidentiality of all information disclosed by Purchaser to Seller during the course of work under any Order, including, but not limited to, all "Purchaser Data" (as defined in the Data Security Section below), any information regarding Purchaser or its business or its customers, the existence and terms of any request for quotation or purchase order, and any drawings, specifications, or other documents prepared by either party in connection with any request for quotation or purchase order. Seller agrees that it will not disclose confidential information to or use confidential information with or for the benefit of itself or any third party without prior written authorization from Purchaser. Seller also agrees to adopt measures to protect the secrecy and confidentiality of confidential information that are reasonable under the circumstances. Confidential information shall not include any information that: (i) was in the possession of Seller before receipt from Purchaser; (ii) is or becomes available to the public through no fault of Seller; or (iii) is received by Seller in good faith from a third party having no duty of confidentiality to Purchaser.

B. Seller's obligations with respect to confidential information shall remain in effect during the time that any such information is considered by Purchaser to be secret or confidential or otherwise qualify for protection under the Uniform Trade Secrets Act.

C. All information provided by Seller to Purchaser in connection with each Order shall be disclosed on a non-confidential basis, and Purchaser shall have no duty to maintain the secrecy or confidentiality of such information.

D. At the request of Purchaser, Seller will return to Purchaser all materials (in any form) that include, incorporate, or otherwise contain confidential information of Purchaser.

E. Seller shall not sell or dispose of, as scrap or otherwise, any completed or partially completed or defective Goods manufactured hereunder without defacing or rendering them unsuitable for use

F. Seller shall promptly notify Purchaser if it has provided information to a Government regarding the Goods, tooling or equipment provided under this Order.

**51. Data Security.** For purposes of this Section, "Purchaser Data" means all data, content, material, confidential information and other information provided by Purchaser to Seller or otherwise transmitted to Seller for use in connection with this Order. Seller will maintain and enforce information and data privacy and security procedures with respect to its access, use and storage of all Purchaser Data that: (a) are at least equal to industry standards taking into consideration the

25

sensitivity of the relevant Purchaser Data, and the nature and scope of the Goods to be provided; (b) are in accordance with Purchaser's reasonable security requirements; (c) comply with all applicable international, foreign, federal, state and local laws, statutes, rules, orders and regulations; and (d) provide reasonably appropriate administrative, technical, and physical safeguards to protect against accidental or unlawful destruction, loss, alteration or unauthorized disclosure, access or use of Purchaser Data. Without limiting the generality of the foregoing, Seller will take all reasonable measures to secure and defend its location and equipment against anyone who may seek, without authorization, to modify or access Seller systems or the information found therein without consent. Seller will periodically test its systems for potential areas where security could be breached. Seller will report to Purchaser immediately any breaches of security or unauthorized access to Seller systems that Seller detects or becomes aware of. Seller will use diligent efforts to remedy such breach of security or unauthorized access in a timely manner and deliver to Purchaser a root cause assessment and future incident mitigation plan with regard to any breach of security or unauthorized access affecting Purchaser Data. Without limiting the generality of the foregoing, Seller is solely responsible for the integrity of its email, accounting, invoicing, accounts payable, accounts receivable, and other systems. In the event that any payment to Seller is lost or misdirected as a result of an unauthorized third party accessing Seller's system, Purchaser (and its Customer) shall have no further obligation to Seller for such payment. If Purchaser (or its Customer) makes any payment to a third party that is lost or misdirected as a result of an unauthorized third party accessing Seller's system, Seller shall reimburse Purchaser (or its Customer) for the amount of such payment. The requirements of this Section shall apply regardless of whether Seller hosts the Purchaser Data itself or through a third party hosting or cloud services provider.

**52. Customer-Funded Tooling & Equipment.** In cases in which Purchaser's customer is funding or reimbursing Purchaser for the cost of tooling, notwithstanding the particular payment terms applicable to a Purchase Order, in no event will Seller have a right to payment for tooling before: (i) Purchaser is paid by its customer for such tooling; and (ii) the tooling meets the applicable approved PPAP process.

**53. Construction.** When used in the Order, "including" means "including, without limitation," and terms defined in the singular include the plural and vice versa. The headers, titles and numbering are for convenience of reference only and shall not affect the construction or interpretation of the Order.

**54. Relationship of The Parties.** Seller and Purchaser are independent contracting parties and nothing in this Order shall make either party the agent or legal representative of the other for any purpose whatsoever, nor does it grant either party any authority to assume or to create any obligation on behalf of or in the name of the other party.

**55. Entire Agreement; Modification.** The Order, together with the attachments, exhibits or supplements specifically referenced in the Order, constitutes the entire agreement between Seller and Purchaser with respect to the matters contained in the Order and supersedes all prior oral or written representations and agreements. Purchaser may modify the Terms and Conditions, at any time, by posting notice of such modified Terms and Conditions through links provided on the Camaco/Amvian web site at http://Camacollc.com under Supplier Information at least ten (10) days prior to any modified Terms and Conditions becoming effective. Seller shall review the Camaco/Amvian website and the Terms and Conditions periodically. Seller's continued performance under the Order without providing written notice to Purchaser in accordance with Section 49 detailing Seller's objection to any modified Terms and Conditions prior to the effective date of such modified Terms and Conditions will be subject to and will constitute Seller's acceptance of such modified Terms and Conditions. Except as provided in the preceding sentences or as otherwise

26

provided in these Terms and Conditions, the Order may only be modified by an Order amendment or a Signed Writing by Purchaser's Vice President – Procurement.

**56. Governing Law/Jurisdiction/ Venue.**

A. If the applicable Order is issued from a Purchaser location in the United States, the obligations of the parties respecting this Order, the sale or shipment of goods and all other matters and disputes between the parties shall be governed, construed, performed and enforced in accordance with the substantive laws of the State of Michigan.

B. If the applicable Order is issued from a Purchaser location outside of the United States, the obligations of the parties respecting this Order, the sale or shipment of goods and all other matters and disputes between the parties shall be governed, construed, performed and enforced in accordance with the substantive laws of the jurisdiction where the Purchaser facility issuing the Order is located.

C. Subject to Section 57 regarding Arbitration, any legal action or proceeding related to the shipment or receipt of goods under any contract, purchase order or otherwise shall be brought in the state or federal courts for Oakland County, Michigan, and the parties hereto irrevocably consent to and submit themselves to the exclusive jurisdiction and venue of such courts.

**57. Arbitration.**

A. All disputes arising under or in connection with any Order or any other document pertaining to any Order shall be finally settled by arbitration before a single arbitrator. The decision of the arbitrator shall be final and binding upon Purchaser and Seller, shall not be appealable, and judgment on the award rendered may be entered in any court of competent jurisdiction. The arbitrator will have no authority to award punitive or other damages not measured by the prevailing party's actual damages. Each party will bear equally the costs and expenses arbitration. Each party will bear its own costs and expenses. The failure by one party to pay its share of arbitration fees constitutes a waiver of such party's claim or defense in the arbitration. All arbitration proceedings shall be confidential, except to the extent that disclosure is necessary to enforce an arbitration award in a court of competent jurisdiction. Notwithstanding anything to the contrary, Purchaser shall have the right, without waiving any remedy under the Order, to seek from any court of competent jurisdiction (a) equitable relief and (b) any interim or provisional relief that is necessary to protect the rights or property of Purchaser.

B. If the applicable Order is issued from a Purchaser location in the United States, the arbitrator shall be appointed by the American Arbitration Association ("AAA"), which arbitration shall be conducted under the AAA's commercial arbitration rules in effect at the time of the Order, provided however, that discovery shall be permitted in accordance with the United States Federal Rules of Civil Procedure. The location of the arbitration will be in Michigan.

C. If the applicable Order is issued from a Purchaser location outside of the United States, the arbitrator shall be appointed by the International Chamber of Commerce Court of Arbitration ("ICC"), which arbitration shall be conducted under the ICC's commercial arbitration rules in effect at the time of the Order, provided however, that reasonable discovery proportional to the needs of the case and the amount in dispute shall be permitted prior to the arbitration hearing. The location of the arbitration will be in the jurisdiction where the Purchaser facility issuing the Order is located.

**58. Waiver of Jury Trial.** PURCHASER AND SELLER ACKNOWLEDGE THAT THE RIGHT TO TRIAL BY JURY IS A CONSTITUTIONAL ONE, BUT THAT IT MAY BE WAIVED. EACH OF PURCHASER AND SELLER, AFTER CONSULTING (OR HAVING THE OPPORTUNITY TO CONSULT) WITH COUNSEL OF ITS CHOICE, KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHT TO TRIAL BY JURY IN ANY ACTION OR OTHER LEGAL PROCEEDING ARISING OUT OF OR RELATING TO ANY ORDER OR ANY OTHER DOCUMENT PERTAINING TO ANY ORDER.

# EXHIBIT C

AMERICAN ARBITRATION ASSOCIATION

CAMACO, LLC,

      Petitioner,

v.

FAURECIA SISTEMAS AUTOMOTRICES
DE MEXICO SA DE CV,

      Respondent.

---

## **DEMAND FOR ARBITRATION**

Camaco, LLC ("Camaco" or "Petitioner"), by and though its undersigned counsel, for its Demand for Arbitration, states as follows:

1.      Camaco is a limited liability company organized under the laws of Delaware with its principal place of business in Michigan.

2.      Upon information and belief, Faurecia Sistemas Automotrices de Mexico SA de CV ("Forvia") is an entity organized under the laws of Mexico with its principal place of business at Av Central No 200 Parque Logistico, San Luis Potosi S.L.P., C.P. 78395, Mexico. Upon information and belief, Forvia is authorized to do business in New York and has designated a resident agent to receive service of process in New York. That registered agent is Corporation Service Company, 80 State Street, Albany, NY 12207.

3.      Camaco and Forvia entered into purchase orders under which Forvia agreed to supply and Camaco agreed to purchase, among other parts, tracks for automotive seating.

4.      The purchase orders issued by Camaco are governed by Camaco's terms and conditions, a copy of which is attached as **Exhibit 1**.

5.     In paragraph 14B of Camaco's terms and conditions, Forvia expressly warranted that (i) all Goods covered by each Order will strictly conform to all specifications, standards, drawings, samples or descriptions furnished to or by Purchaser, and all industry standards, laws and regulations in force in countries where Goods or vehicles equipped with such Goods are to be sold; (ii) all Goods will be merchantable, of good material and workmanship and free from defects and shall be new and of the highest quality; (iii) safe, fit and sufficient for the particular purposes intended by Purchaser, which purposes Seller acknowledges are known to it.

6.     Forvia breached each of these warranties by delivering defective tracks.

7.     The tracks were defective in at least two respects.

8.     First, Forvia used undersized balls that did not provide adequate preload and did not adequately separate the upper and lower rails of the track.

9.     Second, one of the containment actions for this defect was to apply grease to the tracks, which Forvia failed to implement on a consistent basis.

10.     As a result of the defects in the tracks supplied by Forvia, Camaco has incurred more than $4.5 million in damages.

11.     Paragraph 57 of the terms and conditions provides that "All disputes arising under or in connection with any Order or any other document pertaining to any Order shall be finally settled by arbitration before a single arbitrator."

12.     Paragraph 57 of the terms and conditions further provides that "[i]f the applicable Order is issued from a Purchaser location in the United States, the arbitrator shall be appointed by the American Arbitration Association ('AAA') … The location of the arbitration will be in Michigan."

2

WHEREFORE, Camaco respectfully requests that the Arbitrator enter an award in favor of Camaco and against Forvia in an amount to be proven at the hearing of this matter.

Date: February 13, 2023                    Respectfully submitted,

                                           HICKEY HAUCK BISHOFF
                                           JEFFERS & SEABOLT

                                           By:/s/ Scott T. Seabolt
                                              Scott T. Seabolt (P55890)
                                           706 S. Main
                                           Plymouth, Michigan 48170
                                           (734) 544-5525
                                           sseabolt@hhbjs.com
                                           *Attorneys for Petitioner*

# EXHIBIT D

**CAMACO/AMVIAN PURCHASE ORDER TERMS AND CONDITIONS**
**October 1, 2013 Version**

**1. Formation; Offer; Acceptance; Exclusive Terms.**

A. Each purchase order, together with these Terms and Conditions ("Order") is an offer by Camaco/Amvian or its applicable affiliate or subsidiary ("Purchaser") to the party to whom such Order is addressed and such party's applicable affiliates and subsidiaries ("Seller") to enter into the agreement it describes and it shall be the complete and exclusive statement of such offer and agreement. An Order does not constitute an acceptance by Purchaser of any offer or proposal by Seller, whether in Seller's quotation, acknowledgement, invoice or otherwise. In the event that any Seller quotation or proposal is held to be an offer, that offer is expressly rejected and is replaced in its entirety by the offer made up of the Order.

B. A contract is formed when Seller accepts the offer of Purchaser. Each Order shall be deemed accepted upon the terms and conditions of such Order by Seller by shipment of goods, performance of services, commencement of work on goods, written acknowledgement, or any other conduct of Seller that recognizes the existence of a contract pertaining to the subject matter hereof.

C. Acceptance is expressly limited to these Terms and Conditions and such terms and conditions as are otherwise expressly referenced on the face of the Order. No purported acceptance of  any Order on terms and conditions which modify, supersede, supplement or otherwise alter these Terms and Conditions shall be binding upon Purchaser and such terms and conditions shall be deemed rejected and replaced by these Terms and Conditions unless Seller's proffered terms or conditions are accepted in a physically signed writing (a "Signed Writing") by Purchaser's Director – Purchasing, notwithstanding Purchaser's acceptance of or payment for any shipment of goods or similar act of Purchaser.

D. In the event of a conflict between the Order and any prior or contemporaneous agreement or document exchanged between Purchaser and Seller, the Order governs.

E. Camaco/Amvian may from time to time administer purchasing for its affiliates and subsidiaries and issue Orders containing the Camaco/Amvian logo, but identifying a different Purchaser. Seller acknowledges and agrees that no such Order shall constitute or be interpreted to represent an Order of Camaco/Amvian or a guaranty by Camaco/Amvian of any obligations or liabilities of the Purchaser identified on the Order.

**2. Applicability of Terms and Conditions.**

A. These terms and conditions, as may be amended from time to time (the "Terms and Conditions") apply to the purchase by Purchaser of all goods and/or services, as applicable, from Seller as described on the face of each Order (collectively, "Goods") or on any document expressly referenced on the face of such Order describing such Goods. The term "Goods" throughout these Terms and Conditions includes, without limitation, raw materials, components, intermediate assemblies, tooling, molds, equipment and end products and all services, whether or not performed in connection with any of the foregoing items. Certain of the Terms and Conditions apply only to particular types of Goods, but only where expressly limited to those types of Goods.

B. These Terms and Conditions apply to all Sellers under an Order, including, without limitation, any Seller that is a Directed Supplier. A "Directed Supplier" is any Seller from which Purchaser has been requested or recommended to procure Goods at the direction or suggestion of Purchaser's customer and/or the ultimate Original Equipment Manufacturer ("OEM") customer, if different (collectively, the "Customer") (including through co-sourcing arrangements), or when, due to a Customer's product description, specification or other limitation, Purchaser is limited to such Seller for the Goods required. Each Seller that is a Directed Supplier acknowledges the applicability of these Terms and Conditions and agrees to be bound by these Terms and Conditions, including, without limitation, the World Class Supplier requirements under Section 6 and the payment terms under Section 33.

C. Each Order and Order amendment issued by Purchaser to Seller after October 1, 2013 incorporates these Terms and Conditions which shall apply to each such Order, as amended, in its entirety. In addition, Camaco/Amvian's Supplier Requirements Manual, Quality Assurance Agreement, Warranty Agreement, Tooling Equipment and Die Design Build Standards  and Tooling Audit Guidelines, Packaging and Shipping requirements, and other manuals, guidelines and requirements available from time to time under the heading "Documents" through links provided on the Camaco/Amvian web site at http://camacollc.com under Supplier Information (together, the "Documents") are incorporated by reference. In the event of a conflict between any Documents and these Terms and Conditions, these Terms and Conditions shall govern. Purchaser may modify any Documents or add additional Documents, at any time, by posting notice of such modified or new Documents through links provided on the Camaco/Amvian web site at http://camacollc.com under Supplier Information at least ten (10) days prior to any modified or new Documents becoming effective. Seller shall review the Camaco/Amvian website and the Documents periodically. Seller's continued performance under the Order without providing written notice to Purchaser in accordance with Section 44 detailing Seller's objection to any modified or new Documents prior to the effective date of such modified or new Documents will be subject to and will constitute Seller's acceptance of such modified or new Documents.

D. The Terms and Conditions and Documents that are applicable to each Order are the Terms and Conditions that are in effect on the Issue Date shown on the later of the Order or any Order amendment applicable to such Order.

E. No exception to, deviation from, or waiver of these Terms and Conditions shall be valid or binding on Purchaser unless specified on the face of an Order or Order amendment or made in a Signed Writing by Purchaser's Director – Purchasing.

**3. Documents used in Purchasing**. The following documents may be used by Purchaser as a part of Purchaser's sourcing and purchasing process. Except as otherwise (i) expressly provided in one of the following documents enumerated in subsections A through I that has been signed by Purchaser's Director – Purchasing or (ii) expressly provided on the face of the Order, the Order supersedes all such documents in their entirety.

A. Long Term Agreement ("LTA"). This is an agreement relating to price reductions that also is used, in some cases, as an indicator for eligibility to quote on certain business.

B. Supply Agreement ("LSA"). This is an agreement that provides relationship terms between Seller and Purchaser including agreed upon price changes and that also is used, in some cases, as an indicator for eligibility to quote on certain business.

C. Joint Development Agreement ("JDA"). This is an agreement between Purchaser and another party to develop jointly a specific product or technology.

D. Letter of Intent ("LOI"). This is an agreement by which Purchaser agrees to be liable for certain expenses associated with the acquisition by a third party of long lead time items, normally tooling or equipment. Such an agreement is binding on Purchaser only if it (i) expressly states that it is binding and (ii) contains a stated maximum liability and a limited duration.

E. Supplier Owned Tooling Agreement ("SOTA"). This is an agreement between Purchaser and Seller relating to tooling owned by Seller that is used, in certain cases, to supplement the relevant terms of the Order.

F. Request for Quotation ("RFQ"). This is an introductory step in potentially generating an offer from Purchaser to Seller contained in an Order. It may include Volume and Duration Projections (See Section 5) and specifications for the Goods being quoted.

G. Engineering Change Notice ("ECN") This is an alternative introductory step in potentially generating an offer from Purchaser to Seller contained in an Order. It may include Volume and Duration Projections (See Section 5) and specifications for the Goods being quoted.

H. Quotation. Following the RFQ or ECN, this is generally the next step in generating the offer from Purchaser to Seller contained in the Order. It also may include Volume and Duration Projections (See Section 5) and may reference projected prices.

I. Order. The Order describes the Goods being purchased, specifies the name and address of the Purchaser and Seller and incorporates these Terms and Conditions. In accordance with Section 1, each Order constitutes Purchaser's offer to Seller to enter into the agreement it describes and is the complete and exclusive statement of such offer and agreement. Each Order is either a Spot-buy Order, a Blanket Order or a requirements contract Order depending on the quantity and duration specified on the face of the Order. A Spot-buy Order is a one-time Order for a specific quantity of Goods. A Blanket Order is an Order for Goods in accordance with the firm quantities and delivery schedules specified in Releases issued by Purchaser pursuant to the Order. A requirements contract Order is an Order for all or a designated portion of Purchaser's requirements for Goods for a specified period of time in accordance with the firm quantities and delivery schedules specified in Releases issued by Purchaser pursuant to the Order. All references to an "Order" shall mean the initial Order, as amended by any Order amendments issued by Purchaser.

J. Release. This is a schedule by which Purchaser (i) specifies the firm quantity of Goods that Seller is to deliver to Purchaser on at least a weekly basis, (ii) authorizes material fabrication, and/or (iii) authorizes the purchase of raw materials/components, each for the period specified therein. The Release indicates the firm quantity of Goods and/or the firm quantity of raw materials/components, as applicable, for which Purchaser is liable to Seller and that Seller is obligated to provide to Purchaser for the period specified therein. The Release may also provide a forecast of the quantity of Goods that will be ordered beyond the firm quantity amount. The forecast is not binding on Purchaser or Seller.

K. Order amendment. This is an amendment to the Order issued by Purchaser on Purchaser's purchase order form through Purchaser's standard purchasing protocol to reflect an amendment or modification to the Order.

**4. Quantity and Duration**.

A. The quantity applicable to each Order and its duration are specified on the face of the Order. The quantity specified may be for up to one hundred percent (100%) of Purchaser's requirements for the Goods. For all Blanket Orders and requirements contract Orders, Purchaser shall issue a Release (see Section 3.L) to specify the quantities needed, delivery locations, and dates. Seller acknowledges and agrees that, notwithstanding anything in any Order to the contrary, Seller is obligated to provide Goods to Purchaser in at least the quantity and for at least the period specified in any Release. A Release will specify a firm quantity of Goods and/or a firm quantity of raw materials/components that Purchaser will be responsible for in the event of termination (see Section 17.B). Releases may include Volume and Duration Projections (see Section 5), but Releases are only binding upon Purchaser for, and Purchaser will have no obligation or liability beyond, the quantity specified as firm in the Release. Seller acknowledges and agrees to accept the risk associated with the lead times of the various components if they are beyond the firm Release amounts provided by Purchaser.

B. Unless the Order specifically provides that Seller shall produce one hundred percent (100%) of Purchaser's requirements for the Goods, Purchaser shall have the right to obtain a portion of such Goods from another third party source or from Purchaser's internal sources.

**5. Volume and Duration Projections.** From time to time and in connection with quotations, requisitions and Orders, Purchaser may provide Seller with estimates, forecasts or projections of its future volume or quantity requirements for the Goods and/or the term of a program ("Volume and Duration Projections"). Volume and Duration Projections, unlike a Release for a firm quantity, are not binding on Purchaser. They also are not evidence of a requirements contract. Seller acknowledges that the Volume and Duration Projections, like any other forward looking projections, are based on a number of economic and business factors, variables and assumptions, some or all of which may change over time, and may or may not be accurate at the time they were made or later. Purchaser makes no representation, warranty, guaranty or commitment of any kind or nature, express or implied, regarding any Volume and Duration Projections or other estimate, forecast or projection provided to Seller, including as to its accuracy or completeness. Seller accepts that Volume and Duration Projections may not be accurate and that actual volume or duration could be less than or greater than the projections. Seller acknowledges that this risk, and possible reward, is an aspect of the automotive industry.

**6. World Class Supplier Requirements.** Seller must provide world-class competitive Goods in terms of ***cost*** (see Section 7), ***quality*** (see Section 8), ***delivery*** (see Section 9), ***technology*** (see Section 10) and ***customer support*** (see Section 11). Each reference to World Class Supplier in these Terms and Conditions and in any other document or agreement between Purchaser and Seller incorporates by reference each of the foregoing elements (cost, quality, delivery, technology and customer support) and all of the conditions, provisions and requirements pertaining to such elements in these Terms and Conditions. Seller's failure to meet the requirements of a World Class Supplier is a basis for Purchaser's immediate termination of the Order under Section 17.A.

**7. Cost**.
A. Prices charged for Goods listed on the Order are not subject to increase, including specifically any increase based upon changes in raw material or component pricing, labor or overhead, unless specifically agreed to by Purchaser on the face of an Order amendment or in a Signed Writing by Purchaser's Director – Purchasing.

B. Seller represents that the price charged to Purchaser for Goods is at least as low as the price charged by Seller to buyers of a class similar to Purchaser under conditions similar to those specified in the Order and that all prices comply with all applicable governmental laws and regulations in effect at the time of quotation, sale and delivery. Seller agrees that any price reduction implemented by Seller for any Goods or related charges will apply to all shipments of such Goods under the Order or any Order amendment from and after Seller's implementation of the price reduction.

C. Seller shall ensure that the price charged to Purchaser for Goods remains competitive with the price for similar goods available to Purchaser from other sellers.

D. Seller agrees to participate in Purchaser's cost savings and productivity programs and initiatives and to implement Seller's own cost savings and productivity programs and initiatives to reduce Seller's costs.

**8. Quality.**

A. Seller shall meet all quality requirements of Purchaser and all quality requirements of Purchaser's Customer, including, but not limited to, the applicable plans relating to TS 16949, ISO 14001 and the various OEM End of Life Vehicle ("ELV") reporting and other requirements.

B. Seller agrees to participate in Purchaser's quality and development program(s) and to comply with all quality requirements and procedures specified by Purchaser, as revised from time to time. Based on Purchaser's assessment of responsibility, the Seller may be held responsible for any and all costs associated with quality issue investigation, containment and Remedial Actions on account of Goods provided by Seller to Purchaser (including third party activities identified and initiated by Purchaser). Seller is obligated to provide any and all reasonable support requested by Purchaser to address immediately and correct concerns regarding the quality of Goods provided. Seller shall provide additional resources, as necessary and as identified by Purchaser, to support product-development, process development, validation, production launch, or any issue that may jeopardize the success of the manufacture or assembly of any Goods or of the program.

C. Seller must assure overall equipment (shared and specific) and plant capacity are adequate to meet Purchaser's needs. Ongoing capacity analysis must account for at least: scrap variation, downtime, maintenance, and other Customer requirements. Each production process must successfully complete a Run-at-Rate. The Run-at-Rate must demonstrate that Seller's production process can produce in less than 24 hours at least one day's quantity of acceptable quality Goods to satisfy Seller's Capacity Planning Volume ("CPV"). Purchaser is not obligated to pay Seller any incremental costs as long as the Release quantities do not exceed Seller's CPV. The requirement for capacity and the CPV is not a volume, program or other commitment by Purchaser.

D. Seller is responsible for all sub-tier providers of goods or services. Seller must maintain adequate development, validation, launch, and ongoing supervision to assure all Goods provided to Purchaser conform to all specifications, standards, drawings, samples and descriptions, including, without limitation, as to quality, performance, fit, form, function and appearance, under the Order.

E. For all Goods, in addition to any other applicable warranties, Seller shall provide the warranties specified in Section 12.

**9. Delivery.**

A. Deliveries shall be made both in quantities and at times specified on the Order or on Releases furnished by Purchaser. Time and quantity of delivery are of the essence of each Order. Seller shall adhere to shipping directions specified on the Order or Releases. Purchaser shall not be required to make payment for Goods delivered to Purchaser that are in excess of firm quantities and delivery schedules specified in Purchaser's Releases. Purchaser may change the rate of scheduled shipments or direct temporary suspension of scheduled shipments, neither of which shall entitle Seller to a modification of the price of Goods covered by any Order. With each delivery, Seller shall be deemed to have made the representations, warranties and covenants with respect to its financial and operating condition provided in Section 14.

B. Premium shipping expenses and/or other related expenses necessary to meet delivery schedules set forth in Releases shall be Seller's sole responsibility, unless the delay or expense was solely the result of Purchaser's negligence and Seller provides Purchaser with notice of any claim against Purchaser within ten (10) days after the occurrence of the alleged negligent action of Purchaser giving rise to such claim.

C. Notwithstanding any agreement concerning payment of freight expenses, delivery shall not have occurred and the risk of loss shall not have shifted to Purchaser until the Goods have been delivered to Purchaser's applicable facility and have been accepted at that facility.

**10. Technology**

A. If Purchaser furnished or supplied Seller with any designs, drawings, specifications, blueprints or other materials that contain proprietary information, Seller shall not disclose or use for the benefit of Seller or others such designs, drawings, specifications, blueprints or other material including any copies thereof, except as approved by Purchaser on the face of an Order or Order amendment or in a Signed Writing by Purchaser's Director - Purchasing.

B. Seller expressly warrants that all Goods covered by each Order will not and do not infringe on any patent, trademark, copyright or other intellectual property of any third party. Seller (i) agrees to defend, hold harmless and indemnify Purchaser and its Customers against all claims, demands, losses, suits, damages, liability and expenses (including actual fees for attorneys, experts and consultants, settlement costs and judgments) arising out of any suit, claim or action for actual or alleged direct or contributory infringement of, or inducement to infringe, any United States or foreign patent, trademark, copyright or other proprietary right by reason of the manufacture, use or sale of the Goods ordered, not including infringement arising out of compliance with specifications furnished by Purchaser or for actual or alleged misuse or misappropriation of a trade secret resulting directly or indirectly from Seller's actions; and (ii) waives any claim against Purchaser and its Customers, including any hold-harmless or similar claim, whether known or unknown, contingent or latent, in any way related to a claim asserted against Seller or Purchaser for infringement of any patent, trademark, copyright or other proprietary right, not including claims arising out of compliance with specifications furnished by Purchaser. Seller hereby assigns to Purchaser all right, title and interest in and to all inventions, trademarks, copyrights and other proprietary rights in any material created for and paid for by Purchaser under each Order. Technical information and data furnished to Purchaser in connection with each Order are disclosed on a non confidential basis.  Seller warranties are not applicable for goods designed or developed by Purchaser or procured from a Directed Supplier of Purchaser.

C. Seller expressly warrants that all copyrightable works of original authorship (including

but not limited to computer programs, technical specifications, documentation and manuals), ideas, inventions (whether patentable, patented or not), know-how, processes, compilations of information, trademarks and other intellectual property (collectively, "Deliverables") shall be original to Seller and shall not incorporate any intellectual property (including copyright, patent, trade secret, mask work, or trademark rights) of any third party.

D. All Deliverables that are created in the course of performing any Order (separately or as part of any Goods), and all intellectual property rights in Deliverables, are owned by Purchaser and not by Seller. Seller agrees that all works of original authorship created by Seller in connection with each Order are "works made for hire" as that term is used in connection with the U.S. Copyright Act. To the extent that, by operation of law, Seller owns any intellectual property rights in the Deliverables, Seller hereby assigns to Purchaser all rights, title and interest, including copyrights and patent rights, in such Deliverables.

E. Seller grants to Purchaser an irrevocable, non-exclusive, worldwide license with the right to grant sublicenses to affiliates to use any technical information, know how, copyrights and patents owned or controlled by Seller or its affiliates to make, have made, use and sell any Goods provided by Seller under each Order. The license shall be effective from the first delivery of Goods under the Order. For a period of two (2) model years from Seller's first delivery of Goods under the Order, Purchaser shall pay to Seller a "reasonable royalty" for such license, which is acknowledged by Seller to be included in the price paid by Purchaser to Seller for the Goods. In the event Purchaser sources the Goods from a party other than Seller, Purchaser shall pay Seller a "reasonable royalty" for a period of two (2) model years from the date of Seller's first delivery of Goods and thereafter, Purchaser's license shall be royalty free, fully paid-up, permanent and irrevocable for the subject program(s) only.

F. Seller shall ensure that any subcontractors to Seller shall have contracts with Seller in writing consistent with the terms of this Section 10 to ensure that the protections required by Purchaser from Seller are also received from subcontractors for the benefit of Purchaser and Seller. Camaco will work with Seller to come to agreement with these subcontractors of Seller.

## 11. Customer Support.

A. Seller shall support all supplier initiatives of Purchaser and support Purchaser in meeting the initiatives of its Customers. Upon Seller's written request, Purchaser shall cooperate with Seller to explain to Seller the terms, conditions and requirements of Purchaser's Customers.

B. As all elements of the automotive tiered supply network must work together to ensure that Purchaser's Customer's terms, conditions and requirements are met, it is the intent of both Seller and Purchaser that the applicable terms, conditions and requirements of Purchaser's Customer shall flow through Purchaser to Seller to the extent that they do not conflict with the terms of the Order. To the extent that Seller does not meet the applicable terms, conditions or requirements of Purchaser's Customer or to the extent that the terms of Purchaser's Customer do conflict with the terms of the Order, notwithstanding any such conflict, to indemnify and hold harmless Purchaser from any and all claims and demands from Purchaser's Customer relating to any actual or alleged problem or issue with the Goods sold by Seller under any Order or the manner in which Seller has supplied such Goods under the Order.

C. The automotive industry is customer focused and Seller agrees to work with Purchaser to meet the requirements of Purchaser's Customers. Therefore, in the event that any requirement imposed by any Order on Seller is found to be unenforceable or a gap is otherwise created in

the terms applicable to any Order through operation of law, conflict in terms or otherwise, the parties agree that the corresponding requirement of Purchaser's Customer shall be applicable to and binding on Seller for the benefit of Purchaser. Seller acknowledges that it is familiar with the automotive industry and the applicable terms of Purchaser's Customer that would apply in such an event.

## 12. Warranty.

A. Seller expressly warrants that all Goods covered by each Order will conform to all specifications, standards, drawings, samples or descriptions furnished to or by Purchaser, and all industry standards, laws and regulations in force in countries where Goods or vehicles equipped with such Goods are to be sold and that all Goods will be merchantable, of good material and workmanship and free from defects. In addition, Seller acknowledges that if Seller is design responsible, Seller knows of Purchaser's intended use and expressly warrants that all Goods covered by each Order will be fit and sufficient for the particular purpose intended by Purchaser.

B. Seller expressly warrants that, for all Goods under the Order, Seller shall convey good title to Purchaser, free of all liens, claims or other encumbrances.

C. All warranties will be effective for the longer of (i) the period provided by applicable law, or (ii) the warranty period provided by Purchaser to its Customer; provided, however, in the event that Purchaser or its Customer voluntarily or pursuant to a government mandate, makes an offer to owners of vehicles (or other finished products) on which the Goods, or any parts, components or systems incorporating the Goods, are installed to provide remedial action to address a defect or condition that relates to motor vehicle safety or the failure of the vehicle to comply with any applicable law, safety standard or guideline, whether in connection with a recall campaign or other customer satisfaction or corrective service action (a "Remedial Action"), the warranty shall continue for such time period as may be dictated by Purchaser's Customer or the federal, state, local or foreign government where the Goods are used or provided and Seller shall fully comply with the requirements under Section 12.I.

D. The warranty period for non-production Goods shall be the longer of one (1) year after final acceptance by Purchaser or the period stated in Seller's sales materials.

E. All warranties are intended to provide Purchaser with protection from any and all warranty claims brought against Purchaser by its Customer. This includes, but is not limited to, meeting any Customer-required warranties relating to the Goods in question or products into which the Goods are incorporated. All such Customer-required warranties are incorporated by reference.

F. The following communications shall each constitute notice of breach of warranty under the Order: (i) any communication specifying a defect, default, claim of defect or other problem or quality issue with Goods sold under the Order; (ii) any communication to Seller claiming that Seller's Goods are in breach of any warranty or that Seller is in default under the Order; and (iii) a termination notice from Purchaser under Section 17.A. Any such claim of breach by Purchaser may only be rescinded in writing by an authorized member of Purchaser's Legal Department.

G. To mitigate its damages, Purchaser may fully defend any claim from any Customer that any Goods supplied by Seller are defective, in breach of warranty, or otherwise did not meet applicable legal or contractual requirements because such Customer may attempt to hold Purchaser responsible for problems caused in whole or in part by Seller. Seller and Purchaser

agree that this defense is in the interest of both Seller and Purchaser. Seller hereby waives the right to argue that the fact that Purchaser took any such position in any way limits Purchaser's right to assert a claim against Seller by Purchaser for breach of warranty, contribution, indemnification or other claim that may arise from or be related to the subject matter of any of the foregoing.

H. In the event that Seller wishes to participate in any of the negotiations with Purchaser's Customer regarding any of the foregoing or any related litigation or defense of any such claim, then in each case that Seller receives notice of default or claim of breach, Seller shall give Purchaser prompt notice of its request to participate in accordance with Section 44, which notice shall describe with particularity the details of the alleged default or breach.

I. Notwithstanding the expiration of the warranty period set forth in Section 12.C, Seller shall nonetheless be liable for costs and damages associated with the conduct of any Remedial Action to the extent that such Remedial Action is based upon a reasonable determination (including by use of statistical analysis or other sampling methodology) that the Goods fail to conform to the warranties set forth in the Order. Where applicable, Seller shall pay all reasonable expenses associated with determining whether a Remedial Action is necessary. Purchaser and Seller agree that any Remedial Action involving Goods for Purchaser shall be treated separately and distinctly from similar Remedial Actions of other goods of Seller; provided that such separate and distinct treatment is lawful and Seller shall in no event fail to provide at least the same protection to Purchaser on such Goods as Seller provides to its other customers in connection with such similar Remedial Actions.

**13. Changes.**

A. Purchaser reserves the right at any time to direct changes, or cause Seller to make changes, to the Goods under any Order or Order amendment, including, but not limited to, changes in the design (including drawings and specifications), processing, methods of packing and shipping and the date or place of delivery of the Goods covered by the Order or to otherwise change the scope of the work covered by the Order including work with respect to such matters as inspection, testing or quality control, and Seller agrees to promptly make such changes. Any such changes shall be deemed not to affect the time for performance or cost under the Order unless (i) Seller provides Purchaser with written notice in accordance with Section 44 of a claim for adjustment to time for performance or cost within ten (10) days after Purchaser's notice to Seller of the change and (ii) after auditing such claim, Purchaser determines that an adjustment (up or down) is appropriate. Any such claim by Seller for adjustment to time for performance or cost under an Order must be solely and directly the result of the change directed by Purchaser and any notice of such claim shall be effective only if accompanied by all relevant information sufficient for Purchaser to verify such claim. In addition, Purchaser shall have the right to audit all relevant records, facilities, work or materials of Seller to verify any claim. Seller shall consider and advise Purchaser of the impact of a design change on the system in which the Goods covered by the Order are used. ***Nothing in this Section 13 shall excuse Seller from proceeding with the Order as changed.***

B. Without the prior approval of Purchaser on the face of an Order amendment or in a Signed Writing by Purchaser's Director – Purchasing, Seller shall not make any changes to any Order or the Goods covered by the Order, including, without limitation, changing (i) any third party supplier to Seller of services, raw materials or goods used by Seller in connection with its performance under the Order, (ii) the facility from which Seller or such supplier operates, (iii) the price of any of the Goods covered by the Order, (iv) the nature, type or quality of any services,

raw materials or goods used by Seller or its suppliers in connection with the Order; (v) the fit, form, function, appearance, performance of any Goods covered by the Order; or (vi) the production method, or any process or software used in the production or provision of any Goods under the Order. Any changes by Seller to any Order or the Goods covered by the Order without the prior signed PPAP approval shall constitute a breach of the Order.

**14. Financial and Operational Condition of Seller.**

A. Seller represents and warrants to Purchaser as of the date of each Order (which representations and warranties shall be deemed repeated as of the date of Seller's acceptance of each Release under the Order and at the time of each delivery under the Order) that it is not insolvent and is paying all debts as they become due; that it is in compliance with all loan covenants and other obligations; that all financial information provided by Seller to Purchaser concerning Seller is true and accurate; that such financial information fairly represents Seller's financial condition; and that all financial statements of Seller have been prepared in accordance with generally accepted accounting principles, uniformly and consistently applied.

B. Seller shall permit Purchaser's third party representatives to review Seller's books and records concerning compliance with each Order and Seller's overall financial condition and agrees to provide Purchaser with full and complete access to all such books and records for such purpose upon Purchaser's request. Seller agrees that, if Seller experiences any delivery or operational problems, Purchaser may, but is not required to, designate a representative to be present in Seller's applicable facility to observe Seller's operations. Seller agrees that, if Purchaser provides to Seller any accommodations (financial or other) that are necessary for Seller to fulfill its obligations under any Order, Seller shall reimburse Purchaser for all costs, including attorneys' and other professionals' fees, incurred by Purchaser in connection with such accommodation and shall grant a right of access to Purchaser to use Seller's premises, machinery, equipment and other property necessary for the production of Goods covered by such Order (and a lien to secure the access right) under an access and security agreement

**15. Seller Insolvency.** Purchaser may immediately terminate each Order without any liability of Purchaser to Seller upon the occurrence of any of the following or any other similar or comparable event (each, a "Seller Insolvency"): (i) insolvency of Seller; (ii) Seller's inability to promptly provide Purchaser with adequate and reasonable assurance of Seller's financial capability to perform timely any of Seller's obligations under any Order; (iii) filing of a voluntary petition in bankruptcy by Seller; (iv) filing of an involuntary petition in bankruptcy against Seller; (v) appointment of a receiver or trustee for Seller; or (vi) execution of an assignment for the benefit of creditors of Seller. .

**16. Remedies for Breach by Seller**.
A. The rights and remedies reserved to Purchaser in each Order, including, without limitation, the rights of entry, reclamation and inspection under Section 22, shall be cumulative with, and additional to, all other or further remedies provided in law or equity. Without limiting the generality of the foregoing, should any Goods fail to conform to the warranties set forth herein or should Seller or any Goods provided by Seller fail to meet any of the conditions of a World Class Supplier under Section 6, Purchaser shall notify Seller and Seller shall, if requested by Purchaser, reimburse Purchaser for nonconforming Goods, including, but not limited to, costs, expenses and losses incurred by Purchaser (a) in inspecting, sorting, testing, repairing or replacing such nonconforming Goods; (b) resulting from production interruptions, (c) in conducting Remedial Actions, and (d) in connection with claims for personal injury (including death) or property damage caused by such nonconforming Goods. If requested by Purchaser,

Seller shall, without charge to Purchaser, administer and process warranty charge-backs for nonconforming Goods in accordance with Purchaser's directions. Seller acknowledges and agrees that money damages would not be a sufficient remedy for any actual, anticipatory or threatened breach of any Order by Seller with respect to its delivery of Goods to Purchaser and that, in addition to all other rights and remedies which Purchaser may have, Purchaser shall be entitled to specific performance and temporary, preliminary and permanent injunctive or other equitable relief as a remedy for any such breach.

B. In addition, notwithstanding the foregoing, Seller acknowledges that shutting down Customer's plant creates issues for which money damages are not a sufficient remedy. While the cost of a plant shutdown may easily generate substantial costs, the damages to Purchaser's relationship with Purchaser's Customer through potential loss of business, and other damages which are equally difficult to calculate, are far worse. Because of these risks, in the event of a breach or threatened breach by Seller of any of the representations, warranties or covenants of Seller (including without limitation, any commitment related to being a World Class Supplier), Purchaser may, without notice to Seller, resource the production of Goods from Seller to another supplier or dual source any of the Goods covered hereby (i.e., have another supplier produce or be prepared to produce Goods being produced by Seller), to protect Purchaser and its Customers. This process of moving business may take a considerable amount of time and Seller understands that, given the risks posed by the possible shutdown of Purchaser's Customer, Purchaser is justified in initiating and transferring business without prior notice to Seller

C. Seller understands that the resourcing of business during a program, while not desirable, is a part of the automotive business and is an acknowledged risk to Seller in the industry. Even the risk of Seller's financial or operational uncertainty, in light of the huge risks to Purchaser and Purchaser's Customer, is an example of a justified reason to move production, without notice, and that any incidental or related activity by Purchaser is understandable and reasonable.

D. Notwithstanding anything to the contrary contained in any Order, Purchaser does not release any claim against Seller that is based in whole or in part on any fraud or duress in connection with the Order or any breach or anticipatory breach of the Order or any other Order between Purchaser and Seller (even if that Order relates to other products).

**17. Termination**.

A. Purchaser's Right to Terminate for Breach. Purchaser reserves the right to terminate immediately all or any part of each Order of Purchaser to Seller if Seller: (i) repudiates, breaches or threatens to breach any of the terms of the Order including, without limitation, Seller's warranties and World Class Supplier provisions; (ii) fails to perform or deliver Goods as specified by Purchaser; or (iii) fails to provide Purchaser with adequate and reasonable assurance of Seller's ability to perform timely any of Seller's obligations under any Order, including, without limitation, delivery of Goods; or if Purchaser terminates for breach any other Order issued by Purchaser to Seller in accordance with the terms of such other Order (whether or not such other Order is related to the Order).

B. Purchaser's Right to Terminate for Convenience.

(1) In addition to any other rights of Purchaser to terminate each Order, Purchaser may at its option, immediately terminate all or any part of the Order at any time and for any reason by giving written notice to Seller.

(2) Upon receipt of notice of termination pursuant to this Section 17.B, Seller, unless otherwise directed in writing by Purchaser, shall (i) terminate immediately all work under the Order; (ii) transfer title and deliver to Purchaser the usable and merchantable finished Goods, work in process, and raw materials/components that Seller produced or acquired in accordance with firm Release amounts under the Order and which Seller cannot use in producing goods for itself or for others; (iii) settle all claims by subcontractors approved by Purchaser on the face of an Order or Order amendment or in a Signed Writing by Purchaser's Director – Purchasing, if any, for reasonable actual costs that are rendered unrecoverable by such termination; (iv) take actions reasonably necessary to protect property in Seller's possession in which Purchaser has an interest and (v) upon Purchaser's request, cooperate with Purchaser in effecting the resourcing of the Goods covered by the Order to an alternative supplier designated by Purchaser.

(3) Upon termination  of any Order by Purchaser under this Section 17.A or 17.B, Purchaser shall pay to Seller the following amounts without duplication: (i) the Order price for all finished and completed Goods that conform to the requirements of the Order and not previously paid for; (ii) Seller's reasonable actual cost of the usable and merchantable work in process and raw materials/components transferred to Purchaser in accordance with subsection B(2)(ii) hereof; (iii) Seller's reasonable actual cost of settling claims for the obligations Seller would have had to the subcontractors approved by Purchaser on the face of an Order or Order amendment or in a Signed Writing by Purchaser's Director – Purchasing in the absence of termination, and (iv) Seller's reasonable actual cost of carrying out its obligations under subsections B(2)(iv) and B(2)(v). Purchaser shall not be liable for and shall not be required to make payments to Seller, directly or on account of claims by Seller's subcontractors, for any other alleged losses or costs, whether denominated as loss of anticipated profit, unabsorbed overhead, interest on claims, product development and engineering costs, facilities and equipment rearrangement costs or rental, unamortized depreciation costs, general and administrative burden charges resulting from termination of the Order or otherwise. Purchaser's obligation to Seller upon termination under this Section 17.B shall not exceed the obligation Purchaser would have had to Seller in the absence of termination. All outstanding tooling amounts shall be paid by the Purchaser to the Seller prior to any tool moves.

(4) Upon notification within twenty (20) days after the effective date of termination under this Section , Seller shall furnish to Purchaser its termination claim, together with all supporting data which shall consist exclusively of the items of Purchaser's obligation to Seller that are listed in subsection B(3). Purchaser may audit Seller's records before or after payment to verify amounts requested in Seller's termination claim.

C. ~~No~~ Termination Right by Seller. Because Purchaser's commitments to its Customers are made in reliance on Seller's commitments under each Order, Seller has no right to terminate any Order

D. Transition of Supply. Upon the expiration or earlier termination of any Order for whatever reason, Seller agrees to take such action as may be reasonably required by Purchaser to accomplish the transition from Seller to an alternative seller, including, without limitation the actions set forth below. The term "alternative seller" expressly includes, but is not limited to, a Purchaser-owned facility.

(1) Seller shall provide all notices necessary or desirable for Purchaser to resource the Order to an alternative seller.

(2) Seller shall provide a sufficient bank of Goods covered by the Order to ensure

that the transition to any alternative seller chosen by Purchaser will proceed smoothly. Unless otherwise specified by Purchaser on the face of an Order amendment or in a Signed Writing by Purchaser's Director – Purchasing, a six week parts inventory bank will be deemed sufficient to accomplish the transition. Such "six week parts bank" will be calculated using the Orders of Purchaser from the six weeks immediately prior to Seller's notice of termination not including any temporary interruptions, plant or industry shutdowns or other reduced schedules.

(3) Seller shall return to Purchaser all Bailed Property and any other property furnished by or belonging to Purchaser or any of Purchaser's Customers in as good as condition as when received by Seller, reasonable wear and tear excepted.

(4) Seller shall, at Purchaser's option, (i) assign to Purchaser any or all supply contracts or orders for raw material or components relating to the Order, (ii) sell to Purchaser, at Seller's cost, any or all inventory and work in process relating to the Order and (iii) sell to Purchaser, at the unamortized portion of the cost of such items, less any amounts Purchaser previously has paid to Seller for the cost of such items, any or all Seller's Property relating to the Order (see Section 21).

**18. Limitation of Damages**. In no event shall Purchaser be liable to Seller for anticipated profits or for special, incidental or consequential damages. This limitation of liability provision applies notwithstanding the type of the Order (including, without limitation, Spot-buy Orders, Blanket Orders or requirements contract Orders). Purchaser's liability for a claim of any kind or for any loss or damage arising out of or in connection with or resulting from each Order, the Goods or any other agreement between Purchaser and Seller is the Reasonable Obsolescence, if any, created by the event giving rise to the claim. Purchaser and Seller agree that "Reasonable Obsolescence" means the following amounts without duplication: (i) the Order price for all finished and completed Goods that conform to the requirements of the Order and not previously paid for; (ii) Seller's reasonable actual cost of the usable and merchantable work in process and raw materials/components transferred to Purchaser in accordance with the termination and that are covered by outstanding firm Releases from Purchaser; and (iii) Seller's reasonable actual cost of settling claims for the obligations Seller would have had to the subcontractors approved in a Signed Writing by Purchaser's Director – Purchasing in the absence of termination limited to the amount of the firm quantities of Goods and raw materials/components specified in Releases issued by Purchaser that are currently outstanding. Purchaser shall not be liable for and shall not be required to make payments to Seller, directly or on account of claims by Seller's subcontractors, for any other alleged losses or costs, whether denominated as loss of anticipated profit, recoupment of investment, unabsorbed overhead, interest on claims, product development and engineering costs, facilities and equipment rearrangement costs or rental, unamortized depreciation costs, general and administrative burden charges resulting from termination of the Order or otherwise. Notwithstanding anything to the contrary, Purchaser's obligation to Seller upon termination of any Order shall not exceed the obligation Purchaser would have had to Seller in the absence of termination of such Order. All outstanding tooling amounts shall be paid by the Purchaser to the Seller prior to any tool moves.

**19. Assignment.** Seller shall not assign or delegate any of its duties or obligations under any Order without the prior consent of Purchaser on the face of an Order or Order amendment or in a Signed Writing by Purchaser's Director – Purchasing, which consent may be withheld in Purchaser's sole discretion. Any sale or other transfer of stock or other securities of Seller that would result in a change in control of Seller shall be deemed an assignment under the Order. Seller may assign its claims for money under any Order as collateral security for indebtedness of Seller, but Purchaser shall not be required to pay the assignee until Purchaser receives written notice of the assignment, a true copy of the assignment and a release from Seller reasonably

acceptable to Purchaser. Any such assignment shall not prohibit Purchaser from enforcing its rights against Seller or the assignee, including, without limitation, Purchaser's rights to setoff and recoupment under Section 34, all of which rights of Purchaser against Seller or assignee are senior to any rights of such assignee. Purchaser may freely assign to any third party its rights and obligations under any Order without the consent of Seller.

**20. Bailed Property**.

A. All supplies, materials, molds, machinery, equipment, patterns, tools, dies, jigs, fixtures, blueprints, designs, specifications, drawings, photographic negatives and positives, art work, copy layout, consigned material for production or repair and other items furnished by Purchaser, either directly or indirectly, to Seller or to any sub-supplier of Seller in connection with or related to any Order, or for which Seller has been reimbursed by Purchaser (collectively, "Bailed Property"), shall be and remain the property of Purchaser and be held by Seller on a bailment at-will basis. Seller shall bear the risk of loss of and damage to the Bailed Property and Seller, at its own expense, shall keep such Bailed Property insured for the benefit of Purchaser, naming Purchaser as the loss payee and additional insured. The Bailed Property shall at all times be properly housed and maintained by Seller; shall not be used by Seller for any purpose other than the performance of the Order; shall be deemed to be personal property; shall be conspicuously marked by Seller to identify it as the property of Purchaser and indicate Purchaser's name and address; shall not be commingled with the property of Seller or with that of a third person and shall not be moved from Seller's premises without the prior approval by Purchaser on the face of an Order or Order amendment or in a Signed Writing of Purchaser's Director – Purchasing. Seller, at its expense, shall maintain, repair and refurbish Bailed Property in first class condition. All replacement parts, additions, improvements and accessories for such Bailed Property shall automatically become Purchaser's property upon their incorporation into or attachment to the Bailed Property.

B. Seller agrees that Purchaser has the right, at any time, with or without reason of any kind to retake possession of or request return of any or all Bailed Property, without the necessity of obtaining a court order. Upon the request of Purchaser, the Bailed Property shall be immediately released to Purchaser or delivered to Purchaser by Seller, either (i) F.O.B. transport equipment at Seller's plant, properly packaged and marked in accordance with the requirements of the carrier selected by Purchaser to transport such property, or (ii) to any location designated by Purchaser, in which event Purchaser shall pay to Seller the reasonable cost of delivering such Bailed Property to such location. Purchaser shall have the right to enter onto Seller's premises at all reasonable times to inspect the Bailed Property and Seller's records with respect thereto. When permitted by law, Seller waives any lien or other rights that Seller might otherwise have on any of the Bailed Property for work performed on such property, for the purchase price of any Goods or otherwise. Seller agrees that any missing components of or inserts to any Bailed Property shall be replaced by Seller at current costs.  Bailed property shall be released upon full payment of amounts due for work performed on Purchaser's property.

C. Seller acknowledges and agrees that (i) Purchaser is not the manufacturer of the Bailed Property nor the manufacturer's agent nor a dealer therein; (ii) Purchaser is bailing the Bailed Property to Seller for Seller's benefit; and (iii) Seller has inspected the Bailed Property and is satisfied that the Bailed Property is suitable and fit for its purposes, and (ii) PURCHASER HAS NOT MADE AND DOES NOT MAKE ANY WARRANTY OR REPRESENTATION WHATSOEVER, EITHER EXPRESS OR IMPLIED, AS TO THE FITNESS, CONDITION, MERCHANTABILITY, DESIGN OR OPERATION OF THE BAILED PROPERTY OR ITS FITNESS FOR ANY PARTICULAR PURPOSE. Purchaser will not be liable to Seller for any

loss, damage, injury or expense of any kind or nature caused, directly or indirectly, by the Bailed Property, including, without limitation, its use or maintenance, or its repair, service or adjustment, or by any interruption of service or for any loss of business whatsoever or howsoever caused, including, without limitation any anticipatory damages, loss of profits or any other indirect, special or consequential damages.

D. Seller authorizes Purchaser to file a UCC-1 financing statement or similar document with the appropriate filing authority to give notice of Purchaser's ownership interest in the Bailed Property. Failure to file a financing statement will not alter or amend Purchaser's ownership rights to the Bailed Property. Seller shall provide Purchaser, upon Purchaser's request, with a written inventory of all Bailed Property.

**21. Seller's Property**. Unless otherwise agreed to by Purchaser and Seller in a written agreement signed by both Seller and Purchaser's Director – Purchasing, Seller, at its expense: shall (i) furnish, (ii) keep in good condition, and (iii) replace when necessary all Seller's Property (hereinafter defined). Seller hereby grants Purchaser an irrevocable option to purchase, free and clear of all liens, claims and other encumbrances, any or all of Seller's supplies, materials, molds, machinery, equipment, patterns, tools, dies, jigs, fixtures, blueprints, designs, specifications, drawings, photographic negatives and positives, art work, copy layout and other items necessary for the production of the Goods under any Order (collectively, "Seller's Property") that are specially designed or configured for manufacture or assembly of Goods under the Order upon Purchaser's payment of the unamortized portion of the cost of such items of Seller's Property, less any amounts Purchaser previously has paid to Seller for the cost of such Seller's Property. Seller shall permit Purchaser to audit Seller's records to verify the amount due for any of Seller's Property. This option will not apply to any of Seller's Property that is used by Seller to produce a substantial quantity of like products for other customers of Seller which cannot readily be obtained by Seller's customer(s) from third parties unless, Purchaser does not have the ability to acquire the property comparable to Seller's property to run the tools, and in such cases, Seller assigns to Purchaser and Purchaser or its designee assumes Seller's obligation to produce such products for Seller's other customers using those items of Seller's Property during the period subsequent to the sale of Seller's Property to Purchaser. Seller shall cooperate with Purchaser's reasonable requests for information regarding any such obligation to Seller's other customer(s) and to effect such assignment and assumption. Purchaser's right to exercise the option under this Section 21 is not conditioned on a breach by Seller or Purchaser's termination of the Order.

**22. Rights of Entry, Reclamation and Inspection**. Purchaser shall have the right to enter Seller's facility during normal business hours or, in the event of a Seller shutdown, at reasonable times, to inspect the facility, Goods, materials and any property of Purchaser covered by each Order and, without the necessity of a court order, may enter upon Seller's property and remove property belonging to Purchaser or any Customer of Purchaser, including, without limitation, Bailed Property and other Goods, inventory or Seller's Property that has been or is agreed to be sold to Purchaser under the Order. Purchaser's inspection of the Goods, whether during manufacture, prior to delivery or within a reasonable time after delivery, shall not constitute acceptance of any work in process or finished Goods.

**23. Subcontracting**.

A. Seller shall not subcontract any of its duties or obligations under any Order without prior approval by Purchaser on the face of an Order or Order amendment or in a Signed Writing by Purchaser's Director – Purchasing. Seller shall ensure that any subcontractor so approved complies with all production part approval process requirements of Purchaser's Customer and any

other requirements of Purchaser. Purchaser or Purchaser's representative shall be afforded the right to verify at any subcontractor's premises and Seller's premises that subcontracted Goods conform to specified requirements. Verification by Purchaser or Purchaser's representative shall not (i) shift responsibility for quality by the subcontractor from Seller to Purchaser, (ii) absolve Seller of the responsibility to provide acceptable Goods nor (iii) preclude subsequent rejection of Goods by Purchaser. Notwithstanding any verification by Purchaser or Purchaser's representative, Seller remains fully liable for any work subcontracted.

B. In the event Seller's subcontracting of any of the work under any Order is approved by Purchaser on the face of an Order or Order amendment or in a Signed Writing by Purchaser's Director – Purchasing, and as a condition to such approval, Seller shall provide Purchaser with written evidence that the subcontractor agrees to be bound by these Terms and Conditions and the Order.

C. In the event Seller cannot fulfill any of its obligations under any Order, Seller shall, at Purchaser's option and in addition to any other rights or remedies available to Purchaser under the Order or otherwise, assign to Purchaser all of Seller's rights with respect to any subcontractors under such Order.

**24. Nonconforming Goods.** Purchaser, at its option, may reject and return at Seller's risk and expense, or retain and correct, Goods received pursuant to any Order that fail to conform to the requirements of the Order even if the nonconformity does not become apparent to Purchaser until the manufacturing, processing or assembly stage or later. To the extent Purchaser rejects Goods as nonconforming, the quantities under the Order will not be reduced by the quantity of nonconforming Goods unless Purchaser otherwise notifies Seller in writing. Seller shall replace nonconforming Goods with conforming Goods unless otherwise notified in writing by Purchaser, including, without limitation by way of a termination notice from Purchaser under Section 17.A. Nonconforming Goods will be held by Purchaser for disposition in accordance with Seller's written instructions at Seller's risk. Seller's failure to provide written instructions within ten (10) days (or such shorter period as may be commercially reasonable under the circumstances) after notice of nonconformity shall entitle Purchaser, at Purchaser's option, to charge Seller for storage and handling, or to dispose of the Goods without any liability of Purchaser to Seller. Seller shall reimburse Purchaser for (a) any amounts paid by Purchaser on account of the purchase price of any rejected nonconforming Goods, and (b) any costs incurred by Purchaser in connection with the nonconforming Goods, including, but not limited to inspection, sorting, testing, evaluations, storage or rework, within ten (10) days after a debit memo for the costs has been issued by Purchaser. Payment by Purchaser for nonconforming Goods shall not constitute an acceptance, limit or impair Purchaser's right to assert any legal or equitable remedy, or relieve Seller's responsibility for latent defects

**25. Indemnification**.  .

A. Seller hereby covenants and agrees to indemnify and hold harmless Purchaser, its affiliates and subsidiaries, and their respective directors, officers, employees and agents from any claims, liabilities, damages (including special, consequential, punitive and exemplary damages), costs and expenses (including actual fees for attorneys, experts and consultants, settlement costs and judgments) incurred in connection with any claims (including lawsuits, administrative claims, regulatory actions and other proceedings to recover for personal injury or death, property damage or economic losses) that are related in any way to or arise in any way from the Goods, Seller's representations, Seller's performance of or failure to perform obligations under any Order, including claims based on Seller's breach or alleged breach of warranty (whether or not the Goods

have been incorporated into Purchaser's products and/or resold by Purchaser), and claims for any violation of any applicable law, ordinance or regulation or government authorization or order. Seller's obligation to indemnify will apply regardless of whether the claim arises in tort, negligence, contract, warranty, strict liability or otherwise, except to the extent of any such liability arising solely out of the gross negligence of Purchaser. Seller's indemnification obligations will not apply  if Purchaser furnishes all or a portion of the design and specifies all or a portion of the processing used by Seller unless a separate written agreement signed by Seller and Purchaser's Director – Purchasing provides otherwise.

B. If Seller performs any work on Purchaser's premises or utilizes the property of Purchaser, whether on or off Purchaser's premises, Seller shall indemnify and hold harmless Purchaser, its affiliates and subsidiaries, and their respective directors, officers, employees and agents from and against any liabilities, claims, demands or expenses (including actual fees for attorneys, experts and consultants, settlement costs and judgments) for damages to the property of or injuries (including death) to Purchaser, its employees or any other person arising from or in connection with Seller's performance of work or use of Purchaser's property except to the extent of any such liability, claim or demand arising solely out of the gross negligence of Purchaser.

**26. Insurance.** Seller shall obtain and maintain at its sole expense insurance coverage customary in the industry and as otherwise required by law or reasonably requested by Purchaser with such insurance carriers and in such amounts as are reasonably acceptable to Purchaser. This includes, without limitation, providing full fire and extended coverage insurance for the replacement value of (i) all Seller's Property and (ii) any Bailed Property, both for their full replacement value. Seller shall furnish to Purchaser certificates of insurance setting forth the amount of coverage, policy number and date(s) of expiration for insurance maintained by Seller and such certificates must provide that Purchaser shall receive thirty (30) days prior written notification from the insurer of any termination or reduction in the amount or scope of coverages.  Seller's furnishing of certificates of insurance or purchase of insurance shall not release Seller of its obligations or liabilities under any Order. If Seller shall fail to maintain any insurance under any Order, Purchaser shall have the right to procure such insurance and Seller shall reimburse Purchaser on demand, for all actual costs and expenses of procuring such insurance.

**27. Compliance.**

A. Seller agrees to comply with all federal, state, local and foreign laws, Executive Orders, rules, regulations and ordinances that may be applicable to Seller's performance of its obligations under each Order, and each Order shall be deemed to incorporate by reference all the clauses required by the provisions of said laws, orders, rules, regulations and ordinances. All purchased materials used in manufacture of the Goods shall satisfy current governmental and safety constraints on restricted, toxic and hazardous materials as well as environmental, electrical and electromagnetic considerations applicable to the country of manufacture and sale. All suppliers must be in compliance with ISO14001, TS16949 and ELV or their successors, as amended from time to time.

B. Seller shall not (i) utilize forced or involuntary labor, regardless of its form, (ii) employ any child, except as part of a government approved job training, apprenticeship or similar program, or (iii) engage in abusive employment or corrupt business practices, in the supply or provision of Goods under any Order.

C. Seller shall adopt and enforce a code of conduct for business practices with principles,

policies and procedures consistent with the principles, policies and procedures set forth in Purchaser's Code of Business Conduct and Ethics available through links provided on the Camaco/Amvian web site at http://Camacollc.com. Seller shall promptly report all violations of Seller's code of conduct to Purchaser's Director – Purchasing.

D. Seller shall provide Purchaser written notice immediately upon becoming aware that any director, officer or employee of Seller, or any of its subsidiaries or affiliates, is also a director, officer or immediate family member of any director or officer of Purchaser, or any of its subsidiaries or affiliates. As to employees of Seller only, Seller only needs to report this information to Purchaser if the employee (excluding an officer or director of Seller) is substantively involved in Seller's business relationship with Purchaser or receives any direct or indirect compensation or benefit based on Seller's business relationship with Purchaser.

E. In the event Seller subcontracts any of its duties or obligations under any Order in accordance with Section 23, Seller shall ensure that all subcontractors comply with the requirements under this Section 27. At Purchaser's request, Seller shall certify in writing Seller's and its subcontractor's compliance with all such requirements. Purchaser shall have the right to audit and monitor Seller's and its subcontractor's compliance with Seller's and its subcontractor's obligations under any Order. Seller shall indemnify and hold harmless Purchaser, its affiliates and subsidiaries, and their respective directors, officers, employees and agents from and against any liability claims, demands or expenses (including actual fees for attorneys, experts and consultants, settlement costs and judgments) arising from or relating to Seller's or it's subcontractor's noncompliance.

**28. Production Part Approval Requirements.** With respect to Orders for production parts, Seller agrees to meet the full requirements identified in the industry production part approval process manual and agrees to present this information and data relating thereto to Purchaser upon request, regardless of the authorized submission level, at Level No. 3 or its current equivalent unless otherwise authorized by Purchaser on the face of an Order or Order amendment or in a Signed Writing by Purchaser's Director – Purchasing.

**29. Identification of Goods.** All Goods supplied pursuant to each Order that are construed as a completed part shall permanently bear Purchaser's part number and name or code name, Seller's name or code name, and date of manufacture by Seller.

**30. Shipping**.
A. Seller agrees (i) to properly pack, mark and ship Goods in accordance with the requirements of Purchaser and the involved carrier in a manner to secure the lowest transportation cost; (ii) to route shipment in accordance with Purchaser's instructions; (iii) to make no charge for handling, packaging, storage, transportation (including duties, taxes, fees, etc.), cost of vehicle or other transport expenses or drayage of Goods unless otherwise approved by Purchaser on the face of an Order or Order amendment or in a Signed Writing by Purchaser's Director – Purchasing; (iv) to provide with each shipment papers showing the Order number, Order amendment or Release number, Purchaser's part number, Seller's part number where applicable, quantity of pieces in shipment, number of cartons or containers in shipment, Seller's name and vendor number, the bill of lading number and the country of origin; and (v) to promptly forward the original bill of lading or other shipment receipt for each shipment in accordance with Purchaser's instructions and carrier requirements. The marks on each package and identification of the Goods on packing slips, bills of lading and invoices shall be sufficient to enable Purchaser to easily identify the Goods purchased.

B. For Goods that may contain potentially hazardous and/or restricted materials, if requested by Purchaser, Seller shall promptly furnish to Purchaser in whatever form and detail Purchaser requests (i) a list of all potentially hazardous ingredients in the Goods, (ii) the quantity of one or more such ingredients, and (iii) information concerning any changes in or additions to such ingredients. Before shipping the Goods, Seller agrees to furnish to Purchaser sufficient warning and notice in writing (including appropriate labels on the Goods, containers and packing) of any hazardous material that is an ingredient or a part of any of the Goods, together with such special handling instructions necessary to advise the involved carriers, Purchaser, and their respective employees how to exercise that measure of care and precaution that will best prevent bodily injury or property damage in the handling, transportation, processing, use or disposal of the Goods, containers and packing shipped to Purchaser. Seller shall comply with all applicable federal, state, local and foreign laws and regulations pertaining to product and warning labels. If Goods are shipped by Seller to European destinations, before shipments are made, Seller shall notify Purchaser of the "Classification of Dangerous Goods" as required by the European Agreement concerning the "International Carriage of Dangerous Goods".

C. Any packaging made of wood (including pallets) must conform to the international softwood standards, including USDA Regulations on Wood Packaging Material Imports. In the event Seller fails to comply with such standards, Seller shall be liable for all related replacement and transportation costs.

**31. Customs Drawback Documents, Other Government Requirements, and Export Controls**.

A. Upon Purchaser's request, Seller shall furnish promptly all documents required for customs drawback purposes, properly completed in accordance with government regulations applicable thereto. Seller shall furthermore, at its expense, provide all information necessary (including written documentation and electronic transaction records relating to the Goods, tooling and equipment necessary for Purchaser to fulfill any customs-related or other Governmental agency-related obligations, origin marking or labeling requirements and certification or local content reporting requirements, to enable Purchaser to claim preferential duty treatment at the time of entry for Goods, tooling and equipment eligible under applicable trade preference regimes, and to make all arrangements that are necessary for the Goods to be covered by any applicable duty deferral or free trade zone program(s) of the country of import. Seller shall, at its expense, provide Purchaser or Purchaser's nominated service provider with all documentation to enable the Goods to be exported, and obtain all export licenses or authorizations necessary for the export of the Goods, tooling and equipment unless otherwise indicated in the Order, in which event Seller shall provide all information as may be necessary to enable Purchaser to obtain such licenses or authorization(s). Credits or benefits resulting or arising from any Order, including trade credits, export credits or the refund of duties, taxes or fees, shall belong to Purchaser.

B. Seller is responsible for any incorrect information provided by Seller or any noncompliance with the U.S. Customs Regulations by Seller that results in penalties and/or additional duties for Purchaser. Seller also acknowledges and agrees to adhere to all security procedures required by the Customs-Trade Partnership Against Terrorism (C-TPAT). Seller shall share with Purchaser any audit or inspection information related to C-TPAT inspection and/or validation at Seller's location.

**32. Invoices.** All invoices and/or advanced shipping notices ("ASN") for Goods shipped pursuant to each Order must reference the Order number, Order amendment or Release number, Purchaser's part number, Seller's part number where applicable, quantity of pieces in shipment,

number of cartons or containers, Seller's name and number, and bill of lading number, before any payment will be made for Goods by Purchaser. In addition, no invoice may reference any term separate from or different than these Terms and Conditions or the terms that appear on the face of the Order. Purchaser reserves the right to return all invoices or related documents submitted incorrectly. Payment terms will begin to run once the latest correct invoice or ASN is received and input into Purchaser's system by the applicable Purchaser facility. Any payment by Purchaser of a nonconforming invoice is not an acceptance of any nonconforming element or terms on such invoice.

## 33. Payment Terms.

A. Payment terms are Net 60 prox means that invoices received through the fifteenth day of a given month will be paid on the fifth day of the second month following.

B. If a payment date falls on a non-business day, payment will occur on the following business day.

C. Notwithstanding the particular payment terms applicable to an Order, (i) in no event will Seller have a right to payment for Tooling before Purchaser is paid by its Customer for such Tooling, (ii) in no event will a Seller who is a Directed Supplier have a right to receive payment from Purchaser until Purchaser is fully paid by Purchaser's Customer for the related Goods or, as applicable, the goods into which such Goods are incorporated, and (iii) Purchaser may, at its option, upon notice to Seller, revise its payment terms for production Goods to take into account any change in the payment terms of Purchaser's Customer applicable to the Goods under any Order.

## 34. Setoff and Contractual Recoupment.

A. In addition to any right of setoff or recoupment provided or allowed by law, all amounts due Seller, or any of its subsidiaries or affiliates shall be considered net of indebtedness or obligations of Seller, or any of its subsidiaries or affiliates to Purchaser or any of its subsidiaries or affiliates, and Purchaser or any of its subsidiaries or affiliates may setoff against or recoup from any amounts due or to become due from Seller, or any of its subsidiaries or affiliates to Purchaser or any of its subsidiaries or affiliates however and whenever arising. In the event that Purchaser or any of its subsidiaries or affiliates reasonably feels itself at risk, Purchaser or any of its subsidiaries or affiliates may withhold and recoup a corresponding amount due Seller or any of its subsidiaries or affiliates to protect against such risk.

B. An "affiliate" of a party means any other company that controls, is controlled by, or is under common control with such party. For purposes of this definition, the term "control" means the ownership, directly or indirectly, of twenty percent (20%) or more of the capital or equity of a company or the ability, by voting securities, contract or otherwise, to elect a majority of the board of directors or other governing body of such company.

C. If an obligation of Seller or any of its subsidiaries or affiliates to Purchaser or any of its subsidiaries or affiliates is disputed, contingent or unliquidated, Purchaser or any of its subsidiaries or affiliates may defer payment of all or any portion of the amount due until such obligation is resolved. Without limiting the generality of the foregoing and by way of example only, in the event of a bankruptcy of Seller, if all of the Orders between Purchaser and Seller have not been assumed, then Purchaser may defer payment to Seller, via an administrative hold or otherwise, for Goods against potential rejection and other damages.

**35. Sales Tax Exemption.** Purchaser hereby certifies that Goods purchased under each Order and identified as industrial processing are eligible for state and federal sales tax exemption under the Federal tax payer identification number indicated on the face of the Order.

**36. Advertising.** Seller shall not refer to Purchaser in advertising or public releases without the prior approval in a Signed Writing of Purchaser's Director – Purchasing and shall not use Purchaser's trademarks or trade names in advertising or promotional materials.

**37. Force Majeure**. Any delay or failure of Purchaser or Seller to perform its obligations under the Order will be excused if, and to the extent that, the party is unable to perform specifically due to an event or occurrence beyond its reasonable control and without its fault or negligence, such as: acts of God; restrictions, prohibitions, priorities or allocations imposed or actions taken by a governmental authority; embargoes; fires; explosions; natural disasters; riots; wars; sabotage; or inability to obtain power. As soon as possible (but no more than one full business day) after the occurrence, Seller shall provide written notice describing such delay and assuring Purchaser of the anticipated duration of the delay and the time that the delay will be cured. During the delay or failure to perform by Seller, Purchaser may at its option: (a) purchase Goods from other sources and reduce its Releases to Seller by such quantities, without liability of Purchaser to Seller and require Seller to reimburse Purchaser for any additional costs to Purchaser of obtaining the substitute Goods compared to the prices set forth in the Order; (b) require Seller to deliver to Purchaser at Purchaser's expense all finished Goods, work in process and parts and materials produced or acquired for work under the Order; or (c) require Seller to provide Goods from other sources in quantities and at a time requested by Purchaser and at the price set forth in the Order. In addition, Seller at its expense shall take all actions deemed reasonably necessary by Seller to ensure that in the event of any anticipated labor disruption, strike or worker slowdown or resulting from the expiration of Seller's labor contracts, an uninterrupted supply of Goods will be available to Purchaser in an area that will not be affected by any such disruption for a period of at least thirty (30) days. If upon request of Purchaser, Seller fails to provide within ten (10) days (or such shorter period as Purchaser requires) adequate assurances that any delay will not exceed thirty (30) days or if any delay lasts longer than thirty (30) days, Purchaser may terminate the Order without liability and Seller shall reimburse Purchaser for costs associated with the cancellation. Seller acknowledges and agrees that the change in cost, supplier actions or contract disputes will not excuse performance by Seller under theories of force majeure, commercial impracticability or otherwise and Seller expressly assumes these risks.

**38. Service and Replacement Parts.**
A. Upon receipt of a Release, Seller shall sell to Purchaser all Goods necessary for Purchaser to fulfill Purchaser's and its Customer's service and replacement parts requirements for its current model year at the then current production prices plus any actual net cost differential for required unique packaging. If the Goods are systems, modules or assemblies, Seller shall sell the components or parts of such systems, modules or assemblies at prices that will not in the aggregate exceed the then current production price of the system, module or assembly less the costs of labor involved in connection with the system, module or assembly plus any actual net cost differential for required unique packaging.

B. After termination of the current model production of the vehicle involved, Seller shall sell to Purchaser Goods necessary for Purchaser to fulfill Purchaser's and its Customers' service and replacement parts requirements for past model years at the prices then specified in the last Order for current model production plus for the first five (5) years of past model service. For the following ten (10) years of past model service or such longer period as Purchaser's Customer

requires service parts, the prices shall be as specified in the last Order for current model production plus any actual net cost differential for required unique packaging, plus any actual net cost differential and manufacturing costs as mutually agreed between Purchaser and Seller.

**39. Packaging.** All packaging must conform to Purchaser's standard packaging requirements, which are available through links provided on the Camaco/Amvian web site at http://Camacollc.com under Supplier Information.

**40. Claims from Seller.** Any action by Seller under any Order must be commenced within one (1) year after the breach or other event giving rise to Seller's claim occurs, regardless of Seller's lack of knowledge of the breach or other event giving rise to such claim.

**41. Severability.** If any term(s) of the Order is invalid or unenforceable under any statute, regulation, ordinance, executive order or other rule of law, such term(s) shall be deemed reformed or deleted, as the case may be, but only to the extent necessary to comply with such statute, regulation, ordinance, order or rule, and the remaining provisions of the Order shall remain in full force and effect.

**42. Electronic Communications and Electronic Signatures.** Seller shall comply with any method of electronic communication specified by Purchaser, including requirements for electronic funds transfer, purchase order transmission, production Releases, electronic signature, and communication. E-mails, even those containing a signature block of one of Purchaser's representatives shall not constitute a Signed Writing.

**43. Notices.** All notices, claims and other communications to Purchaser required or permitted under the Order shall be made in writing and sent by certified or registered mail, return receipt requested and proper postage prepaid to the following address and shall be effective only upon receipt by Purchaser.

Seller's failure to provide any notice, claim or other communication to Purchaser in the manner and within the time periods specified in the Order shall constitute a waiver by Seller of any and all rights and remedies that otherwise would have been available to Seller upon making such notice, claim or other communication.

**44. Confidentiality.**

A. Seller shall (i) keep all Purchaser's information confidential and disclose it only to its employees who need to know such Purchaser's information in order for Seller to supply Goods, tooling, and equipment to Purchaser under the Order and (ii) use Purchaser's Information solely for the purpose of supplying Goods to Purchaser. "Purchaser's information" means all information provided to Seller by Purchaser or its representatives or subcontractors in connection with the business, programs, and Goods covered by the Order, including without limitation, pricing and other terms of the Order, specifications, data, formulas, compositions, designs, sketches, photographs, samples, prototypes, test vehicles, manufacturing, packaging or shipping methods and processes and computer software and programs (including object code and source code). Purchaser's information also includes any materials or information that contain, or are based on, any Purchaser's Information, whether prepared by Purchaser, Seller or any other person.

B. Seller shall promptly notify Purchaser if it has provided information to a Government regarding the Goods, tooling or equipment provided, including information provided to the U.S.

Government in accordance with the following reporting requirements of U.S. law: 49 CFR Part 573 (Defect and Noncompliance Reporting) and 49 CFR Part 579 (Reporting of Information and Communications about Potential Defects.)

**45. Tooling & Equipment - Supplemental Terms.** In addition to being governed by these Terms and Conditions, each Order for the purchase of tooling ("Tooling") and equipment ("Equipment") shall be governed by Purchaser's Supplemental Tooling and Equipment Terms which are available through links contained in the Camaco/Amvian web site at http://Camacollc.com under Supplier Information (the "Supplemental Tooling and Equipment Terms"); provided, that in the event of an inconsistency between these Terms and Conditions and the Supplemental Tooling and Equipment Terms, the Supplemental Tooling and Equipment Terms shall control as to all such Tooling and Equipment.

**46. Construction.** When used in the Order, "including" means "including, without limitation," and terms defined in the singular include the plural and vice versa. The headers, titles and numbering are for convenience of reference only and shall not affect the construction or interpretation of the Order
.

**47. Entire Agreement; Modification.** The Order, together with the attachments, exhibits or supplements specifically referenced in the Order, constitutes the entire agreement between Seller and Purchaser with respect to the matters contained in the Order and supersedes all prior oral or written representations and agreements. Purchaser may modify the Terms and Conditions, at any time, by posting notice of such modified Terms and Conditions through links provided on the Camaco/Amvian web site at http://Camacollc.com under Supplier Information at least ten (10) days prior to any modified Terms and Conditions becoming effective. Seller shall review the Camaco/Amvian website and the Terms and Conditions periodically. Seller's continued performance under the Order without providing written notice to Purchaser in accordance with Section 44 detailing Seller's objection to any modified Terms and Conditions prior to the effective date of such modified Terms and Conditions will be subject to and will constitute Seller's acceptance of such modified Terms and Conditions. Except as provided in the preceding sentences or as otherwise provided in these Terms and Conditions, the Order may only be modified by an Order amendment or a Signed Writing by Purchaser's Director – Purchasing.

**48.  Governing Law/Jurisdiction/ Venue**. The obligations of the parties respecting this Order, the sale or shipment of goods and all other matters and disputes between the parties shall be governed, construed, performed and enforced in accordance with the substantive laws of the State of where Camaco/Amvian plant issuing the Order is located. Any legal action or proceeding related to the shipment or receipt of goods under any contract, purchase order or otherwise shall be brought in the courts located at the Camaco/Amvian plant issuing the Order  and the parties hereto irrevocably consent to and submit themselves to the exclusive jurisdiction and venue of such courts.

**49. Arbitration.** All disputes arising under or in connection with any Order or any other document pertaining to any Order shall be finally settled by arbitration in Southfield, Michigan, before a single arbitrator appointed by the American Arbitration Association ("AAA") which arbitration shall be conducted under AAA's commercial arbitration rules then in effect at the time of the Order provided, however, that discovery shall be permitted in accordance with the United States Federal Rules of Civil Procedure. The decision of the arbitrator shall be final and binding upon Purchaser and Seller, shall not be appealable, and judgment on the award rendered may be entered in any court of competent jurisdiction. The arbitrators will have no authority to award punitive or other damages not measured by the prevailing party's actual damages. Each party will

bear equally the costs and expenses of AAA and of the arbitrator. Each party will bear its own costs and expenses. The failure by one party to pay its share of arbitration fees constitutes a waiver of such party's claim or defense in the arbitration. All arbitration proceedings shall be confidential, except to the extent that disclosure is necessary to enforce an arbitration award in a court of competent jurisdiction. Notwithstanding anything to the contrary, Purchaser shall have the right, without waiving any remedy under the Order, to seek from any court of competent jurisdiction (a) equitable relief and (b) any interim or provisional relief that is necessary to protect the rights or property of Purchaser.

**50. Waiver of Jury Trial.** PURCHASER AND SELLER ACKNOWLEDGE THAT THE RIGHT TO TRIAL BY JURY IS A CONSTITUTIONAL ONE, BUT THAT IT MAY BE WAIVED. EACH OF PURCHASER AND SELLER, AFTER CONSULTING (OR HAVING THE OPPORTUNITY TO CONSULT) WITH COUNSEL OF ITS CHOICE, KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHT TO TRIAL BY JURY IN ANY ACTION OR OTHER LEGAL PROCEEDING ARISING OUT OF OR RELATING TO ANY ORDER OR ANY OTHER DOCUMENT PERTAINING TO ANY ORDER.

# EXHIBIT E

 **Wires**

# Payment Information

|  |  |  |  |
|---|---|---|---|
| Fed Ref # | ███████████ | Status | Successful |
| Payment ID | ██ | Modified | 02/26/2021 01:48 pm ET by STILS560 |
| Type | Wire |  |  |
| Name | Faurecia Mexico |  |  |

# Debit Account

Debit Account

Camaco Operating Account
Acct # ███████ USD

# Beneficiary

Beneficiary

Faurecia Sistemas Automotrices de M
United States of America (US)
Acct # █████

Beneficiary Bank

CITIBANK, N.A.
399 PARK AVENUE
NEW YORK 10022
United States of America (US)
FEDWIRE# ███████

# Payment Details

|  |  |
|---|---|
| Debit Currency | USD   United State   Dollar |
| Credit Currency | USD - United States Dollar |
| Amount | ███████ USD |
| Value Date | 02/26/2021 |

# References

Originator

CAMACO, LLC
37000 W 12 MILE RD STE 105
FARMINGTON HILLS MI 483313055
United States of America (US)

Payment References

ID or Acct # ███████

# EXHIBIT E



# Faurecia Sistemas Automotrices De México, S.A. De C.V.

| Website | Directions | Save | Call |

3.2 ★★★☆☆ 23 Google reviews

Manufacturer in San Luis Potosí, Mexico

**Address:** Av. Central No. 200 Interior 365 Parque Logistico, 78395 San Luis, S.L.P., Mexico

**Hours:** Open · Closes 1:30 AM ▾
Updated by phone call 8 weeks ago

**Phone:** +52 444 137 0800

Suggest an edit

# EXHIBIT F

# Department of State
## Division of Corporations

## Entity Information

Return to Results    Return to Search

**Entity Details**                                                                                    ⌃

**ENTITY NAME:** FAURECIA SISTEMAS AUTOMOTRICES DE          **DOS ID:** 6547530
MEXICO, S.A. DE C.V.

**FOREIGN LEGAL NAME:** FAURECIA SISTEMAS AUTOMOTRICES     **FICTITIOUS NAME:**
DE MEXICO, S.A. DE C.V.

**ENTITY TYPE:** FOREIGN BUSINESS CORPORATION              **DURATION DATE/LATEST DATE OF DISSOLUTION:**

**SECTIONOF LAW:** BUSINESS CORPORATION - 1304 BUSINESS    **ENTITY STATUS:** ACTIVE
CORPORATION LAW - BUSINESS CORPORATION LAW

**DATE OF INITIAL DOS FILING:** 07/08/2022                 **REASON FOR STATUS:**

**EFFECTIVE DATE INITIAL FILING:** 07/08/2022             **INACTIVE DATE:**

**FOREIGN FORMATION DATE:** 02/02/1995                    **STATEMENT STATUS:** CURRENT

**COUNTY:** ALBANY                                        **NEXT STATEMENT DUE DATE:** 07/31/2024

**JURISDICTION:** MEXICO                                  **NFP CATEGORY:**

ENTITY DISPLAY      NAME HISTORY      FILING HISTORY      MERGER HISTORY      ASSUMED NAME HISTORY

Service of Process on the Secretary of State as Agent

The Post Office address to which the Secretary of State shall mail a copy of any process against the corporation served upon the Secretary of State by personal delivery:

Name:  CORPORATION SERVICE COMPANY

Address:  80 STATE STREET, ALBANY, NY, UNITED STATES, 12207 - 2543

Electronic Service of Process on the Secretary of State as agent: Not Permitted

Chief Executive Officer's Name and Address

Name:

Address:

Principal Executive Office Address

Address:

Registered Agent Name and Address

Name:

Address:

Entity Primary Location Name and Address

Name:

**Address:**

Farmcorpflag

**Is The Entity A Farm Corporation:**  NO

Stock Information

| Share Value | Number Of Shares | Value Per Share |
|---|---|---|

# EXHIBIT H

ATTORNEY(S)

Index # : xxxxxx

PURCHASED/FILED :

STATE OF : New York

COURT : American Arbitration Assoc.

COUNTY/DISTRICT : xxxxxx

# AFFIDAVIT OF SERVICE

*Camaco, LLC*

vs

*Faurecia Sistemas Automotrices De Mexico Sa De Cv*

Plaintiff(s)/Petitioner(s)

Defendant(s)/Respondent(s)

STATE OF NEW YORK               COUNTY OF ALBANY

**KYLE WARNER**                              , being duly sworn deposes and says deponent is not a party herein, is over the age of eighteen years and resides in the State of New York. That on        **FEBRUARY 21, 2023**      at         **3:15PM**      at                          **c/o CSC 80 STATE STREET, ALBANY, NY 12207**                          deponent did serve the following :
(Address where service was accomplished.)

### DEMAND FOR ARBITRATION, W/ EXHIBITS

on:                          **FAURECIA SISTEMAS AUTOMOTRICES DE MEXICO SA DE CV**                          ,

              Respondent             (herein called recipient) therein named.        , SS.:

INDIVIDUAL ☐ By delivering a true copy of each to said recipient personally; deponent knew the person served to be the person described as said person therein.

CORP.  ☒ A corporation, by delivering thereat a true copy of each to _____ **LEGAL REPRESENTATIVE OF CSC** personally, deponent knew said corporation so served to be the corporation, described in same as said recipient and knew said individual to be _____ **AUTHORIZED AGENT** _____ thereof.

Service was made in the following manner after your deponent was unable, with due diligence, to serve the defendant in person, including an effort to reach the defendant by telephone, (if such telephone number was available) and an attempt to locate the defendant's place of employment.

| Previous attempts at personal service are as follows: | | |
|---|---|---|
| on the _____ day of _____ | at _____ |
| on the _____ day of _____ | at _____ |
| on the _____ day of _____ | at _____ |
| on the _____ day of _____ | at _____ |
| on the _____ day of _____ | at _____ |

SUITABLE PERSON ☐ By delivering a true copy of each to _____ a person of suitable age and discretion who agreed to accept on behalf of the party.. Said premises is recipient's:    [  ] dwelling house (usual place of abode).    [  ] actual place of business

AFFIXING TO DOOR ☐ By affixing a true copy of each to the door of said premises, which is recipient's [  ] actual place of business [  ] dwelling house (usual place of abode) within the state.

MAILING COPY ☐ On _____ deponent completed service under the last two sections by depositing a copy of the above listed documents to the above address in a First Class postpaid properly addressed plain envelope marked "Personal and Confidential" in an official depository under the exclusive care and custody of the United States Post Office in the State of New York.

The outside of the envelope did not include a return address or indicate that the communication was from an attorney.

DESCRIPTION ☒ A description of the person served is as follows:
(use with #1, 2 or 3)  Sex **FEMALE** Color of skin ___ **WHITE** ___ Hair **BLONDE** Approx.Age **51 - 65 YRS.** Approx.Height **5' 4" - 5' 8"** Approx. weight **161 - 200 LBS** Other _____

WIT. FEES ☐ $ _____ the authorizing traveling expenses and one day's witness fee was paid (tendered) to the recipient.

NON MIL ☒ To the best of my knowledge and belief, said person was not presently in military service of the United States Government or on active duty in the military service in the State of New York at the time of service.

Sworn to before me on this
21st day of February, 2023

**NOTARY PUBLIC**
YVONNE STRAIN
NOTARY PUBLIC, State of New York
01ST6314054, Schenectady
Commission Expires  November 3, 2026

KYLE WARNER

**Invoice·Work Order #** 2306903

Attorney File #    **Camaco**

# EXHIBIT I



| Camaco-Columbus | **BLANKET PURCHASE** |
|---|---|
| 1851 East 32nd Ave. | **ORDER CCM051650** |
| Columbus, Nebraska 68601 | |
| Tel (402)-564-3211 | |
| Fax (402) 563-8858 | |

| **Supplier:** | Faurecia Automotive SLP | **PO No:** | CCM051650 |
|---|---|---|---|
| | Av. Central No. 200, Parque Logistico | **PO Date:** | 9/26/18 |
| | San Luis Potosi | **Due Date:** | |
| | San Luis Potosi | **PO Revision:** | 12 |
| | C.P. 78395 Mexico | **Revision Date:** | 4/1/22 |
| | Phone: +1-248-606-9256 | **Issued By:** | Manager, Materials |
| | Supplier Customer Code: | | |
| **Attention:** | Hugol, Stephanie | **Blanket Order:** | 1/1/17 - 12/31/25 |
| | | **Carrier:** | UNIMEX |
| **Ship To:** | CAMACO LLC | **Pymt Terms:** | Net 47 |
| | Columbus Manufacturing | **INCO Terms:** | FCA |
| | 1851 East 32nd Ave. | **Freight Terms:** | Collect |
| | | **Note:** | Rev 14 Q4 2022 pricing metal |
| | Columbus, NE 68601 | | Rev 13 Q3 2022 pricing metal |
| | | | Rev 12 Q2 2022 pricing metal adjustment. |
| | | | Rev 11 Q1 2022 pricing metal adjustment |
| | | | Rev 10 Q4 2021 pricing |
| | | | Rev 9 Q3 2021 pricing |
| | | | Rev 8 Q2 2021 pricing |
| | | | Rev 7 Q1 2021 pricing |
| | | | Rev 6 Q4 2020 pricing |
| | | | Rev 5 Q3 2020 pricing |
| | | | Rev 4 Q2 2020 pricing |
| | | | Rev 3 Q1 2020 pricing |
| | | | U-625 Blanket Production PO. |
| | | | |
| | | | REV 1 6/18/19: |
| | | | |
| | | | Added cost of $0.0170 for expendable |
| | | | packaging to the piece price of the recliners. |
| | | | |
| | | | Packaging quote: 021919C. |

**Items**

| Line Item | Part | Supplier Part No | Description | Account | Effective Date | Unit Price |
|---|---|---|---|---|---|---|
| 1 | 219390-A | CAM-0000-0574 | RECLINER RH IB -FAURECIA Faurecia Part # 2139691X | 4231 | 1/1/17 | $3.48/pcs |
| | | | | | 1/1/19 | $3.597/pcs |
| | | | | | 4/1/19 | $3.567/pcs |
| | | | | | 7/1/19 | $3.547/pcs |
| | | | | | 10/1/19 | $3.517/pcs |
| | | | | | 1/1/20 | $3.5028/pcs |
| | | | | | 4/1/20 | $3.523/pcs |
| | | | | | 7/1/20 | $3.5028/pcs |
| | | | | | 10/1/20 | $3.4894/pcs |
| | | | | | 1/1/21 | $3.5749/pcs |
| | | | | | 4/1/21 | $3.7166/pcs |
| | | | | | 7/1/21 | $3.834/pcs |
| | | | | | 10/1/21 | $3.9584/pcs |
| | | | | | 1/1/22 | $3.9368/pcs |
| | | | | | 4/1/22 | $3.7309/pcs |
| | | | | | 7/1/22 | $3.7879/pcs |
| | | | | | 10/1/22 | $3.6141/pcs |



Camaco-Columbus
1851 East 32nd Ave.
Columbus, Nebraska 68601
Tel (402)-564-3211
Fax (402) 563-8858

# BLANKET PURCHASE ORDER CCM051650

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | **Items** | | | | |
| Line Item | Part | Supplier Part No | Description | Account | Effective Date | Unit Price | |
| 2 | 219391-A | CAM-0000-0453 | RECLINER_LH_IB-FAURECIA Faurecia Part # 2139690X | 4231 | 1/1/17 | $3.48/pcs | |
| | | | | | 1/1/19 | $3.597/pcs | |
| | | | | | 4/1/19 | $3.567/pcs | |
| | | | | | 7/1/19 | $3.547/pcs | |
| | | | | | 10/1/19 | $3.517/pcs | |
| | | | | | 1/1/20 | $3.5028/pcs | |
| | | | | | 4/1/20 | $3.523/pcs | |
| | | | | | 7/1/20 | $3.5028/pcs | |
| | | | | | 10/1/20 | $3.4894/pcs | |
| | | | | | 1/1/21 | $3.5749/pcs | |
| | | | | | 4/1/21 | $3.7166/pcs | |
| | | | | | 7/1/21 | $3.834/pcs | |
| | | | | | 10/1/21 | $3.9584/pcs | |
| | | | | | 1/1/22 | $3.9368/pcs | |
| | | | | | 4/1/22 | $3.7309/pcs | |
| | | | | | 7/1/22 | $3.7879/pcs | |
| | | | | | 10/1/22 | $3.6141/pcs | |

## Notes

CAMACO's Supplier Requirements Manual applies to this purchase order. It is available on our website: www.camacollc.com > Suppliers > Supplier Manual.

Mail invoice to the attention accounts payable. OR e-mail to: invoices@camacollc.com

Camaco-Amvian's Supplier Requirements Manual Terms and Conditions shall apply to this order.

Camaco-Amvian's PO Terms & Conditions shall apply to this order.

These documents are available on our website at: www.camacollc.com > Suppliers

ALL COMMUNICATION / PAPERWORK MUST BE SUBMITTED IN ENGLISH.

*Plex 10/31/22 6:22 AM kjbryant*



CAMACO Portage Manufacturing, LLC
6515 Ameriplex Dr. Suite B
Portage, IN 46368
Tel (248) 442-6800

# BLANKET PURCHASE ORDER CPM000126

| | |
|---|---|
| **Supplier:** | Faurecia Automotive SLP<br>Av Central No 200 Parque Logisitico<br>San Luis Potosi S.L.P.<br>San Luis Potosi<br>C.P. 78395 Mexico<br>Phone: +1-248-606-9256 |
| **Attention:** | Hugol, Stephanie |
| **Ship To:** | 6515 Ameriplex Drive<br>Suite B<br><br>Portage, IN 46368 |

| | |
|---|---|
| **PO No:** | CPM000126 |
| **PO Date:** | 10/14/18 |
| **Due Date:** | |
| **Purchase Order Revision:** | 10 |
| **Revision Date:** | 1/16/23 |
| **Issued By:** | Benavidez, Jimmie |
| **Blanket Order:** | 10/31/18 - 12/30/25 |
| **Pymt Terms:** | Net 47 |
| **INCO Terms:** | FCA |
| **Freight Terms:** | |
| **Note:** | PO for production parts purchased from Faurecia. U625.<br><br>Revision 1 6/19/19:<br><br>Added cost of $0.5810 for expendable packaging to the piece price of the tracks.<br><br>*Quote:030819A.<br><br>Revision 2 6/27/19:<br><br>Changed payment terms to Net 47 days.<br><br>Changed 1/1/19 for rev 3 to retro quarterly steel pricing.<br><br>7/8/2020 -<br>Rev.4 Added Q3 2020 pricing per Larry K. worksheet<br><br>Rev.5 Q4 Price change added.<br>Rev.6 Q1 2022 price added.<br>Rev.7 Q2 2022 price added.<br>Rev.8 Q3 2022 price added.<br>Rev.9 Q4 2022 price added.<br>Rev.10 Q1 2023 price added. |

## Items

| Line Item | Part | Supplier Part No | Description | Account | Effective Date | Unit Price |
|---|---|---|---|---|---|---|
| 1 | CAM-0000-1926 | | PLASTIC CLIP- RECLINER TUBE RETAINER RH<br>CAM-0000-1926-DWG-2<br>EAU 420,885 | 4231-000-000 | - | $0.115/pcs |
| 2 | CAM-0000-1927 | | PLASTIC CLIP- RECLINER TUBE RETAINER LH<br>DWG: CAM-0000-1926-DWG-2<br>EAU 420,886 | 4231-000-000 | - | $0.115/pcs |



CAMACO Portage Manufacturing, LLC
6515 Ameriplex Dr. Suite B
Portage, IN 46368
Tel (248) 442-6800

# BLANKET PURCHASE ORDER CPM000126

## Items

| Line Item | Part | Supplier Part No | Description | Account | Effective Date | Unit Price |
|---|---|---|---|---|---|---|
| 3 | CAM-0000-0567 | | ASM TRACK FAURECIA L315 U625 RH OB<br>CAM-0000-0567-DWG-04<br>EAU 381,850 | 4231-000-000 | 12/31/16<br>12/31/18<br>3/31/19<br>6/30/19<br>9/30/19<br>12/31/19<br>3/31/20<br>6/30/20<br>9/30/20<br>12/31/20<br>3/31/21<br>6/30/21<br>9/30/21<br>12/31/21<br>3/31/22<br>7/1/22<br>10/1/22<br>1/1/23 | $8.68/pcs<br>$9.74/pcs<br>$9.59/pcs<br>$9.49/pcs<br>$9.37/pcs<br>$9.3051/pcs<br>$9.3974/pcs<br>$9.2749/pcs<br>$9.2437/pcs<br>$9.6351/pcs<br>$10.2839/pcs<br>$10.8213/pcs<br>$11.3912/pcs<br>$11.292/pcs<br>$10.3494/pcs<br>$10.6105/pcs<br>$9.8151/pcs<br>$9.5833/pcs |
| 4 | CAM-0000-0464 | | ASM TRACK FAURECIA_L315_U625 OB LH<br>CAM-0000-0567-DWG-04<br>EAU 381,850 | 4231-000-000 | 12/31/16<br>12/31/18<br>3/31/19<br>6/30/19<br>9/30/19<br>12/31/19<br>3/31/20<br>6/30/20<br>9/30/20<br>12/31/20<br>3/31/21<br>6/30/21<br>9/30/21<br>12/31/21<br>3/31/22<br>7/1/22<br>10/1/22<br>1/1/23 | $8.68/pcs<br>$9.74/pcs<br>$9.59/pcs<br>$9.49/pcs<br>$9.37/pcs<br>$9.3051/pcs<br>$9.3974/pcs<br>$9.2749/pcs<br>$9.2437/pcs<br>$9.6351/pcs<br>$10.2839/pcs<br>$10.8213/pcs<br>$11.3912/pcs<br>$11.292/pcs<br>$10.3494/pcs<br>$10.6105/pcs<br>$9.8151/pcs<br>$9.5833/pcs |
| 5 | CAM-0000-1128 | | ASM TRACK FAURECIA L315 U625 RH IB<br>CAM-0000-0567-DWG-04<br>EAU 381,850 | 4231-000-000 | 12/31/16<br>12/31/18<br>3/31/19<br>6/30/19<br>9/30/19<br>12/31/19<br>3/31/20<br>6/30/20<br>9/30/20<br>12/31/20<br>3/31/21<br>6/30/21<br>9/30/21<br>12/31/21<br>3/31/22<br>7/1/22<br>10/1/22<br>1/1/23 | $8.68/pcs<br>$9.74/pcs<br>$9.59/pcs<br>$9.49/pcs<br>$9.37/pcs<br>$9.3051/pcs<br>$9.3974/pcs<br>$9.2749/pcs<br>$9.2437/pcs<br>$9.6351/pcs<br>$10.2839/pcs<br>$10.8213/pcs<br>$11.3912/pcs<br>$11.292/pcs<br>$10.3494/pcs<br>$10.6105/pcs<br>$9.8151/pcs<br>$9.5833/pcs |



CAMACO Portage Manufacturing, LLC
6515 Ameriplex Dr. Suite B
Portage, IN 46368
Tel (248) 442-6800

# BLANKET PURCHASE ORDER CPM000126

## Items

| Line Item | Part | Supplier Part No | Description | Account | Effective Date | Unit Price |
|---|---|---|---|---|---|---|
| 6 | CAM-0000-1129 | | ASM TRACK FAURECIA_L315_U625 IB LH CAM-0000-0567-DWG-04 EAU 381,850 | 4231-000-000 | 12/31/16 | $8.68/pcs |
| | | | | | 12/31/18 | $9.74/pcs |
| | | | | | 3/31/19 | $9.59/pcs |
| | | | | | 6/30/19 | $9.49/pcs |
| | | | | | 9/30/19 | $9.37/pcs |
| | | | | | 12/31/19 | $9.3051/pcs |
| | | | | | 3/31/20 | $9.3974/pcs |
| | | | | | 6/30/20 | $9.2749/pcs |
| | | | | | 9/30/20 | $9.2437/pcs |
| | | | | | 12/31/20 | $9.6351/pcs |
| | | | | | 3/31/21 | $10.2839/pcs |
| | | | | | 6/30/21 | $10.8213/pcs |
| | | | | | 9/30/21 | $11.3912/pcs |
| | | | | | 12/31/21 | $11.292/pcs |
| | | | | | 3/31/22 | $10.3494/pcs |
| | | | | | 7/1/22 | $10.6105/pcs |
| | | | | | 10/1/22 | $9.8151/pcs |
| | | | | | 1/1/23 | $9.5833/pcs |

## Notes

Please invoice to:

Camaco Portage Manufacturing
6515 Ameriplex Dr. Suite B
Portage, IN 46368

A/P Contact:  Kizzie Wade

AP-Portage@camacollc.com

*Please ship parts based only on releases by the Camaco Portage plant.*

Camaco-Amvian's Supplier Requirements Manual Terms and Conditions shall apply to this order.

Camaco-Amvian's PO Terms & Conditions shall apply to this order.

These documents are available on our website at: www.camacollc.com > Suppliers

*Plex 1/16/23 8:48 AM jbenavidez*



CAMACO Portage Manufacturing, LLC
6515 Ameriplex Dr. Suite B
Portage, IN 46368
Tel (248) 442-6800

# BLANKET PURCHASE ORDER CPM000126

| | |
|---|---|
| **Supplier:** | Faurecia Automotive SLP<br>Av Central No 200 Parque Logisitico<br>San Luis Potosi S.L.P.<br>San Luis Potosi<br>C.P. 78395 Mexico<br>Phone: +1-248-606-9256 |
| **Attention:** | Hugol, Stephanie |
| **Ship To:** | 6515 Ameriplex Drive<br>Suite B<br><br>Portage, IN 46368 |

| | |
|---|---|
| **PO No:** | CPM000126 |
| **PO Date:** | 10/14/18 |
| **Due Date:** | |
| **Purchase Order Revision:** | 11 |
| **Revision Date:** | 3/31/23 |
| **Issued By:** | Benavidez, Jimmie |
| **Blanket Order:** | 10/31/18 - 12/30/25 |
| **Pymt Terms:** | Net 47 |
| **INCO Terms:** | FCA |
| **Freight Terms:** | |
| **Note:** | PO for production parts purchased from Faurecia. U625.<br><br>Revision 1 6/19/19:<br><br>Added cost of $0.5810 for expendable packaging to the piece price of the tracks.<br><br>*Quote:030819A.<br><br>Revision 2 6/27/19:<br><br>Changed payment terms to Net 47 days.<br><br>Changed 1/1/19 for rev 3 to retro quarterly steel pricing.<br><br>7/8/2020 -<br>Rev.4 Added Q3 2020 pricing per Larry K. worksheet<br><br>Rev.5 Q4 Price change added.<br>Rev.6 Q1 2022 price added.<br>Rev.7 Q2 2022 price added.<br>Rev.8 Q3 2022 price added.<br>Rev.9 Q4 2022 price added.<br>Rev.10 Q1 2023 price added.<br>Rev.11 Q2 2023 price added. |

## Items

| Line Item | Part | Supplier Part No | Description | Account | Effective Date | Unit Price |
|---|---|---|---|---|---|---|
| 1 | CAM-0000-1926 | | PLASTIC CLIP- RECLINER TUBE RETAINER RH<br>CAM-0000-1926-DWG-2<br>EAU 420,885 | 4231-000-000 | - | $0.115/pcs |
| 2 | CAM-0000-1927 | | PLASTIC CLIP- RECLINER TUBE RETAINER LH<br>DWG: CAM-0000-1926-DWG-2<br>EAU 420,886 | 4231-000-000 | - | $0.115/pcs |
| 3 | CAM-0000-0567 | | ASM TRACK FAURECIA L315 U625 RH OB<br>CAM-0000-0567-DWG-04<br>EAU 381,850 | 4231-000-000 | 12/31/16<br>12/31/18<br>3/31/19<br>6/30/19<br>9/30/19<br>12/31/19<br>3/31/20<br>6/30/20<br>9/30/20 | $8.68/pcs<br>$9.74/pcs<br>$9.59/pcs<br>$9.49/pcs<br>$9.37/pcs<br>$9.3051/pcs<br>$9.3974/pcs<br>$9.2749/pcs<br>$9.2437/pcs |



CAMACO Portage Manufacturing, LLC
6515 Ameriplex Dr. Suite B
Portage, IN 46368
Tel (248) 442-6800

# BLANKET PURCHASE
# ORDER CPM000126

| Items | | | | | | |
|---|---|---|---|---|---|---|
| Line Item | Part | Supplier Part No | Description | Account | Effective Date | Unit Price |
|  |  |  |  |  | 12/31/20 | $9.6351/pcs |
|  |  |  |  |  | 3/31/21 | $10.2839/pcs |
|  |  |  |  |  | 6/30/21 | $10.8213/pcs |
|  |  |  |  |  | 9/30/21 | $11.3912/pcs |
|  |  |  |  |  | 12/31/21 | $11.292/pcs |
|  |  |  |  |  | 3/31/22 | $10.3494/pcs |
|  |  |  |  |  | 7/1/22 | $10.6105/pcs |
|  |  |  |  |  | 10/1/22 | $9.8151/pcs |
|  |  |  |  |  | 1/1/23 | $9.5833/pcs |
|  |  |  |  |  | 4/1/23 | $9.7989/pcs |
| 4 | CAM-0000-0464 |  | ASM TRACK FAURECIA_L315_U625 OB LH CAM-0000-0567-DWG-04 EAU 381,850 | 4231-000-000 | 12/31/16 | $8.68/pcs |
|  |  |  |  |  | 12/31/18 | $9.74/pcs |
|  |  |  |  |  | 3/31/19 | $9.59/pcs |
|  |  |  |  |  | 6/30/19 | $9.49/pcs |
|  |  |  |  |  | 9/30/19 | $9.37/pcs |
|  |  |  |  |  | 12/31/19 | $9.3051/pcs |
|  |  |  |  |  | 3/31/20 | $9.3974/pcs |
|  |  |  |  |  | 6/30/20 | $9.2749/pcs |
|  |  |  |  |  | 9/30/20 | $9.2437/pcs |
|  |  |  |  |  | 12/31/20 | $9.6351/pcs |
|  |  |  |  |  | 3/31/21 | $10.2839/pcs |
|  |  |  |  |  | 6/30/21 | $10.8213/pcs |
|  |  |  |  |  | 9/30/21 | $11.3912/pcs |
|  |  |  |  |  | 12/31/21 | $11.292/pcs |
|  |  |  |  |  | 3/31/22 | $10.3494/pcs |
|  |  |  |  |  | 7/1/22 | $10.6105/pcs |
|  |  |  |  |  | 10/1/22 | $9.8151/pcs |
|  |  |  |  |  | 1/1/23 | $9.5833/pcs |
|  |  |  |  |  | 4/1/23 | $9.7989/pcs |
| 5 | CAM-0000-1128 |  | ASM TRACK FAURECIA L315 U625 RH IB CAM-0000-0567-DWG-04 EAU 381,850 | 4231-000-000 | 12/31/16 | $8.68/pcs |
|  |  |  |  |  | 12/31/18 | $9.74/pcs |
|  |  |  |  |  | 3/31/19 | $9.59/pcs |
|  |  |  |  |  | 6/30/19 | $9.49/pcs |
|  |  |  |  |  | 9/30/19 | $9.37/pcs |
|  |  |  |  |  | 12/31/19 | $9.3051/pcs |
|  |  |  |  |  | 3/31/20 | $9.3974/pcs |
|  |  |  |  |  | 6/30/20 | $9.2749/pcs |
|  |  |  |  |  | 9/30/20 | $9.2437/pcs |
|  |  |  |  |  | 12/31/20 | $9.6351/pcs |
|  |  |  |  |  | 3/31/21 | $10.2839/pcs |
|  |  |  |  |  | 6/30/21 | $10.8213/pcs |
|  |  |  |  |  | 9/30/21 | $11.3912/pcs |
|  |  |  |  |  | 12/31/21 | $11.292/pcs |
|  |  |  |  |  | 3/31/22 | $10.3494/pcs |
|  |  |  |  |  | 7/1/22 | $10.6105/pcs |
|  |  |  |  |  | 10/1/22 | $9.8151/pcs |
|  |  |  |  |  | 1/1/23 | $9.5833/pcs |
|  |  |  |  |  | 4/1/23 | $9.7989/pcs |
| 6 | CAM-0000-1129 |  | ASM TRACK FAURECIA_L315_U625 IB LH CAM-0000-0567-DWG-04 EAU 381,850 | 4231-000-000 | 12/31/16 | $8.68/pcs |
|  |  |  |  |  | 12/31/18 | $9.74/pcs |
|  |  |  |  |  | 3/31/19 | $9.59/pcs |
|  |  |  |  |  | 6/30/19 | $9.49/pcs |
|  |  |  |  |  | 9/30/19 | $9.37/pcs |
|  |  |  |  |  | 12/31/19 | $9.3051/pcs |
|  |  |  |  |  | 3/31/20 | $9.3974/pcs |
|  |  |  |  |  | 6/30/20 | $9.2749/pcs |
|  |  |  |  |  | 9/30/20 | $9.2437/pcs |
|  |  |  |  |  | 12/31/20 | $9.6351/pcs |
|  |  |  |  |  | 3/31/21 | $10.2839/pcs |
|  |  |  |  |  | 6/30/21 | $10.8213/pcs |
|  |  |  |  |  | 9/30/21 | $11.3912/pcs |
|  |  |  |  |  | 12/31/21 | $11.292/pcs |
|  |  |  |  |  | 3/31/22 | $10.3494/pcs |

Case 2:23-cv-10763-GAD-KGA   ECF No. 11, PageID.306   Filed 04/26/23   Page 101 of 102



CAMACO Portage Manufacturing, LLC
6515 Ameriplex Dr. Suite B
Portage, IN 46368
Tel (248) 442-6800

# BLANKET PURCHASE ORDER CPM000126

| Items | | | | | | |
|---|---|---|---|---|---|---|
| Line Item | Part | Supplier Part No | Description | Account | Effective Date | Unit Price |
| | | | | | 7/1/22 | $10.6105/pcs |
| | | | | | 10/1/22 | $9.8151/pcs |
| | | | | | 1/1/23 | $9.5833/pcs |
| | | | | | 4/1/23 | $9.7989/pcs |
| **Notes** | | | | | | |



CAMACO Portage Manufacturing, LLC
6515 Ameriplex Dr. Suite B
Portage, IN 46368
Tel (248) 442-6800

# BLANKET PURCHASE ORDER CPM000126

| Notes |
|---|

Please invoice to:

Camaco Portage Manufacturing
6515 Ameriplex Dr. Suite B
Portage, IN 46368

A/P Contact: Kizzie Wade

AP-Portage@camacollc.com


*Please ship parts based only on releases by the Camaco Portage plant.*


Camaco-Amvian's Supplier Requirements Manual Terms and Conditions shall apply to this order.

Camaco-Amvian's PO Terms & Conditions shall apply to this order.

These documents are available on our website at: www.camacollc.com > Suppliers